# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 22-390 |
| MUHAMAD ALY RIFAI | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and Joan E. Burnes, Assistant United States Attorney for the District, respectfully submits this trial memorandum to outline the government's case and assist the Court in the trial of this matter.

On November 8, 2022, a federal grand jury sitting in the Eastern District of Pennsylvania returned an indictment charging defendant Muhamad Aly Rifai with four counts of healthcare fraud in violation of 18 U.S.C. § 1347. The indictment charges that the defendant Rifai executed a scheme to defraud Medicare from on or about January 1, 2015 through in or about October, 2022, by directing his staff to submit claims for higher levels of care and for services that were never provided to Medicare beneficiaries. For each of the four substantive counts, the indictment charges causing the submission of claims for 30 minutes of psychotherapy services (CPT code 90833) when the provider (a Rifai employee) performed only a 15 minute medication check. Trial is scheduled to commence on February 26, 2024.

## I. SUMMARY OF EVIDENCE

**Background**

The trial evidence will show that the Medicare Program ("Medicare") was a federal health care program providing benefits to persons who are at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

By becoming a participating provider in Medicare, enrolled providers such as Rifai agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. As part of the Medicare enrollment application, Rifai agreed that he would ensure every electronic entry can be readily associated and identified with the original source document. The provider was required to retain all original source documents and medical records pertaining to any such Medicare claim for six years from the date of its creation, or the date when it was last in effect, whichever is later. Health care providers were given, and provided with online access to, Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

Health care providers used a National Provider Identifier (NPI), a standard unique identification number for covered health care providers for financial transactions, including claims. In order to bill the Medicare program, providers used a five-digit number, known as a

Current Procedural Terminology (CPT) code, that identified the nature and complexity of the service provided. Medicare paid a specified amount for each CPT code billed.

Health care providers could only submit claims to Medicare for medically necessary services that they rendered. Medicare regulations required health care providers to maintain complete and accurate patient medical records to verify that the services were provided as described in the claim. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider. Codes relevant to this case include Psychotherapy 30 minutes (90833), chronic care management (99490), and interactive complexity (90785).

**The Scheme**

Defendant Muhamad Aly Rifai was a licensed psychiatrist who was the sole owner of Blue Mountain Psychiatry, LLC ("Blue Mountain Psychiatry"), a psychiatry practice with offices located in Easton, Palmerton, and Stroudsburg, Pennsylvania. In addition to his private practice, defendant Rifai was employed at Easton Hospital, and contracted with various nursing homes.

In or about November 2012, Blue Mountain Psychiatry applied to participate as a provider in the Medicare Program. Defendant Rifai signed Blue Mountain Psychiatry's application to enroll as a Medicare provider. Defendant Rifai was the only Delegated Official identified in the application, and he was the primary signatory on Blue Mountain Psychiatry's bank accounts into which Medicare reimbursements were paid by electronic deposit.

Defendant Rifai was the primary provider of psychiatric services at his practice, Blue Mountain Psychiatry. From on or about January 1, 2015, through on or about October 17, 2022, the total claims submitted by Blue Mountain Psychiatry to Medicare Part B was at least approximately $15 million, for which Medicare paid the practice at least approximately $4

3

million. Over 75% of all claims submitted to Medicare, or approximately $11.8 million of charges, were for services that defendant Rifai claimed that he had rendered.

Defendant Rifai employed and contracted with non- physician personnel, including certified registered nurse practitioners, to provide services, including geriatric psychiatry. The nurse practitioners saw patients independently, without Rifai. Depending on the schedule, the nurse practitioners saw patients either in person or by telehealth, at locations including Easton hospital, at one of the Blue Mountain offices (Easton, Palmerton, or Stroudsburg) or at a nursing home. Nurse practitioners did not code for their services—they submitted their notes to the Blue Mountain office. Despite not having seen the patient, defendant Rifai added handwritten notations or a pre-printed stamp to patient progress notes to support billing for psychological and add on services that were not provided by his staff.

Rifai also employed and contracted with administrative staff, including receptionists and billers, to submit claims to Medicare. These witness will testify that Rifai determined which CPT codes to bill to Medicare, even if Rifai had not seen the patient. Witnesses will identify Rifai's handwriting on billing sheets containing beneficiary names, dates of service, and CPT codes for Medicare beneficiaries to whom defendant Rifai had purportedly provided services in nursing homes, including, but not limited to:

a. duplicate claims for the same nursing home resident beneficiaries, on the same dates, at various locations; b. billing for patients who were deceased on or before the dates of service identified in the claims; and c. billing for impossible service days where, had defendant Rifai actually performed the services billed, he would have worked 24 hours or more. Defendant gave the billing sheets to his staff and directed them to submit claims to Medicare on his behalf.

4

The evidence will show that on or about August 29, 2017, Medicare's contractor, Safeguard Services, LLC (SGS), Northeastern Unified Program Integrity Contractor (NE UPIC), requested a random sample of medical records from Dr. Rifai.[1] The request was to substantiate Dr. Rifai's billings for 63 claims with 402 total service units, which represented 10 beneficiaries. The review found that medical records provided by Dr. Rifai did not contain documentation to support that all the services billed were rendered.

Agents from HHS-OIG executed search warrants at three Blue Mountain offices (Easton, Palmerton, and Stroudsburg) on or about June 18, 2019, seizing electronic and physical evidence. At the time of the search, Rifai was interviewed stating, among other information that he had not done telehealth for nursing homes for approximately two and a half years, a claim which is contradicted by data. He also falsely claimed that he never changed or added codes for another provider, unless he saw a patient with another provider, or if one of the other providers asked his advice on what code to bill. Finally, Rifai further falsely claimed he never directed upcoding or put additional codes on encounter sheets. Multiple former employees will testify that Rifai determined which CPT codes to bill, even when he had not seen the patient.

Between on or about January 1, 2015, and on or about October 17, 2022, the total amount Blue Mountain billed for three codes -- psychotherapy 30 minutes (90833), chronic care management (99490), and interactive complexity (90785) -- was almost $5 million, and the amount paid to Rifai's practice was over $1.2 million. The total fraud loss is estimated at over $1.36 million.

---

[1] CMS contracts with "UPICs" (Unified Program Integrity Contractors) which perform Medicare program integrity functions. Safeguard Services, LLC (SGS) is the program integrity contractor for the Northeastern jurisdiction that covers Pennsylvania.

For each of the charged substantive counts, the nurse practitioner who actually provided services will identify her patient progress note for that date which does not show 30 minutes of psychotherapy to the patient on that date, and testify that she did not provide 30 minutes of psychotherapy. Each provider will also identify Rifai's handwriting. Employees will identify the billing form in Rifai's writing, and the claims and payment data.

The healthcare fraud scheme is charged between on or about January 1, 2015, and on or about October 17, 2022. During the course of the scheme, on or about May 17, 2021, June 11, 2021, and August 9, 2021, Rifai issued prescriptions for controlled substances (Adderall, a schedule II stimulant) to an undercover Bethlehem Township Police Department Officer (Patient G.D.). These visits were recorded via audio and/or video. In October, 2023, Rifai produced the patient file of G.D., consisting of 52 pages of records, to DEA pursuant to a DEA administrative subpoena. The 52 pages of medical records produced by the defendant contain documents which patient G.D. did not sign (and were therefore forged with her signature) memorialize events that did not and/or could not have transpired. This evidence is the subject of the government's *Motion in Limine*, filed concurrently.

## II. WITNESSES

The government may call the following witnesses in its case-in-chief:

Special Agent Stephanie Yeager, HHS-OIG

Special Agent Andrew Timonere, DOT-OIG (former HHS-OIG)

Investigator Gretchen Kraemer, Bethlehem Township Police Department

Special Agent Edwardo Rosario, DHS-HSI [2]

---

[2] This witness is expected to testify regarding records summarizing Dr. Rifai's travel history. The government will propose a stipulation to defense.

Noreen Thomas, Safeguard Services, contractor for Center for Medicare and Medicaid Services

**Former Employees**

Candice Boyce

Eileen Teyim

Cynthia Reddy[3]

Leigh Keller

Shelly Anthony

Netoya Nevarez

Kenneth Fulton-Resig

Brenda Soloe

Katlyn Gregory

### III. LEGAL AND EVIDENTIARY MATTERS

While not exhaustive, the government highlights below anticipated legal and evidentiary issues that may arise at trial.

#### A. Exhibits and Summary Charts

The majority of the physical and documentary evidence in this case consists of documents that were provided to Medicare, claims data, medical records, documents stored on the defendant's computers and seized from his offices, travel records, and bank records. The United States intends to introduce into evidence summary charts based on this evidence, which will be disclosed to the defendant in advance of trial. Subjects of the summary charts in this case will include Medicare payments to Rifai; billings for CPT codes – namely 90833 (Psychotherapy

---

[3] Former employees Cynthia Reddy and Leigh Keller have filed a False Claims Act Complaint against Blue Mountain Psychiatry.

30 min), 90785 (Interactive complexity), and 99490 (Chronic care management); billing for duplicate claims for the same nursing home resident beneficiaries, on the same dates, at various locations; billing for patients were deceased on or before the dates of service identified in the claims; billing for dates when Rifai was out of the country; calendar summaries; and billing for impossible service days (where, had defendant Rifai actually performed the services billed, he would have worked 24 hours or more).

A binder with hard copies of the exhibits will be provided to the Court and the defense on the day of jury selection. The government also intends to display these exhibits electronically to the jury once admitted. Further, the government may introduce a timeline of the relevant activity in this case and a map of the Blue Mountain psychiatry offices. The government reserves the right to supplement this preliminary description of exhibits.

Under Federal Rule of Evidence 1006, summary charts are admissible if they are based upon evidence that is: (i) voluminous, (ii) admissible, and (iii) available to the opponent. *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990). Although much of the evidence underlying the government's summary charts will, in fact, be offered for admission, it is not necessary that all the evidence depicted in the charts be admitted as long as it is admissible. *See id.*; *United States v. Janati*, 374 F.3d 263, 272-73 (4th Cir. 2004) (evidence underlying Rule 1006 summary need not be admitted). Such decisions are committed to the sound discretion of the trial court, which in this context is very broad. *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011).

In addition to summaries of voluminous evidence, the government may also rely upon charts or summaries as educational devices. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts

or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." *Id*. A timeline of the relevant activity would help educate the jury.

B. **Summary Witnesses**

The government will use federal agents to testify as summary witnesses in connection with the presentation of much of the evidence described above. This testimony is properly admitted under Federal Rule of Evidence 1006 to describe the contents of voluminous prescriptions/records which cannot conveniently be examined in court. *United States v. Haidara*, 112 F.3d 511, 2007 WL 205378 *2 (4th Cir. 1997) (not published). Here, the evidence is voluminous by any definition, and individual examination in court would be inconvenient and time-consuming. Thus, summary testimony is both necessary and appropriate under Rule 1006.

Summary testimony is also appropriate under Rule 611(a) if the evidence would aid the jury in ascertaining the truth and would not be overly prejudicial to the defendant. *Id.* In this case, there is a large body of documents and other evidence within the purview and knowledge of the government agents. This includes, for example, Medicare data for particular CPT codes. Simply put, an agent may testify about and summarize that material. *United States v. Moore*, 997 F.2d 55, 57-59 (5th Cir. 1993).

C. **Use of Agents' Reports to Cross-Examine Witnesses**

The government has provided voluminous discovery, including numerous reports of witness interviews taken by government agents. To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. Under the Federal Rules of Evidence, however, those reports may

not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

As a matter of evidence, the burden "of proving that notes reflect the witness' own words rather than the note-taker's characterization falls on the party seeking to introduce the notes." *Id.* Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness' statement. *Id.* at 30. In the absence of such proof, cross-examination from such reports or notes should be carefully scrutinized so that a statement that is otherwise inadmissible is not improperly read into the record. *See United States v. Shoenborn*, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993).

### D. Defense Use of Defendant's Statement

The government may present Rifai's statements to law enforcement as admissions of a party opponent under Fed. R. Evid. 801(d)(2). Such evidence, when introduced by the government against the opposing party, is by definition not hearsay. Fed. R. Evid. 801(d). Accordingly, documents written by a party may be admitted against the party who wrote them, *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000), and confessions may be admitted against the party who gave them. *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

These statements may not be admitted by the party who made the statements because Rule 801(d)(2) does not allow a party "to introduce his or her *own* statements through the testimony of other witnesses." *Id*. (emphasis in original). These statements would be offered by the defendant for their truth, Fed. R. Evid. 801(c), and would impermissibly enable the defendant to introduce his self-serving hearsay statements through the government's witnesses without

subjecting the defendant to cross-examination. *United States v. Kapp,* 781 F.2d 1008, 1014 (3d Cir. 1986) (ruling that tape recording of a conversation between a codefendant and a government informant that the defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)). Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *McDaniel*, 398 F.3d at 545; *see also United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985) (Rule 801(d)(2)(A) simply requires that an admission at issue be contrary to a party's position at trial, and that the requirement that an admission be offered against a party is designed to exclude the introduction of self-serving statements by the party making them); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (a party's statement, if offered against him, is not hearsay under Rule 801(d)(2)(A) but is hearsay and not admissible if offered by the party himself).

### E. Reference to Punishments for Charged Offenses

The punishment for the offenses charged is not a proper matter for the jury's consideration. *See Shannon v. United States*, 512 U.S. 573 (1994); *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993); *United States v. Austin*, 533 F.2d 879, 885-86 & n.14 (3d Cir. 1976); *see generally* 1 L. Sand, J. Siffert, W. Loughlin, and S. Reiss, *Modern Federal Jury Instructions -- Criminal* ¶ 9.01 (1993). As the court observed in *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980): "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial." Questioning and argument addressing these issues, thus, would be improper. Evidence should be excluded where it is irrelevant to the issue being tried or where it will "induce the jury to decide the case on an

improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986) (citation omitted). Accordingly, all references by defense counsel or witnesses to punishment for the offenses charged should not be permitted.

### F. **Character Witnesses**

Rule 405(a) allows only two methods of proving character: reputation and opinion. Reputation evidence is from a person who knows the defendant's reputation in the community. It is not the witness's own opinion, but his or her understanding of what the community thinks of the defendant. Opinion evidence is the witness's own opinion about the defendant's character, which can come from a number of sources. Fed. R. Evid. 405(a).

A witness called to testify regarding a person's character may not testify about specific instances of good conduct on direct examination—including their own "satisfaction" with the defendant's services. *Id*. According to the Rule, however, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." *Id*. Questions about specific instances of conduct, which would otherwise be impermissible, are allowed on cross-examination of a character witness for the purpose of testing the character witness's knowledge of the defendant's reputation in the community, or the witness's opinion of the defendant.

The cross-examination permitted by Rule 405(a) includes prior bad conduct by the defendant. As the Supreme Court noted in *Michelson*: "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson v. United States*, 335 U.S. 469, 479 (1948) (cross-examination of character witness regarding year 20-year-old conviction for violating the trademark laws and 27-year-old arrest for receiving stolen goods permissible); *see United States v. Evans*, 569 F.2d 209, 210 (4th Cir.

1978) (trial court did not abuse its discretion by allowing the prosecutor ask character witnesses whether they knew of the defendant's prior convictions for larceny, assault with a deadly weapon, and receiving stolen goods, and of his arrests for assault on a female, failure to stop for a police vehicle, and driving 110 miles per hour in a 55 miles per hour zone); *Government of Virgin Islands v. Roldan*, 612 F.2d 775 (3d Cir. 1979) (asking whether witness knew defendant had been convicted of murder permitted); *United States v. Lundy*, 416 F. Supp. 2d 325, 337 (E.D. Pa. 2005) (inquiry into charges which were dismissed or conduct for which a defendant was acquitted is proper).

Under Rule 405(a), the government may inquire into relevant specific instances of conduct to show the jury that the direct testimony about the defendant's good character paints an incomplete picture. By pointing to instances of a defendant's misconduct, the government can discredit the defendant's character witnesses by showing that they are too biased or too uninformed to portray the defendant accurately. Therefore, on cross-examination, courts have regularly permitted the prosecutor to ask the defendant's character witnesses if he has heard about, or if his opinion would be affected by, certain past instances of the defendant's misconduct, as long as the prosecutor has a good faith basis for his information. *See United States v. Glass*, 709 F.2d 669, 673 (11th Cir. 1983). Cross-examination of a reputation witness can include questions "about conduct, and even about charges, which may have come to the attention of the relevant community." *United States v. Curtis*, 644 F.2d 263, 268 (3d Cir. 1981).

The Court may limit the number of character witnesses, which is a common practice and has been held to be within the trial court's discretion. *United States v. Gray*, 105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to two character witnesses and noting that "[t]his court has repeatedly allowed a maximum of three character witnesses");

13

*United States v. Johnson*, 730 F.2d 683, 688 (11th Cir. 1984) (affirming district court's decision to limit number of character witnesses to three); *United States v. Koessel*, 706 F.2d 271, 275 (8th Cir. 1983) (affirming district court's limit of three character witnesses); *United States v. Henry*, 560 F.2d 963, 965 (9th Cir. 1977) (district court did not abuse its discretion in limiting a defendant to two character witnesses).

### G. Evidence of Specific Facts to Demonstrate Character

As noted above, under Rule 405(a), evidence concerning any specific acts the defendants may have performed, no matter how laudable, is not admissible. This is true even if the witness is not designated as a character witness. A defendant is not permitted to introduce evidence of his or her own good behavior on other occasions to demonstrate a lack of criminal intent during the commission of the charged crime. *See e.g.*, *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) ("evidence that Siegel engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades").

Therefore, the defendants should be precluded from attempting to present evidence of any specific acts for which they may have been commended, because evidence of good conduct is not relevant to negate criminal intent, and is merely an improper attempt to portray a defendant as a person of good character through the introduction of prior "good acts." *See United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (evidence of defendant's allegedly legitimate business activities was inadmissible in his mail fraud prosecution because it did not bear on his intent to defraud with respect to the act in question); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."). Testimony by others about the defendants' good works is, in essence, improper

character testimony concerning specific instances of purportedly good conduct and should not admitted.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s Joan E. Burnes*
JOAN E. BURNES
Assistant United States Attorney

## CERTIFICATE OF SERVICE

      I certify that I caused a copy of the Government's Trial Memorandum to be served by ECF on:

                        Paul J. Hetznecker, Esquire
                           phetznecker@aol.com

                                      /s_Joan E. Burnes_____
                                      JOAN E. BURNES
                                      Assistant United States Attorney

Dated: February 12, 2024