**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**THE UNITED STATES OF AMERICA**

**5:22-cr-00390-JLS**

**v.**

**MUHAMAD ALY RIFAI**

# PRO SE MOTION FOR EXPUNGEMENT OF ARREST AND COURT RECORD

This *pro se* motion and accompanying memorandum respectfully submitted by Defendant Muhamad Aly Rifai (Dr. Rifai) requests this Honorable Court grant a motion to expunge from the official record, all references to the arrest pursuant to this criminal prosecution, the institution of criminal proceedings against Dr. Rifai, and the results thereof. With the effect of the order, Muhamad Aly Rifai, prays he be restored to the status he occupied before such arrest or institution of criminal proceedings resulting from this prosecution through the Honorable Court's equitable power and ancillary jurisdiction[1].

In this motion, Dr. Rifai relies on the precedential Third Circuit Court of Appeals opinion US v. Rowlands at 8 "our precedent clearly establishes that we have jurisdiction over petitions for expungement **only when the validity of the underlying criminal proceeding is challenged**" (emphasis added)[2]. Dr. Rifai submits that this prosecution suffered from profound Federal constitutional infirmities and due process violations rendering it invalid and illegal.

The claim of profound constitutional ailments in this prosecution is consistent with Dr. Rifai battling the United States Department of Justice in a parallel civil proceeding, protesting

[1] US v. Dunegan, 251 F.3d 477 (3d Cir. 2001)

[2] US v. Rowlands, 451 F.3d 173 (3d Cir. 2006)

the use of an administrative subpoena to obtain evidence to be used in this prosecution; an action initiated by the same government agents and prosecutors who initiated this invalid prosecution[3].

In US v. Rowlands at 6, the Third Circuit citing its sister Tenth Circuit in US v. Friesen, stated that only "unusually compelling circumstances . . . justify the exercise of the trial court's 'narrow' power to order expunction."[4]. The Third Circuit further affirms this in Rowlands at 6, quoting its sister Eighth Circuit in US v. Mains "It is established that the federal courts have inherent power to expunge criminal records when necessary to preserve basic legal rights. **The power is a narrow one, usually exercised in cases of illegal prosecution or acquittals and is not to be routinely used**." (emphasis added)[5].

## REQUEST FOR RELIEF

Dr. Rifai submits a prayer for relief to this Honorable Court to declare the following:

A. The entire Government investigation and prosecution violated his rights under the 4th Amendment, 5th Amendment, and 14th amendment of the Constitution, and that the exclusionary rule applied in this context renders this prosecution illegal and invalid.

B. The entire Government investigation and prosecution violated Due Process under 5th Amendment, and 14th amendment codified in 42 CFR § 405.904(a)(2)) as well as other regulations of the Department of Justice and the Department of Health and Human Services.

C. These violations are so severe and pervasive, rendering this prosecution illegal and not valid. Expungement is the only remedy for these constitutional and statutory violations.

---

[3] Muhamad Aly Rifai, M.D. v. Merrick Garland, 5:24-cv-01242-JLS

[4] U.S. v. Friesen, 853 F.2d 816 (10th Cir. 1988)

[5] US v. Mains, 540 F.2d 287, 389-90 (8th Cir. 1978).

D. Dr. Rifai further moves this Honorable Court for an order expunging the records of arrest and for an order directing all law enforcement agencies, including the United States Attorney, the Justice Department, and Federal investigative agencies to remove from their files all notations or references to the arrest and prosecution in this proceeding.

E. Dr. Rifai further asks this Honorable Court for an order expunging the records of this prosecution and all references to this investigation from all Federal and State Health agencies, including the United States Department of Health and Human Services, and federal and State Health and licensing agencies to remove from their files all notations or references to the investigation and prosecution in this proceeding.

F. Dr. Rifai further moves for this Honorable Court to declare that with the order of expungement entered Muhamad Aly Rifai shall not be held thereafter under any provision of law to be guilty of perjury, false swearing, or making a false statement by reason of his failure to recite or acknowledge such arrests or institution of criminal proceedings, or the results thereof, in response to an inquiry made of him for any purpose.

G. Dr. Rifai also request this Honorable Court grant further relief including attorney fees and litigation costs in accordance with 18 U.S.C. § 3006A app as it may deem just and proper.

Respectfully Submitted,

M. Aly Rifai

Muhamad Aly Rifai, MD
Defendant
Blue Mountain Psychiatry
241 North 13th Street Easton, PA 18042
Phone 610-253-2500
Email: Dr.Rifai@BluePsychiatry.org

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE UNITED STATES OF AMERICA

5:22-cr-00390-JLS

v.

MUHAMAD ALY RIFAI

**PRO SE MEMORANDUM IN SUPPORT OF MOTION FOR EXPUNGEMENT OF ARREST AND COURT RECORD**

Defendant Dr. Rifai submits to this Honorable Court and contends that the entire Government investigation and prosecution violated:

1. Dr. Rifai's rights under the Constitution of United States to include the 4th, 5th, and 14th amendments, and as such under the exclusionary rule applied in this context, renders this prosecution illegal and invalid;
2. Government Statutes 42 CFR § 405.904(a)(2))[1], as well as numerous regulations of the Department of Justice and the Department of Health and Human Services;
3. The Constitution of the Commonwealth of Pennsylvania, Const. art. I, §1[2].

These violations are so severe and pervasive, rendering this prosecution illegal and not valid, and granting expungement is the only remedy for these constitutional and statutory violations.

In support of this motion, the Defendant states the following:

---

[1] 42 CFR § 405.904(a)(2)), Medicare initial determinations, redeterminations and appeals: General description.

[2] Constitution of the Commonwealth of Pennsylvania, Const. art. I, §1, "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

## BACKGROUND

### 1. Case History

Dr. Rifai is currently a licensed physician in the Commonwealth of Pennsylvania, board certified in Internal Medicine, Psychiatry, Psychosomatic Medicine, and Addiction Medicine. Prior to November 8, 2022, the initiation of this criminal prosecution, Dr. Rifai had not experienced any legal or disciplinary issues during more than 25 years of medical practice. The criminal record created by these proceedings has severely affected the activities of Dr. Rifai and his business, Blue Mountain Psychiatry, resulting in the loss of many contracts and business opportunities.

On June 19, 2019, the United States Attorneys Office for the Eastern District of Pennsylvania, through agents of the Office of the Inspector General for the Department of Health and Human Services (OIG-HHS), executed a search warrant seeking evidence from Dr. Rifai and Blue Mountain Psychiatry at 3 separate locations in Easton, Stroudsburg, and Palmerton, Pennsylvania. (Exhibit 1,2: Search Warrants 1,2 for 3 locations).

On December 13, 2021, the United States Attorney's Office for the Eastern District of Pennsylvania and agents from OIG-HHS and the Drug Enforcement Administration (DEA) conducted another search on Dr. Rifai's office in Easton, Pennsylvania (Exhibit 3: Search Warrant 3 for one location). On that same day, Dr. Rifai received a letter from the United States Attorneys Office for the Eastern District of Pennsylvania informing him that he is the target of a criminal investigation (Exhibit 4: Target Letter).

On February 15, 2022, Grand Jury proceedings began against Dr. Rifai. On November 8, 2022, the Grand Jury returned an indictment on four counts of Healthcare Fraud 18 USC § 1347 (ECF No. 1). On September 26, 2023, the DEA requested records from Dr. Rifai through an

administrative subpoena. The government then submitted a motion *in limine* to include additional evidence (ECF No. 37). On March 22, 2024, Dr. Rifai files Rifai v Garland, pending before this Honorable Court. On April 29, 2024, the jury trial against Dr. Rifai begins.

On May 9, 2024, a jury found Dr. Rifai NOT GUILTY of all charges (ECF No. 70, 85). Despite a NOT GUILTY verdict, defendant Dr. Rifai continues experiencing adversity related to the criminal proceedings and the arrest record precluding a psychiatrist from tending to the psychiatric needs of Rural Eastern Pennsylvania patients.

**2. Post-Trial Impacts**

Despite the Government's prosecution, Dr. Rifai continues to practice in this District, as there are limited psychiatric services in the rural Eastern District of Pennsylvania. Dr. Rifai's ability to provide medical and psychiatric services to the community has been severely limited by the consequences of this criminal prosecution, as only a small number of physicians practice in the area (ECF No. 86)[3].

**ARGUMENT**

**Interest of Justice, Constitutional Violations**

Defendant Rifai submits to this Honorable Court that this criminal prosecution is illegal and invalid *ab initio* due to overwhelming constitutional and statutory violations.

---

3 Morning Call, *Shrinking pool of psychiatrists means long wait for those in need,* Staff Report (March 18, 2017), https://www.mcall.com/2017/03/18/shrinking-pool-of-psychiatrists-means-long-wait-for-those-in-need/

WFMZ, *People experiencing mental health issues face hurdles in seeking help,* Jamie Stover (January 20, 2020), https://www.wfmz.com/news/area/lehighvalley/people-experiencing-mental-health-issues-face-hurdles-in-seeking-help/article_77d17432-2e73-11ea-899c-1f6c85fa3814.html

WFMZ, *Telemedicine helps people both stay home and see a doctor when feeling sick,* Jamie Stover (March 18, 2020), https://www.wfmz.com/health/coronavirus/telemedicine-helps-people-both-stay-home-and-see-a-doctor-when-feeling-sick/article_e4d846fc-6959-11ea-8404-3381181faa18.html

**The Fourth Amendment Violations.**

The Fourth Amendment of the US Constitution states, "…the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Third Circuit in its Precedential ruling in US v. Alexander indicated that, at 1 "The purpose of the exclusionary rule is to deter police misconduct that violates the Fourth Amendment."[4]. In Herring v United States, the Supreme Court clarified * c "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[5].

During this prosecution, the Government, through its agents, executed multiple searches and seizures on Dr. Rifai's practices during June 2019 and December 2021. It also obtained records through an Administrative Subpoena to be used in this prosecution; a matter currently being litigated in front of this Honorable Court through Rifai v Garland[3]. In relying on US v. Alexander, to challenge the constitutionality of this prosecution and exclude the Government's ill-gotten gains from these illegal searches, we must examine the search warrant affidavits, The Third Circuit clarifies at 17 states, "Rather, we must consider the propriety of the probable cause finding made by the magistrate judge who issued the warrant."[4]. The Third Circuit further provides a roadmap for this examination, "We answer that question by looking at the information submitted to the magistrate judge in Officer …'s affidavit."[4]. The Third Circuit affirms in Dempsey v. Bucknell University at 20 "we now clarify that when a court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless

---

4 United States v. Alexander, 985 F.3d 291 (3d Cir. 2021)

5 Herring v. United States, 555 U.S. 135 (2009)

disregard for the truth, **it must perform a word-by-word reconstruction of the affidavit**" (emphasis added)[6].

**The June 2019 Probable Cause Affidavit**

In June 2019, OIG-HHS agents Stephanie Yeager and Andrew J. Timonere, supervised by Assistant US Attorney (AUSA) Joan E. Burnes, collectively, "the Government", submitted three applications for search warrants of Blue Mountain Psychiatry location(s) and Dr. Rifai, alleging violations of 18 USC §1347 and 18 USC §1035 (Exhibit 1, 2)[7,8].

The nearly identical search warrant applications relied on introductory informational attestation and several sections to establish probable cause. Both Agents Yeager and Timonere acted as affiants to these search warrants and attested under oath[9],

> *I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare program.*

Agents Yeager and Timonere, after introducing themselves and the Medicare Program, supplied the presiding Magistrate with information about the Current Procedural Terminology (CPT) text published and updated yearly by the American Medical Association (AMA). CPT guides both the Center for Medicare Services (Medicare) and practitioners on the rules for coding and documenting their medical services. In this prosecution, the Government incorrectly alleged

---

[6] Dempsey v. Bucknell Univ., 834 F.3d 457 (3d Cir. 2016)

[7] Affiants. Yeager and Timonere, US District Court, Eastern District of Pennsylvania, June 2019

[8] The Yeager version of the affidavit heading reads, "Requesting AUSA J Burnes"

[9] These statements were made despite Agent Yeager having only four years of investigative experience and Agent Timonere still being in a probationary period; on the job for less than one year. The Supreme Court in Ornelas v. United States, 517 U. S. 690, 699–700 (1996) affirmed circumstance of probable cause challenges, "These circumstances frequently include a particular officer's knowledge and experience."

that the violation of these coding and documentation rules amounted to services not being provided, translating to charges of healthcare fraud under 18 USC §1347 (ECF No. 1).

The Government intentionally and recklessly presented false CPT coding information.

Both affidavits (Exhibit 1, 2) state on page 9 that "in order to bill the Medicare program providers use a five-digit number……. That identifies the nature and complexity of the service provided.". AMA updates the CPT text on a yearly basis, introducing new coding structures to describe the development of new payment structures of psychiatric services. The Government knowingly and intentionally omitted from the search warrant probable cause affidavit the specific calendar year (i.e., 2012, 2016) of the CPT manual they relied on. At trial, the Government presented select snippets of the 2016 version of the CPT marked as Government Exhibit 68 (Exhibit 5 original CPT 2016). This information is of critical importance and its absence renders the probable cause affidavit without any reliable time-context or foundational basis.

Prior to January 1, 2013, the AMA CPT book described a code for providing most psychiatric services called pharmacological management, also known as "Med Check" or "Medication Check"[10], and Code 90862 was described as "pharmacological management, including prescription, use, and review of medications with no more than minimal medical psychotherapy"[11] (Exhibit 6). On January 1, 2013, code 90862 known as "Med Check" or "Medication Check" was eliminated and abolished.

Even though this code was eliminated and abolished in 2013, the Government in its June 2019 affidavit, used the term "Med Check" and "Medication check" numerous times (at 39, at

---

[10] Centers for Medicare and Medicaid Services, *Coding and billing guidelines: Psychiatry and psychiatry services*, https://downloads.cms.gov/medicare-coverage-database/lcd_attachments/30489_31/L30489_PHYS014_CBG_060112.pdf

[11] AMERICAN MEDICAL ASSOCIATION, CPT 2012: CURRENT PROCEDURAL TERMINOLOGY (2011).

42, at 50). The use of this eliminated and abolished CPT code in the context of a probable cause affidavit to allege criminal activity is analogous in accusing a defendant with criminal violations based on an eliminated or abolished criminal Federal statute (i.e. it is invalid and illegal). The use of this terminology bewildered the witnesses and knowingly and intentionally supplied the presiding Magistrate with false information[12] (Exhibit 6: 2012 CPT Excerpt Page 324 Right Column). Furthermore, the Government failed to inform the Grand Jury about which CPT text version they used, and the indictment omitted this information (ECF No. 1).

The Government demonstrated intentional recklessness in presenting only portions of the psychiatry section of the CPT textbook.

On January 1, 2013, the AMA CPT 2013 book introduced a new coding structure to describe psychiatric services. The Government presented an excerpt of the CPT book, including pages 10-15 of the search warrant affidavit, still without informing the presiding magistrate which CPT version year they were presenting.

After Code 90862 was abolished and eliminated, it was replaced by a new coding structure. Psychiatric Services were segregated into two components: an evaluation and management component "E/M" (in Layperson's term, the medical treatment part and review and prescribing of medications) and a psychotherapy component (talk therapy; therapeutic communication). The CPT code referred to the psychotherapy component as "add-on psychotherapy.". The Government's core allegations were that psychotherapy services under code 90833 were not provided by Dr. Rifai and his staff (ECF No 1). These were add-on services, meaning that they were provided in addition to a medical service (E/M) utilizing CPT codes

[12] The Government persisted in using the term "Med Check" in many of its motions and its trial Memorandum (ECF No 36) but ceased when confronted at trial with their false assertions.

99308 and 90833 (99308+90833). The probable cause affidavit (Exhibit 1, 2) describes the structure and times required for these codes.

On page 10 of the affidavit at 24, the Government affirms, "A unit of time is attained when the mid-point has passed." In other words, CPT code 90833, described as a 30-minute service (Page 12), can be lawfully billed once 15 minutes have elapsed (Testimony of David Klein, ECF No. 82, page 80, Testimony of Noreen Thomas ECF No 71 Page 60).

Nonetheless, the Government intentionally and recklessly misinformed the presiding Magistrate by not including in the text critical information rendering this probable cause affidavit invalid. The 2016 CPT code text indicates that when codes 99308 and 90833 are combined (99308+90833), "The E/M code is complexity-based and not time based" (Exhibit 5 Page 584 Left Column No 2, Testimony of David Klein, ECF No. 82, page 77). The Government failed to include this text in their description of the CPT codes provided to the Judge. The services provided by Dr. Rifai as codes 99308+90833 could be billed after 15 minutes have passed (Testimony of David Klein, ECF No.82, page 77).

In Andrews v Scuilli the Third Circuit citing its sister Eighth Circuit, concludes, "Omissions are made with reckless disregard where "an officer withholds a fact in his ken that '[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know.'" Id. (quoting US v. Jacobs, 986 F.2d 1231, 1235 (8th Cir.1993))."[13]. In this probable cause affidavit that led to multiple search warrant and evidence to initiate a criminal indictment (ECF No. 1), the Government, having affirmed their familiarity with Medicare rules and CPT codes, should have known not to omit any information about CPT coding and complexity-based coding that should have been made available to the Judge. The Third Circuit reminds us in

[13] Andrews v. Scuilli 15-3393 (3rd Circuit 2016)

Dempsey v. Bucknell Univ at 469 "When an officer submits a sworn affidavit of probable cause, he or she 'is not free to disregard plainly exculpatory evidence'"[6].

It is without a doubt that a Magistrate would have wanted to hear from the Government that Dr. Rifai who billed the Medicare program for codes 99308+90833 was within the bounds of CPT rules and the Medicare program regulations, the Third Circuit in Wilson v. Russo supports the notion, at 783, that this is information that "any reasonable person would know that a judge would want to know."[14].

<u>The Government falsely and recklessly misrepresented the description of "Psychotherapy Notes"</u>

On page 12 of the affidavit (Exhibit 1, 2), the government agents quote 42 CFR § 164.501 "Psychotherapy notes means notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record. Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date."

The Government falsely editorialized and recklessly added an assertion (Page 12 at 26): "This class of information does not qualify as psychotherapy note material." The agents used this factually incorrect assertion to conclude that the records they cited on Pages 26 – 29 did not include psychotherapy notes and thus concluded falsely that no psychotherapy was provided.

[14] Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000)

The Government's assertion about "psychotherapy notes" being a requirement to prove psychotherapy is quite laughable and "obviously wrong"[15] considering that Medicare indicated on January 21, 2005 (Exhibit 8) that physicians (Like Dr. Rifai) are not required to provide psychotherapy notes[16]. In fact, the policy clearly states, "This policy instructs contractors not to request that a provider submit psychotherapy notes." The Policy further states, "Finally, it indicates that the provider is responsible for extracting the information needed to support that the claim is reasonable and necessary."[12]. Dr. Rifai was never asked to submit such information.

The Third Circuit clearly concluded in Andrews v Scuilli at 26 that "the combined effect of the omissions and misrepresentations suffices to call into question the reliability of the affiant." [13]. The Government provided the Judge presiding over the June 2019 search warrant affidavit with a foundation of falsehoods by intentionally and recklessly citing incorrect information about the CPT psychiatry coding rules and recklessly disregarded their obligation to provide a full text (to include date of publication) of the CPT code for consideration of the Judge.

In Sherwood v. Mulvihill, the Third Circuit clearly states, "Under Franks and its progeny, the plaintiff must prove, by a preponderance of the evidence, (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause. See Franks, 438 U.S. at 171-72; Frost, 999 F.2d at 742-43."[17].

---

[15] United States v. Reyes-Romero, 959 F.3d 80 (3d Cir. 2020)

[16] Centers for Medicare and Medicaid Services, *Publication 100-08 on Medicare Program Integrity (Transmittal 98)*, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R98PI.pdf

[17] Sherwood v Mulvihill 113 F.3d 396 (3d Cir. 1997)

Under Franks v Delaware, falsehoods are deemed material to the finding of probable cause if the affidavit, "with the . . . false material set to one side . . . is insufficient to establish probable cause." at 156[18].

We explore further into the 2019 Search warrant affidavit despite the probable cause assertions by the agents being in shambles thus far and collapsing under their wrongful weight (as happened at trial). Our purpose is to leave no doubt that the probable cause was completely absent from this June 2019 affidavit.

On Page 17 of the Affidavit (Exhibit 1, 2), the Government titled the section Probable cause for search and reference 4 sections, these four components relied upon to establish probable cause collapsed at trial under their own unlawful weight:

1. Audit results for Medicare's Northeastern Program Integrity Contractor (NE UPIC) Safeguard Services LLC;
2. Statements from two former Blue Mountain Psychiatry employees, Cynthia Reddy and Leigh Keller, both acted as realtors in a *qui tam* civil action [19];
3. Statements from Candice Reagan, Eileen Teyim, and Netoya Nevarez;
4. Alleged services provided by Dr. Rifai and Blue Mountain Psychiatry in an impossible day fashion (services billed worth more than 24 hours of work).

<u>The Government relied on dubious testimony and flawed written reports of witnesses with questionable motivation</u>

The Government relied heavily on the NE UPIC audit (initiated in 2017) summary, without any detailed or even minimal review of its results and supporting documentation, nor did

[18] Franks v. Delaware, 438 U.S. 154 (1978)

[19] Docketed at 17-5059-JLS, remains under seal eight years later before this Honorable Court.

the Government expert Noreen Thomas review it either (ECF No 71 at 38). The agents in the probable cause affidavit summarize the first page of the report concluding, "the review found that the medical records provided by Dr. Rifai did not contain documentation to support that all the service is billed and were rendered."

Despite professing significant expertise in the Medicare program (Exhibit 1,2), the Government failed to observe numerous references (5 presented at trial, but the total is 10 out of 14 records detailed in the NE UPIC report) to medical records that were neither requested nor received within the NE UPIC audit (ECF No. 78 at 54, Statement from Judge Schmehl in response to Noreen Thomas about missing medical record documentation as basis for Fraud allegations).

JUDGE SCHMEHL: Well, they can't be received if they're not requested

Noreen Thomas, RN, a nurse reviewer employee of NE UPIC contractor Safeguard Services LLC, concluded that her integrity does not allow her to support the findings of the Government's investigation(s), nor the UPIC audit results (ECF No. 78 at 62,63,64);

BY MR. HETZNECKER QUESTIONING NOREEN THOMAS RN:

**Q:** Do you know what the percentage is from 93 percent if you eliminate those five, what the percentage would be in terms of those claims denied?

**A:** Not off the top of my head, no. I would need to do the calculation.

**Q:** Me too. Ms. Thomas, this is a completely flawed report, is it not?

**A:** It's not accurate.

**Q:** So because it's not accurate, the data, that's, the basis for the conclusions, is not accurate, correct?

**A:** Correct.

**Q:** Therefore, the conclusions are not accurate, correct?

**A:** Correct.

**Q:** Therefore, the report is not accurate, correct?

**A:** Correct.

**Q:** And as you sit here now, would you have endorsed this report, knowing these flaws in the report, before testifying today?

**A:** I would not want to put my name behind something that was flawed like that.

**Q:** I understood. Because you have integrity about the work you do, correct?

**A:** Yes.

**Q:** And this work doesn't match your standard of integrity does it?

**A:** No.

**Q:** And this report would never go out, correct?

**A:** Correct.

**Q:** And it wouldn't be part of any further investigation done by the Federal Government or done by CMS, because it would never have gone out, correct?

**A:** Correct.

**Q:** And certainly didn't go to Dr. Rifai or Blue Mount Psychiatry, did it?

**A:** It did not.

The absence of record documentation for service dates that were neither requested nor sent to NE UPIC by Dr. Rifai was construed by the Government as an indication of Fraud. The affidavit summarizes the report "of these 225 services Units 204 service units (91%) were denied due to insufficient documentation to support the requirement for the psychotherapy code when performed with an E/M service code."

It would have been helpful to the presiding Judge to hear from the Government that SafeGuard Services LLC is a private corporation; specifically, a Medicare contractor with a financial interest in a positive audit result falsely claiming that Dr. Rifai's services were fraudulent. By increasing the recovery of funds paid to Medicare providers (Through flawed reports similar to the one here), Safeguard Services LLC ensures its continued contract with

Medicare and thus has an incentive to "fudge" the audit results, as happened in this case. It is important to note that Safeguard Services LLC's Medicare contracts increased 5-fold between 2017 to 2022 [20], information that the Judge should have been told about.

The Government further acknowledged that Cynthia Reddy and Leigh Keller "have a financial interest in the outcome of an investigation of Dr. Rifai and Blue Mountain Psychiatry" (Exhibit 1, 2, page 19 at 37), at trial. Both witnesses were impeached, having made many false self-serving statements (ECF No. 75, 76). The Third Circuit states in Wilson v. Russo at 790 "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the… officers …such that probable cause would not exist"[21].

Witness Candice Reagan gave the agents a statement claiming the "The vast majority of these billings are false," (Page 29 at 51) while the agents synopsized Eileen Teyim statement as, "these billings concern her because she definitely did not perform psychotherapy during every nursing home visit." The testimony of both Candice Reagan and Eileen Teyim at trial contradicted the statements mentioned in the search warrant affidavit (ECF No. 78, 79). The Judge was not informed that witnesses Candice Reagan and Eileen Teyim statements to describe their services such as "15-minute examination", "30-minute examination" were contradictory and incorrect. Furthermore, Eileen Teyim clarified "She concluded that here was no way she could have spent 30 minutes with each patient." According to the CPT code rules, once 15 minutes have elapsed the unit of time for the billed code has been attained.

Lastly, the Government presented the impossible day theory (Page 31 at 56) incorrectly claiming that Dr. Rifai, "would have seen 51 different patients on October 12, 2015, for visit

---

[20] SafeGuard LLC Services, https://www.sgsdetect.com/

[21] Wilson v Russo 212 F.3d 781 (3d Cir. 2000)

times that accumulated to 49 hours." Based on these findings, both agents in identical language, concluded Dr. Rifai and his company, Blue Mountain Psychiatry, "have committed and are committing violations of Title 18 United States Code Section 1347 health care fraud and title 18 United States Code §1035, false statements relating to health care matters." Even under minimal scrutiny and examination of the supporting medical record (an action not performed by the Government or its contractor), and after correcting the false information incorporated in the CPT foundational sections, the impossible day theory would have collapsed as confirmed by testimony from David Klein, as these days were found to be possible, practical days (Lasting 8-10 hours not the flawed imaginary 49 hours) rather than impossible (ECF No. 79 at pages 22-30).

The Government relied on four invalid probable cause components, despite lacking investigative experience, being new on the job, and not being equipped with requisite knowledge to make any of these attestations. As a result, the Government recklessly submitted false attestations to the Judge. These facts make clear that the search warrant application of June 2019 lacked probable cause and should therefore be null and void. The searches at the premises of Blue Mountain Psychiatry and Dr. Rifai's offices on June 19, 2019 violated the Fourth Amendment. The government's ill-gotten evidence and medical records should be excluded, foreclosing the entire basis for the indictment and this prosecution (ECF No 1).

**The December 2021 Probable Cause Affidavit**

In December 2021, the Government submitted an affidavit for a fourth search warrant on Blue Mountain Psychiatry offices in Easton, Pennsylvania (Exhibit 3). The Government lacked medical experience and expertise in controlled substances, and wrongfully alleged violations of the Controlled Substances Act. Agent Yeager prefaced her affidavit by falsely proclaiming that, "Dr. RIFAI expanded this scheme by having students in a physician assistant graduate program

who were unlicensed and uncredentialled conduct psychiatric follow up visits with patients of Blue Mountain." Agent Yeager wrongly attested that the clinical activities of Physician Assistant students and Blue Mountain Psychiatry were part of an illegal fraud scheme. This notion is "laughable" and analogous to someone claiming a law firm is committing fraud by mentoring law students (enrolled in Academic Law School programs) who may perform unpaid paralegal services, such as editing briefs, meeting clients and conducting case law research in return for mentorship and academic guidance. The lawyer (or a Judge, for that matter) will get academic affiliations and potentially free work in return for providing mentorship to students; training students enrolled in academic institutions is definitively not a fraud scheme.

Furthermore, Agent Yeager's attestation was largely dependent on the undercover activity of police officer Gretchen Kraemer, claiming that Dr. Rifai's assessment of the undercover officer was deficient. It was revealed at trial that a large portion of the clinical interview and assessment of undercover police officer Gretchen Kraemer was not recorded or that the recordings were lost/corrupted (ECF No. 71 at 70-75). Officer Kraemer was embroiled in civil litigation with her biological brother Thomas Kraemer, who filed a complaint against her before this Honorable Court. (15-1521 ECF 1 Exhibits1-12) revealing unredacted medical records about Officer Kraemer and her family suffering from Attention Deficit Hyperactivity Disorder (ADHD), the very same condition the Government used in their unfounded and false forgery allegation (ECF 80 at 62) against Dr. Rifai. The Government falsely claimed that Dr. Rifai fabricated a medical record confirming ADHD in undercover Officer Kraemer (ECF 80 at 63-65) while in real life she does have a personal and family history of ADHD[22]. Agent Yeager also claimed Dr. Rifai

[22] Kraemer v. Fontno, CIVIL ACTION NO. 15-1521 JLS (E.D. Pa. Jun. 10, 2015) ECF No 1 By Judge Schmehl "Gretchen Kraemer is identified as plaintiff's sister and a Northampton County Police Officer. However, it appears that she is being sued for her actions/inactions in her capacity as a private citizen rather than her conduct as a police officer."

prescribed more than 100,000 pills of the controlled substance Adderall and that this otherwise legal activity indicated diversion. However, she failed to disclose in both the affidavit and to the magistrate that more than 80% of those pills prescribed were for children and adolescents under the age of 18 who suffer from ADHD (Exhibit 3 returns), requiring medications to be functional at school (Exhibit 3, Page 10 at 25). Prescribing medications for ADHD to children and adolescents in school so they could function and complete their studies is not diversion

Due to Agent Yeager's limited training and experience, she purported an unsubstantiated and unfounded belief that Dr. Rifai violated 28 USC § 841 (a)(1) and distributed prescriptions for controlled substances for no legitimate medical reason, outside the normal course of professional practice. In providing the presiding Magistrate with false information in the search warrant, the December 13, 2021, search of Blue Mountain Psychiatry offices violated Dr. Rifai's Fourth Amendment rights and the search warrant should be null and void.

In considering the Government's affidavit(s) the case for probable cause for the 2019 and 2021 affidavits collapse under their own wicked and fabricated weight. The Third Circuit said it best in Andrews v. Scuilli at 26, "**At a trial, the jury will be able to consider the reconstructed affidavit as a whole to make the ultimate determination as to whether a neutral magistrate, weighing both the inculpatory and exculpatory information in the reconstructed affidavit, would have found probable cause when presented with a properly drawn affidavit**" (emphasis added)[13]. This Honorable Court has the answer to this question in this case! The intelligent jurors of the Eastern District of Pennsylvania, guided by this wise Honorable Court at trial, deeply understood and honored their Constitutional obligations and correctly and masterfully applied the exclusionary rule effectively, thus disbelieving the content and evidence of the affidavit(s), the jury found Dr. Rifai NOT GUILTY (ECF No. 70, 85).

**September 2023 Administrative Subpoena**

After conducting an extensive search on Blue Mountain Psychiatry offices on December 13, 2021, the Government proclaimed they were unable to locate the clinical file of undercover police officer Gretchen Kraemer (although all they had to do was to ask for the file).

In April 2023, Diversion Investigator (DI) Austin T. Lastoskie emailed Attorney Paul Hetznecker indicating defendant Dr. Rifai should surrender his DEA registration or show cause proceedings would initiate in September 2023. The DEA, by means of an Administrative Subpoena, requested the medical chart of patient "Gretchen Davis," undercover police officer, Gretchen Kraemer (Exhibit 7). The DEA returned two months later in November 2023 with an order to show cause for revocation of Dr. Rifai's DEA registration. The requested medical records through administrative subpoena were also delivered to AUSA Burnes in this criminal case as alleged evidence of fraud. This violates previous correspondence with Dr. Rifai's attorney, Ronald Chapman II (24-01242 ECF 17)[3], where DI Lastoskie stated the medical record request would only be used for administrative proceedings. At trial, Officer Kraemer admitted that the entirety of the encounter was not recorded, explaining why the medical record and audio and video recording of the visit do not match up (ECF No. 71 at 78).

The word "unreasonable" from the Fourth Amendment text is most axiomatic of this prosecution. The use of four search warrants and one administrative subpoena to illegally obtain records for this misguided criminal prosecution, was excessive, unreasonable, and in bad faith. The Government's conduct is a case study for systematic violations of the Fourth Amendment rights of Dr. Rifai under the Constitution. The only remedy Dr. Rifai implores, would be this Honorable Court wielding the exclusionary rule, declaring that this prosecution is invalid and illegal and entering an order of expungement.

**Fifth and Fourteenth Amendment Due Process Violations.**

The Fifth Amendment's Due Process Clause protects people from being deprived of life, liberty, or property without due process of law, requiring the government to follow certain rules and procedures, ensuring fairness before infringing upon one's freedom or property. The Fourteenth Amendment states, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Government violated Federal Regulations and the due process Rights of Dr. Rifai

Congress enshrined in the code of Federal Regulations 42 CFR § 405.904 Due Process to protect Medicare providers from Government overreach and granted Dr. Rifai appeal rights to the NE UPIC audit results. The Government instructed the Medicare contractor SafeGuard Services LLC not to disclose the audit results to Dr. Rifai or allow him due process in appealing the results prior to the flawed report being used as evidence of criminal behavioral in a search warrant affidavit (ECF No. 78 at 64). 42 CFR § 405.904 clearly outlines five levels of appeal and an ultimate Federal District Court appeal prior to the results of any report being accepted as valid for purposes of Medicare services payment denial.

> 42 CFR § 405.904 Claim appeals. The Medicare contractor makes an initial determination when a claim for Medicare benefits under Part A or Part B is submitted. A beneficiary who is dissatisfied with the initial determination may request that the contractor perform a redetermination of the claim if the requirements for obtaining a redetermination are met. Following the contractor's redetermination, the beneficiary may request, and the Qualified Independent Contractor (QIC) will perform, a reconsideration of the claim if the requirements for obtaining a reconsideration are met.
>
> Following the reconsideration, the beneficiary may request a hearing before an ALJ. If the beneficiary obtains a hearing before the ALJ and is dissatisfied with the decision of the ALJ, or if the beneficiary requests a hearing and no hearing is conducted, and the beneficiary is dissatisfied with the decision of an ALJ or attorney adjudicator, he or she may request the Council to review the case. If the Council reviews the case and issues a decision, and the beneficiary is dissatisfied with the

> decision, the beneficiary may file suit in Federal district court if the amount remaining in controversy and the other requirements for judicial review are met.

The Government violated Dr. Rifai's constitutional due process rights under the Fifth and Fourteenth amendments. The application of the exclusionary rule in this situation, to preclude the use of the results of the flawed NE UPIC audit results, would result in the finding of no probable cause for the 2019 affidavit. This exclusion would serve as a reminder to OIG-HHS to follow Federal law as passed by Congress and not infringe on due process rights of Medicare providers.

The Government deprived Dr. Rifai of the presumption of innocence

The United States Supreme Court in Coffin v. United States of America, 156 U.S. 432 (1895) stated that the presumption of innocence in criminal cases is "axiomatic and elementary." By depriving Dr. Rifai of the presumption of innocence until proven guilty, the Government damaged Dr. Rifai's reputation and violated Dr. Rifai's due process rights under the Fifth and the Fourteenth Amendments. Since 1790, the Pennsylvania Constitution, Const. art. I, §1, has placed reputation in the same class of protected rights as life, liberty, and property. Pennsylvania's constitutional protection of reputation also has impacts on the law of defamation. As the Supreme Court has stated:

> "Pennsylvania law closely guards the ability of a person whose reputation has been injured by defamatory statements to obtain redress for such injury" because the Constitution "places reputational interests on the highest plane, that is, on the same level as those pertaining to life, liberty, and property." Schanne, 121 A.3d at 946.

The original press release, about this prosecution (Exhibit 9) published on November 14, 2022, and its updated version released October 28, 2024, violates multiple sections of The United States Department of Justice Manual, to include sections 1-7.400, 1-7.500, 1-7.610, 1-7.310 and

1-7.710[23]. The press release omitted the disclaimer "the charge is merely an accusation, and the defendant is presumed innocent until proven guilty." Dr. Rifai's due process rights of the presumption of innocence was infringed upon by omitting this disclaimer. It is only Dr. Rifai, the Muslim defendant of Middle Eastern ancestry, who was deprived of the presumption of innocence while defendants in twenty ***prior*** press releases were afforded this right by including the presumption of innocence disclaimer[24]. Furthermore, in twenty additional press releases for dates ***after*** the press release of Dr. Rifai was published all defendants were afforded the presumption of innocence (Press releases at US Attorney's website https://www.justice.gov/usao-edpa/pr) [25]

The Government carries the full responsibility of all its announcements to the Media. Section 1-7.310 of the Justice Manual states, "Each of the 93 United States Attorneys will exercise discretion and sound judgment, consistent with this Policy, as to matters affecting their own district, …The United States Attorney has responsibility for all matters involving the local media." It is not a sound judgment to deprive Dr. Rifai of due process rights and the presumption of innocence. The Government exhibited "moral obliquity" and lacked discretion, demonstrating the prosecution was "vexatious and in bad faith"[15].

---

[23] The press release in its original and updated versions violated the following Sections of the Justice Manual:

Section 1-7.500, Disclosure of Information; "A news release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty". The original press release, published on November 14, 2022, and its updated version released October 28, 2024, do not contain that statement.

Section 1-7.610, "observation about a defendant or party Character" and "Opinions as to the Defendant's guilt".

Section1-7.310, "United States Attorney will exercise discretion and sound judgment with this policy." It is clear to any independent arbiter from the text of the original and updated release that no discretion or sound judgement was exercised in the drafting of the press release and its update.

Section 1-7.400, "DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations. Except as provided in subparagraph C of this section, DOJ personnel shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress before charges are publicly filed." The press release in its original and updated form creates an eternal investigation status of Muhamad Aly Rifai, MD and Blue Mountain Psychiatry.

[24] Press Release Dates 10/17/2022, 10/13/2022, 10/4/2022, 9/23/2022, 9/22/2022, 9/20/2022, 9/9/2022, 8/10/2022, 7/25/2022, 6/28/2022, 6/24/2022, 6/23/2022, 6/13/2022, 6/1/2022, 5/17/2022, 5/16/2022, 5/5/2022, 4/28/2022, 4/11/2022, 2/18/2022, 2/10/2022, 2/9/2022

[25] Press Release Dates 12/7/2022, 12/9/2022, 1/18/2023, 1/26/2023, 3/31/2023, 4/19/2023, 5/19/2023, 4/24/2023, 6/12/2023, 7/13/2023, 7/20/2023, 8/23/2023, 9/12/2023, 11/30/2023, 1/30/2024, 1/31/2024, 2/5/2024, 2/14/2024, 3/11/2024

The Government and the DEA continue to violate Dr. Rifai's due process rights

In May 2024, following the trial testimony of Officer Kraemer, in which she indicated repeatedly that she has "very little or no recollection of the 2021 encounter," it was revealed that significant segments of the video recordings of the encounter with Dr. Rifai were missing or lost (ECF No. 71 at 70-75). The DEA Administrative Law Judge Theresa A. Wallbaum decided in August 2024, after reviewing the testimony of Officer Kraemer (EFC No. 71), to terminate the entire show-cause proceedings without a hearing and to certify to the DEA Administrator that Dr. Rifai's DEA registration should be revoked [26]. This frivolous DEA administrative proceeding was manufactured by the Government and is a direct result of the invalid and illegal search warrant affidavit(s) and administrative subpoena that violated Dr. Rifai's constitutional right to due process. The frivolous DEA administrative proceeding and show cause hearing should be voided.

**THERE IS OVERWHELMING EVIDENCE TO WARRANT EXPUNGMENT**

The Third Circuit clearly articulated in US v. Noonan "The collective experience of our judiciary reflected by reported cases, however, discloses that expunction of criminal court records is an extraordinary remedy clearly, a federal court has the inherent power to expunge an arrest and conviction record."[27]. The Third Circuit affirms in Rowlands "Our conclusion here is that we have jurisdiction over petitions for expungement in narrow circumstances: where the validity of the underlying criminal proceeding is challenged."[2]. Defendant Dr. Rifai submits to this Honorable Court that there are compelling circumstances to exercise this power. There is a NOT GUILTY jury verdict coupled with overwhelming Constitutional violations that render this prosecution illegal and invalid. Dr. Rifai is asking this court to make a declaration that this

[26] Rifai v. Garland, 5:24-cv-01242-JLS (ECF No. 17)

[27] US v. Noonan, No. 90-3015 (3rd Cir. 1990)

prosecution was illegal and invalid for the purpose of expungement "The validity of the criminal proceeding is challenged.". The Court would apply the exclusionary rule to the Government's probable cause affidavit(s) declaring *post iudicum* these affidavits without probable cause. This would lead to the exclusion of the Government's ill-gotten gains from these searches in 2019 and 2021 which would doom this criminal prosecution making it invalid. Furthermore, the Third Circuit in Rowlands at 7 citing its sister DC Circuit in Menard v. Saxbe affirms, "Thus, for example, both this court and the District Court for the District of Columbia have ordered the expungement of records of police action taken in flagrant violation of the Fourth Amendment." [28] (Menard at III). In Rowlands at 7, the Third Circuit further cites the Eastern District of Wisconsin in United States v Bohr "Expunction has generally been ordered where the arrest was without probable cause." [29].

This Honorable Court can also rely on the due process violations of Defendant Dr. Rifai during this criminal prosecution to wield the exclusionary rule and appropriately declare that evidence presented in the probable cause affidavits(s) violated due process. Dr. Rifai had the due process right to protest, rebut, and declare invalid much of the evidence presented as criminal evidence in this prosecution.

The expungement would also send a message of deterrence to the Government so it would not seek searches and seizures based on defective affidavits without any probable cause. The Government would be sent a message of deterrence not to initiate frivolous prosecutions based on confirmation bias regarding a minority defendant (ECF No 80 at 38).

---

[28] Menard v. Saxbe, 498 1 F.2d 1017 (D.C. Cir. 1974)

[29] United States v Bohr 406 F. Supp. 1218 (E.D. Wisc. 1976)

The consequences of this invalid and illegal prosecution are real and devastating. Defendant Dr. Rifai suffered and continues to experience reputational, professional, and financial losses. The citizens of the Eastern District of Pennsylvania access to one of the very few private Psychiatry practices in the Lehigh Valley, was disrupted[3]. The Center for Disease Control and Prevention (CDC) reported a measurable increase in the rate of suicide attempts and completed suicides in Northampton County, Pennsylvania in 2023 and 2024 following this prosecution[30]. Pursuing this frivolous prosecution (Charges amounted to less than 180.00 $) cost the Government and this Honorable Court exorbitant unneeded expenditure. This prosecution also led to the further erosion of the public trust in the Department of Justice and other Federal Investigative Agencies, a problem already prevalent in these United States of America[31].

## RELIEF REQUESTED

For the reasons set forth above, Muhamad Aly Rifai respectfully requests that this Honorable Court grant relief by ordering expungement of this prosecution and declare:

A. The entire government investigation and prosecution violated his rights under the 4th, 5th, and 14th amendments, the exclusionary rule would render this prosecution invalid.

B. The entire government investigation and prosecution violated government Statutes 42 CFR § 405.904(a)(2)), and numerous regulations of the Department of Justice.

C. These violations are so severe and pervasive, rendering this prosecution illegal and not valid. Expungement is the only remedy for these constitutional and statutory violations.

---

2023, 2024 Center for Disease Control and Prevention (CDC) https://www.cdc.gov/suicide/facts/rates-by-state.html

[31] Forbes, *The Honorable Pam Bondi, Nominee, Attorney General: '72% of Americans have lost faith in the Department of Justice*, https://www.youtube.com/watch?v=mbnCIP4lX9o

D. Dr. Rifai further moves this court for an order expunging the records of arrest and directing all law enforcement agencies, including the United States Attorneys, the Justice Department, and Federal Investigative Agencies to remove from their files all notations or references to the arrest and prosecution in this proceeding.

E. Dr. Rifai further asks this Honorable Court for an order expunging the records of this prosecution and all references to this investigation from all Federal and State Health agencies, including the United States Department of Health and Human Services, and federal and State Health and licensing agencies to remove from their files all notations or references to the investigation and prosecution in this proceeding.

F. That with the order of expungement entered Muhamad Aly Rifai shall not be held thereafter under any provision of law to be guilty of perjury, false swearing, or making a false statement by reason of his failure to recite or acknowledge such arrests or institution of criminal proceedings, or the results thereof, in response to an inquiry made of him for any purpose

G. Dr. Rifai also request this Honorable Court grant further relief including attorney fees and litigation costs in accordance with 18 U.S.C. § 3006A app as it may deem just and proper.

Respectfully Submitted

M. Aly Rifai

Muhamad Aly Rifai, MD Defendant
Blue Mountain Psychiatry
241 North 13th Street Easton, PA 18042
Phone: 610-253-2500
Email Dr.Rifai@BluePsychiatry.org

**PROOF OF SERVICE**

I hereby certify that on February 8, 2025, I served the Government attorney of record by US Postal service a copy of this motion.

Mailed to

AUSA Joan E Burnes
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

M. Aly Rifai

Muhamad Aly Rifai, MD
Defendant
Blue Mountain Psychiatry
241 North 13 th Street Easton, PA 18042
Phone: 610-253-2500
Email Dr.Rifai@BluePsychiatry.org

**Motion for expungement United States of America v. Muhamad Aly Rifai**

**Exhibits Table**

1. Search Warrant 2019 Version Yeager
2. Search Warrant 2019 Version Timonere
3. Search Warrant 2021 Yeager
4. Target Letter
5. CPT 2016 Exhibit
6. CPT 2012 Exhibit
7. Administrative Subpoena
8. Medicare Publication 100-08
9. Press Release Package

# Exhibit 1:

# Search Warrant, 2019

# Agent Yeager

AO 106 (Rev. 04/10) Application for a Search Warrant (requesting AUSA J. Burnes)

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>PREMISES KNOWN AND DESCRIBED AS 241 N 13th St. Easton, PA 18042 | Case No. 19- 1058-M |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A

located in the Eastern District of Pennsylvania, there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search ~~is related~~ related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1035 | False Statements Relating to Health Care Matters |

The application is based on these facts:

See AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Stephanie Yeager, Special Agent, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/17/19

City and state: Philadelphia, PA

[signature]
*Judge's signature*

Elizabeth T. Hey, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AND DESCRIBED AS 241 NORTH 13TH ST, EASTON PA; 217 FRANKLIN AVE, PALMERTON, PA; 564 MAIN ST, STROUDSBURG, PA; AS MORE PARTICULARLY DESCRIBED IN ATTACHMENT A | : | **FILED UNDER SEAL**<br><br>Magistrate No. 19-1058 M |

## AFFIDAVIT

I, Stephanie Yeager, being duly sworn, depose and state:

1. I am a Special Agent of the United States Department of Health and Human Services' Office of Inspector General (HHS-OIG), Office of Investigations and have been employed as such since May 2015. Prior to becoming a Special Agent, I was employed by HHS-OIG Office of Evaluation and Inspections as a Team Leader from August 2006 to May 2015. During my nine years as a Team Leader, I led inspections that focused on preventing fraud, waste, and abuse within HHS' programs and gained extensive experience and knowledge of the government's reimbursement methodologies, program coverage, and data trends for prescription drugs.

2. I have a Bachelor's degree in Psychology from York College of Pennsylvania and a Master's degree in Applied Psychology from the University of Baltimore. I successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia in August 2015.

3. As a Special Agent with HHS-OIG, I am responsible for investigating allegations of fraud against the various programs under HHS's jurisdiction, including the Medicare and Medicaid programs involving violations of 18 U.S.C. § 1347. I am currently assigned to the

HHS-OIG Philadelphia Regional Office. I have been assigned to cases in which many different investigative techniques were utilized including execution of search and arrest warrants, physical surveillance, undercover operations and transactions, and analysis of various business, patient, and personal records, including Medicare claims data, Medicare beneficiaries' medical records, bank statements, tax information, and other business and medical documents. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare programs.

4. Your Affiant does hereby swear and affirm the following information as true and correct to the best of her knowledge and belief.

5. Your Affiant is submitting this Affidavit in support of an Application for a Search Warrant concerning violations of Title 18 U.S.C., Section 1347 (Health Care Fraud) and Section 1035 (False Statements Relating to Health Care Matters). As described in detail below, there is probable cause to believe that, from at least January 2015, Dr. Muhamad Aly Rifai (Dr. Rifai) has orchestrated a scheme to defraud the Medicare program by billing for services that were not rendered to the patient from the offices of Blue Mountain Psychiatry, LLC (Blue Mountain Psychiatry). Dr. Rifai is the sole owner and operator of Blue Mountain Psychiatry.

6. Your Affiant is submitting this Affidavit in support of Applications for Search Warrants for Blue Mountain Psychiatry, located at (1) 241 North 13th Street, Easton, Pennsylvania (EDPa); (2) 217 Franklin Ave, Suite 106, Palmerton, Pennsylvania (MDPa); and (3) 564 Main Street, Suite 103, Stroudsburg, Pennsylvania (MDPa), [1] collectively known as the

[1] The Blue Mountain Psychiatry website, under "locations," lists the Stroudsburg office as Suite 103 (https://bluepsychiatry.org/stroudsburg/). However, the "contact" page on the Blue Mountain Psychiatry website

SUBJECT PREMISES. A detailed description of the search locations is attached as "Attachment A" and is incorporated here.

7. As set forth in more detail below, this search warrant relates to an ongoing investigation concerning violations:

a. Title 18 U.S.C., Section 1347, Health Care Fraud, which states that "whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property, owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment from health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section," and;

b. Title 18 U.S.C., Section 1035, False Statements Relating to Health Care Matters, which states that "whoever, in any matter involving a health care benefit program, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious,

(https://bluepsychiatry.org/contact/) states it is Suite 3. The location is photographed in Attachment B and appears to show Suite 3.

or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services, shall be fined under title or imprisoned not more than 5 years or both."

8. For the reasons set forth herein, Your Affiant is requesting authorization to seize from the SUBJECT PREMISES all records, instrumentalities, fruits and evidence of violations of Title 18 U.S.C., Sections 1347 and 1035. A detailed description of the items to be seized is attached as "Attachment B," and is incorporated herewith.

9. Based on my personal knowledge of and participation in this investigation, including interviews with former employees of Dr. Rifai's and his practice entitled Blue Mountain Psychiatry, and through reviews of documents, I am familiar with the below-detailed facts and circumstances.

10. This affidavit does not set forth all of the information gathered by our investigation to date. Instead, it sets forth sufficient information to establish probable cause to support the issuance of the requested search warrant.

**SCHEME TO DEFRAUD**

11. HHS-OIG initiated this investigation into alleged violations of federal criminal law by Dr. Rifai, and his company, Blue Mountain Psychiatry, based on allegations that Dr. Rifai submitted false claims to the federally funded health care benefit program, Medicare, in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 1035. As described below, the investigation has shown that Dr. Rifai routinely submits claims, or directed his staff to submit claims, for higher levels of care and for services that were never provided to the patients.

12. Between January 1, 2015 and October 31, 2018, Dr. Rifai and Blue Mountain Psychiatry billed approximately $9.3 million and received approximately $2.4 million in

Medicare payment.[2] Your Affiant estimates, based upon the information presented in this Affidavit, including information provided to Your Affiant by former employees of Dr. Rifai and Blue Mountain Psychiatry, that approximately $1.1 million or more of the billings were false or fraudulent. These claims were submitted to Medicare representing either higher levels of care or care that was never provided to patients.

**The Medicare Program**

13. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

14. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Title 18, United States Code, Section 24, defines the term "health care benefit program" as any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

15. Medicare is divided into multiple parts: Part A covers hospital inpatient care, Part B covers the costs of physicians' services and outpatient care, Part C includes Medicare Advantage Plans and Part D covers prescription drugs. Medicare coverage for outpatient

[2] This data was obtained and this figure was calculated by the Medicare Part B contractor, Safeguard Services. Claims were extracted on November 7, 2018.

prescription drugs is primarily provided under the voluntary Part D benefit. However, under certain circumstances, Medicare covers a limited number of outpatient drugs under its Part B benefit. This includes drugs furnished incident to a physician's service (i.e., drugs that are infused or injected in physicians' offices or hospital outpatient settings); drugs administered through durable medical equipment; and drugs covered by statute. See 42 CFR § 414.900.

16. Per 45 CFR § 162, all health care providers (that is, physicians, suppliers, hospitals, and others), must obtain a National Provider Identifier (NPI). The NPI is a standard unique identification number for covered health care providers. Providers must use their NPI in the administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act (HIPAA). These standard HIPAA transactions include claims, eligibility inquiries and responses, claim status inquiries and responses, referrals, and remittance advices.

17. Medicare telehealth services are Part B covered services that a practitioner provides to an eligible beneficiary through a telecommunications system. Coverage and payment for Medicare telehealth includes consultation, office visits, individual psychotherapy, and pharmacologic management delivered via a telecommunication system.

18. A medical provider is required to enroll with the Medicare program in order to submit claims for payment to CMS. To enroll in the Medicare program, a medical provider is required to enter into an agreement with CMS in which the provider agrees to comply with all applicable statutory, regulatory, and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certifies that he/she understands that payment of a claim is conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare program instructions, the law, and on the provider's compliance with all applicable conditions of participation in Medicare. Medicare requires all

Part B claims are submitted electronically for processing. As part of the Medicare enrollment application, the provider must agree that he/she will ensure every electronic entry can be readily associated and identified with the original source document. The provider is required to retain all original source documents and medical records pertaining to any such Medicare claim for 6 years from the date of its creation, or the date when it was last in effect, whichever is later. See 45 C.F.R. § 164.316.

19. According to Title XVIII of the Social Security Act, Section 1833(e), no payment shall be made to any provider of services unless necessary and sufficient information is submitted that show the services were provided and to determine amounts due.

20. It is a crime to "knowingly and willfully execute, or attempt to execute, a scheme or artifice to (1) defraud any health care benefit program, or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of payment for health care benefits, items, or services." See 18 U.S.C. § 1347.

21. In order to bill the Medicare program, providers use a five-digit number, known as a Current Procedural Terminology (CPT) code, that identifies the nature and complexity of the service provided. The CPT codes are listed in the CPT manual, which is published annually by the American Medical Association. CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered. Virtually every medical procedure has its own CPT code. Medicare pays a specified amount for each CPT code billed.

**PSYCHOTHERAPY**

22. According to the CPT Manual, psychotherapy is the treatment of mental illness and behavioral disturbances in which the physician or other qualified health professional uses definitive, therapeutic communication, attempts to alleviate the emotional disturbances, reverse or change maladaptive patterns of behavior, and encourages personality growth and development. Qualified health professionals include clinical psychologists, independent psychologists, nurse practitioners, clinical nurse specialists, and physician assistants when the services performed are within the scope of their state license and clinical practice/education.

23. Psychotherapy services must be comprised of clinically recognized therapies that are pertinent to the patient's illness or condition. The type, frequency, and duration of services must be medically necessary for the patient's condition under accepted practice standards.

24. Psychotherapy times are face-to-face services with the patient and/or family members. The duration of psychotherapy must be individualized for every patient. The patient must be present for all or some of the services. In billing for psychotherapy, the provider is to choose the code that most closely matches the actual time spent performing psychotherapy. A unit of time is attained when the mid-point is passed. If the time is more than half the time on the code, the code is used. For example, an hour is attained when 31 minutes have elapsed. Psychotherapy sessions lasting less than 16 minutes are not to be reported.

25. The psychotherapy billing codes (CPT codes 90832 - 90838) include an ongoing assessment and adjustment of psychotherapeutic interventions. These codes include:

- 90832 – psychotherapy 30 minutes with patient and/or family member (16 - 37 minutes);

- 90834 – psychotherapy 45 minutes with patient and/or family member (38 - 52 minutes); and
- 90837 – psychotherapy 60 minutes with patient and/or family member (53 - 67 minutes.

Some psychiatric patients receive a medical evaluation and management (E/M) service on the same day as a psychotherapy service by the same physician or qualified health care professional. MDs, DOs, qualified Clinical Nurse Specialists, Nurse Practitioners, and Physician Assistants are the only providers that may render psychotherapy codes that include an E/M component. These psychotherapy codes are reported as "add-on" codes to the E/M code. To report both E/M and psychotherapy, the two services must be significant and separately identifiable. The psychotherapy CPT codes that include an E/M component are:

- 90833 – psychotherapy 30 minutes with patient and/or family member (16-37 minutes);
- 90836 – psychotherapy 45 minutes with patient and/or family member (38-52 minutes); and
- 90838 – psychotherapy 60 minutes with patient and/or family member (53-67 minutes.

26. Per 45 CFR § 164.501, psychotherapy notes are defined as notes recorded by a mental health professional which document or analyze the contents of a counseling session and that are separated from the rest of a medical record. The definition of psychotherapy *excludes* medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of administered treatment, results of clinical tests, and any summary of

diagnosis, functional status, treatment plan, symptoms prognosis, ongoing progress and progress to date. This class of information do not qualify as psychotherapy note material.

**INTERACTIVE COMPLEXITY**

27. The 2016 and 2017 CPT Manual states that an add-on code for "Interactive Complexity" (CPT 90785) may be billed in conjunction with psychotherapy codes if specific criteria are met. Interactive complexity refers to four specific communication factors during a visit that complicate delivery of the primary psychiatric procedure. These four criteria include, (1) the need to manage maladaptive communication; (2) caregiver emotions or behavior that interferes with the caregiver's understanding and ability to assist in the implementation of the treatment plan; (3) evidence or disclosure of a sentinel event and mandated report to a third party; and (4) use of play equipment, other physical devices, interpreter, or translator to communicate with the patient to overcome barriers to therapeutic or diagnostic interactions in patients who are not fluent in the same language as the provider or has lost the expressive language communication skills to explain his/her symptoms.

**CHRONIC CARE MANAGEMENT**

28. CMS recognizes chronic care management as a critical component of primary care that contributes to better health and care for individuals. In 2015, Medicare began paying separately for chronic care management services furnished to Medicare patients with multiple chronic conditions. The billing code (CPT 99490) is defined as at least 20 minutes of clinical staff time directed by a physician or other qualified health care professional, per calendar month, with the following required elements: multiple (two or more) chronic conditions expected to last more than 12 months, or until the death of the patient; chronic conditions place the patient under

significant risk of death, acute decomposition, or functional decline; and that a comprehensive care plan is established, implemented, revised, or monitored.

29. Chronic care management may be billed more frequently by primary care practitioners. Chronic care management is not within the scope of practice of limited license physicians and practitioners. Examples of chronic conditions include Alzheimer's disease, cancer, and hypertension. In order to prevent duplicative practitioner billing, a practitioner must obtain consent from the patient before furnishing or billing chronic care management. Consent may be verbal or written but must be documented in the medical record and include informing the patient about the availability and applicable cost-sharing of chronic care management services; that only one practitioner can furnish and be paid for chronic care management services during a calendar month, and that the patient has the right to stop chronic care management services at any time.

30. CMS describes chronic care management as extensive because it includes structured recording of patient health information, maintaining a comprehensive electronic care plan, managing transitions of care and other care management services, and coordinating and sharing patient health information timely. A key component and requirement of chronic care management is the comprehensive care plan. This is a person-centered electronic care plan based on a physical, mental, cognitive, psychosocial, functional, and environmental assessment, and an inventory of resources. The patient and/or caregiver needs to be given a copy of the care plan. The physician also needs to ensure the electronic care plan is available and shared timely within and outside the billing practice to individuals involved in the patient's care. The plan includes, but is not limited to problem lists, expected outcomes and prognosis, measurable

treatment goals, symptom management, planned interventions, medication management, and community/social services ordered.

**DR. MUHAMAD RIFAI AND BLUE MOUNTAIN PSYCHIATRY**

31. Dr. Muhamad Rifai is an internist and psychiatrist who owns and operates Blue Mountain Psychiatry. Blue Mountain Psychiatry became Medicare eligible in November 2012.[3] The practice has multiple locations in northeast Pennsylvania, including offices in Easton, in Palmerton, and in Stroudsburg. Based on discussions with prior employees, patient records are stored at each office. Review of claims data shows that Dr. Rifai bills for services provided at each office. Per its website, Blue Mountain Psychiatry specializes in medication management, psychotherapy, transcranial magnetic stimulations, and addiction. Based on wage reports and claims data, between January 2015 and October, 2018, Blue Mountain Psychiatry has employed five nurse practitioners and two physician assistants. Dr. Rifai has been the sole owner and psychiatrist at Blue Mountain Psychiatry.

32. Based on data from Medicare's Part B contractor, Safeguard Services, Blue Mountain Psychiatry billed Medicare $9.3 million and was paid $2.4 million between January 1, 2015 and October 31, 2018. Billing for services provided by Dr. Rifai accounted for the majority of this amount with $6.6 million billed and $1.7 million paid. Billings for nurse practitioners Eileen Teyim, Candice Regan, and an individual described here as CW-1, accounted for the majority of the remainder of the billings. Psychotherapy, 30 minutes (CPT

[3] Per Medicare's the Provider Enrollment, Chain, and Ownership System (PECOS) and the National Provider Identifier Registry, Blue Mountain Psychiatry's other names listed included "Concierge Psychiatry of the Lehigh Valley" and "Lehigh Valley Wellness."

90833), was the top code billed at Blue Mountain Psychiatry for approximately $2.5 million billed and $879,000 paid.

33. In March 2007, Dr. Rifai was issued Pennsylvania medical license MD 431055. Dr. Rifai was subsequently issued DEA Registration Number BR7552272 for the purpose of prescribing controlled substances in Schedules II through V in Pennsylvania and Maryland. In addition, as of September 9, 2016, Dr. Rifai requested and was authorized to administer, dispense, and prescribe buprenorphine products, including Suboxone, to up to 275 patients for the purpose of treating drug addiction. Though physicians and treatment facilities are subject to strict rules regarding confidentially of patient records, authorized drug treatment programs are more highly regulated and subject to special restrictions and requirements as set forth in Titles 21 and 42 of the United States Code and the Code of Federal Regulations.

## PROBABLE CAUSE FOR SEARCH

34. On August 29, 2017, Medicare's contractor, Northeastern Unified Program Integrity Contractor (NE UPIC), requested a random sample of medical records from Dr. Rifai.[4] This request was prompted by credible evidence regarding data analysis findings, allegations regarding Dr. Rifai's billing practices, and/or medical review probe findings. The request was to substantiate Dr. Rifai's billings for 63 claims with 402 total service units, which represented 10 beneficiaries. The review found that medical records provided by Dr. Rifai did not contain

[4] CMS contracts with UPICs who perform Medicare program integrity functions. UPICs are defined by specific geographic locations and include the Western, Midwestern, Southwestern, Northeastern, and Southeastern jurisdictions. Safeguard Services, LLC (SGS) is the program integrity contractor for the Northeastern jurisdiction that covers Pennsylvania.

documentation to support that all the services billed were rendered. This review was finalized on December 5, 2017 by a registered nurse.

35. Specifically, the time period covered by the UPIC review was January 3, 2016 to May 25, 2017. The NE UPIC reviewed a medical sample containing 225 service units of psychotherapy (CPT code 90833, 30 minutes of psychotherapy with patient, performed with E/M services) and interactive complexity (CPT code 90785). Of these 225 service units, 204 service units (91 percent) were denied due to insufficient documentation to support the requirements for the psychotherapy CPT code when performed with an E/M service code. The NE UPIC's assessment found that the treatment plans were vague, and the medical records contained no documentation about the type, amount, frequency, and duration of the psychotherapy services billed. There was no documentation of how the treatment was expected to improve and/or preserve the patient's level of functioning. The content of the psychotherapy session documentation was not significant and separately identifiable from the E/M visit documentation for the same date of service.

36. The medical review also found that there was no documentation to support the interactive complexity billings (CPT 90785), when used in conjunction with psychotherapy. There was no documentation of any adaptations utilized in the session and the rationale for employing any interactive technique. The documents did not support specific communication factors present during the visits and was insufficient to support the requirements for CPT 90785.

37. On or about November 8, 2017, CW-1, a nurse practitioner at Blue Mountain Psychiatry from January 2015 until September 2015 and then again from January 2016 until September 2017, filed a civil action under seal in the United States District Court, Eastern District of Pennsylvania, alleging violations of the False Claims Act, 31 U.S.C. § 3729, against

Dr. Rifai and Blue Mountain Psychiatry. An amended False Claims Act Complaint was filed on or about February 12, 2018. The Amended Complaint added a second relator, CW-2, a medical biller contracted by Dr. Rifai who worked at Blue Mountain Psychiatry from January 2013 until October 2017. In this civil action, relators seek, on behalf of the United States, civil monetary penalties against Dr. Rifai and Blue Mountain Psychiatry.[5] If the action is successful, CW-1 and CW-2 would be entitled to a percentage of the government's recovery, as well as attorney fees and costs. As such, CW-1 and CW-2 have a financial interest in the outcome of an investigation of Dr. Rifai and Blue Mountain Psychiatry.

38. Your affiant spoke with CW-1 and CW-2 in January and August 2018. CW-1 stated that Dr. Rifai never maintained a consistent schedule and staff referred to him as a "ghost doctor" because of his lack of availability. CW-2 said that Dr. Rifai treated patients at Easton Hospital throughout the week, and typically saw Blue Mountain patients at their office in Stroudsburg on Tuesday, Easton on Wednesday and Friday, and Palmerton on Thursday.

**Former Employee Statements and Records (January 2013 – June 2018)**

**CW-1**

39. CW-1 was a nurse practitioner at Blue Mountain Psychiatry from January 2015 until September 2015 and then again from January 2016 until September 2017. CW-1 utilized telehealth to consult with patients through video-conferencing technology through software created by Forefront Telecare, Inc. (Forefront).[6] CW-1 logged into Forefront to see her patient

---

[5] The civil action, docketed at 17-5069, is pending before the Honorable Jeffrey L. Schmehl in the Eastern District of Pennsylvania, and is under seal.

[6] Forefront is a software platform that enables providers and facilities to connect via audio/video. Per Forefront's website, their system is installed in client healthcare facilities where specialists can interact in real time with staff and patients on a large, high-definition screen. Forefront provides the in-facility equipment, training, scheduling,

list, calendar, and to communicate with patients located in nursing homes. Per our discussions with CW-1, she performed only 15-minute medication checks with her telehealth patients.[7] CW-1 said that Blue Mountain Psychiatry and Dr. Rifai should not have billed for services under her NPI for any service other than a 15-minute telehealth medication check.

40. In July 2017, CW-1 received a letter from CMS requesting documentation to support the billing of a 70-minute patient examination. CW-1 never performed a 70-minute examination on any patient, and never completed a visit should have been billed for more than 15 minutes.

41. After reviewing the letter from CMS, CW-1 reviewed her billing history and had conversations regarding her services with CW-2. Through this, CW-1 discovered that Dr. Rifai had been adding billing codes to her patient visits and billing Medicare under her name for services that she never provided. CW-1 discovered that Dr. Rifai logged into Forefront to code and bill for services that she never provided. Dr. Rifai printed CW 1's one page progress notes and patient information from Forefront, handwrote additional billing codes on the printout, and provided this information to CW-2 for billing purposes. Dr. Rifai added these billing codes without ever discussing the patient or the visit with CW-1, so he would have had incomplete knowledge of the treatment actually provided. In addition, CW-1's progress notes often noted the time spent with the patient (i.e., 15 minutes), yet the billing codes Dr. Rifai often added were for services that require at least 30 minutes.

---

and the technical and logistical support. It does not have any affiliation with the provider or facilities' billing for the services.

[7] When CW-1 worked for Blue Mountain Psychiatry in 2015, in addition to doing 15-minute telehealth visits, she also saw patients at Easton Hospital and at drug and alcohol facilities contracted with Blue Mountain Psychiatry. When she returned in 2016, she only provided services via telehealth.

42. CW-1 stated that she performed only 15 minute medication checks via telehealth. However, Your Affiant's review of the Medicare Part B data indicated that between January 1, 2015 and October 31, 2018, Dr. Rifai used CW-1's identifier to bill $542,000 for psychotherapy, 30 minutes, and was paid $123,000. In another example of false billing, Dr. Rifai used CW-1's identifier to bill $169,000 for chronic care management and was paid $32,000. As noted earlier, chronic care management requires at least 20 minutes of clinical staff time and requires multiple components in order to meet the billing criteria. Both the services for psychotherapy, 30 minutes, and chronic care management are more complicated, and yield a higher reimbursement rate, than the 15-minute medication checks that CW-1 actually performed.

43. When CW-1 conducted her telehealth visits via Forefront, she completed these visits from her home. She either faxed or scanned her progress notes via email to Dr. Rifai and maintained the paper copy. After CW-1 resigned from Blue Mountain Psychiatry, she returned about seven boxes of all of her paper progress notes to the 13th Street office in Easton. CW-1 stated that all old patient records are stored at this location.

**CW-2**

44. CW-2 was a medical biller contracted by Dr. Rifai. CW-2 worked at Blue Mountain Psychiatry from January 2013 until October 2017. CW-2 worked in the administrative office, which was in the 13th Street office in Easton. CW-2 also had the ability to work from her home. CW-2 did not have experience doing medical coding but believed that Rifai had extensive expertise in this area. Dr. Rifai provided the CPT codes to CW-2 and she entered these codes in the billing system. Dr. Rifai gave CW-2 CPT codes and instructions on how he wanted her to bill for services allegedly performed by him and his other medical providers.

45. CW-2 described several billing practices directed by Dr. Rifai. For example, Dr. Rifai requested CW-2 research the reimbursement amounts for the "add-on" CPT codes and if it was a high enough reimbursement, he requested that she include these CPT codes on the patient's bill to Medicare. At times, Dr. Rifai would hand CW-2 a list of "add-on" CPT codes and requested she bill for the entire prior calendar year for all the patients at a particular nursing facility for these specific CPT codes. For example, CW-2 stated that in mid-to-late December 2015, Dr. Rifai provided her with a spreadsheet containing all the patients' names, diagnosis codes, and CPT codes for her to bill. This spreadsheet contained CPT codes for services that were purportedly provided to Blue Mountain Psychiatry patients every month since January 2015. For every patient Dr. Rifai included on the spreadsheet, Dr. Rifai directed her to bill for chronic care management for each month throughout the prior year. Moreover, according to CW-2, in 2016 Dr. Rifai directed CW-2 to bill specific CPT codes from a list he created for every single patient visit, regardless of the services provided at their visit.

46. CW-2 began to have concerns about the billing not being legitimate when she noticed that the billing times did not add up. For example, Dr. Rifai directed her to bill for services that indicated he provided a 60-minute session, but CW-2 said she knows that Dr. Rifai was not at a location for that amount of time. At times, CW-2 knew Dr. Rifai was at Easton Hospital, even though he directed her to bill as though he was in a Blue Mountain Psychiatry office. Dr. Rifai directed CW-2 to bill as though he treated 20 to 50 patients per day. CW-2 thought it seemed physically impossible that Dr. Rifai had treated that number of patients.

**Candice Regan**

47. On October 3, 2018, Your Affiant spoke with Candice Regan (Regan), who worked for Dr. Rifai as a nurse practitioner at Blue Mountain Psychiatry from June 2016 until

February 2018. As part of her employment, Regan conducted in-person outpatient visits at Blue Mountain Psychiatry's office in Palmerton, Pennsylvania and online telehealth visits via Forefront and in-person visits with patients in the various nursing homes that contracted with Blue Mountain Psychiatry.

48. During the in-person visits, Regan completed a progress note for each patient to document chief complaints, changes in medication, and any other pertinent information. Regan stated that she typically spent 15-30 minutes with each patient, and she notated the time spent with the patient on the progress note. Regan commented that she did not do psychotherapy with her patients during these visits, and that she did not have training to provide psychotherapy. In addition, there was not enough time to do patient psychotherapy since the schedule allotted for 15 minutes per patient. Regan provided her progress notes to Dr. Rifai who converted the information into the CPT codes used to bill Medicare.

49. Through the telehealth visits, Regan and the patient could speak back-and-forth via a computer using Forefront. Regan would ask the patient questions about their medical history, conduct a quick cognitive assessment, and review their medications. Initial visits lasted 45 minutes, but the vast majority of the subsequent visits lasted 15 minutes. Regan recorded the length of time for each visit on her progress notes. She then faxed these notes to Dr. Rifai at the Palmerton office, who converted the information into the CPT codes used to bill Medicare.

50. Your Affiant showed Regan copies of progress notes for patients she treated in-person and using telehealth, and showed her the Medicare claims that Dr. Rifai billed for her visits. Regan reviewed and provided the following information:

a. **Patient 1, Date of Service September 2, 2016, Nursing Home Visit.**

i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she only provided a 15-minute examination, as documented on her progress note.

b. **Patient 2, Date of Service September 2, 2016, Nursing Home Visit.**

i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she only provided a 15-minute examination, as documented on her progress note. Regan stated that she never provided Patient 2 with psychotherapy, and that it was impossible due to this patient's issues with communication and lack of engagement with others.

c. **Patient 3, Date of Service November 18, 2016, Nursing Home Visit.**

i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she provided a 30-minute examination to Patient 3, as documented on her progress note. However, she did not do psychotherapy

with the patient due to their diagnosis of dementia. According to Regan, doing psychotherapy on a patient diagnosed with dementia would not be effective because of their cognitive issues.

d. **Patient 4, Date of Service November 18, 2016, Nursing Home Visit.**

i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she only provided a 15-minute examination, as documented on her progress note. She did not do psychotherapy with Patient 4 due to their diagnosis of Alzheimer's Disease.

e. **Patient 5, Date of Service August 18, 2016, Telehealth Visit.**

i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); telehealth originating site facility fee (CPT Q3014); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she entered into Forefront that the visit was a 15-minute follow up (CPT 99308). She did not perform any other service. Documents provided by CW-1 and CW-2 show that CPT 99308 was entered into Forefront, but that CPT codes 90833, 90785, Q3014, and 99490 are handwritten on a printout. CW-1, CW-2, and Regan identified the handwriting as Dr. Rifai's.

51. Blue Mountain Psychiatry's billing for the majority of patients treated by Regan include services that were not provided or indicate that a more complex service was provided. Per Regan's statements and as indicated in her progress notes, Regan rarely performed psychotherapy. Between August 2016 and February 2018, Blue Mountain Psychiatry billed Medicare Part B $96,000 and was paid $23,000 for 30-minute psychotherapy sessions allegedly performed by Regan. In addition, Blue Mountain Psychiatry billed Part B $96,000 and was paid $16,000 for chronic care management and interactive complexity codes for services allegedly performed by Regan. Per Regan's statements, as noted above, the vast majority of these billings are false.

**Eileen Teyim**

52. On November 6, 2018, Your Affiant spoke with Eileen Teyim (Teyim). Teyim is a nurse practitioner who worked for Dr. Rifai at Blue Mountain Psychiatry between October 2016 and June 2018. Teyim conducted her outpatient visits at Blue Mountain Psychiatry's office on 13th Street in Easton, Pennsylvania. As part of Blue Mountain Psychiatry, Teyim also visited nursing homes to provide medication management. She gave all of her patient progress notes to Dr. Rifai for billing purposes. Teyim said she rarely provided psychotherapy to the patients in the nursing homes. Many of these patients had dementia and other behavioral issues, so it would be extremely difficult and ineffective to provide them with psychotherapy. Teyim said she never completed psychotherapy during the outpatient visits at the Easton office.

53. Your Affiant showed Teyim a printout of the claims data billed to Medicare for her services while working at Blue Mountain Psychiatry. Teyim stated that she was surprised that nearly every nursing home patient had psychotherapy billed at each visit. She said that these billings concerned her because she definitely did not perform psychotherapy during every

nursing home visit. She estimated that about 20 to 30 percent of her patients per day received psychotherapy. There literally was not enough time in her workday to provide 30 minutes of psychotherapy to each patient. The billings for the outpatient visits were also concerning to Teyim. She concluded that there was no way she could have spent 30 minutes with each patient, as indicated in the billings, because she did not have enough time in her day.

54. Psychotherapy (30 minutes) was the top code Blue Mountain Psychiatry billed Medicare Part B for Teyim. From January 14, 2017 until June 10, 2018, Blue Mountain Psychiatry billed $169,000 for 30-minute sessions of psychotherapy and was paid $45,000. Teyim's last day working for Dr. Rifai was June 1, 2018. Teyim confirmed that she did not perform services past this day, even though 18 of the submitted psychotherapy claims were for services after June 1, 2018.

**Netoya Nevarez**

55. On January 22, 2019, Your Affiant spoke to Netoya Nevarez (Nevarez). Nevarez was the Coordinator of Practice Management at Blue Mountain Psychiatry in the Palmerton office. She was employed there from July 2015 until November 2017. Nevarez mentioned that patients without insurance are charged $250 cash for their first intake visit and $100 for all subsequent visits. Nevarez also commented that Dr. Rifai does not spend much time with his patients and described him as "in-and-out" of the office. Dr. Rifai would require that Nevarez schedule patients in 15-minute increments for not only himself, but also his physician assistants at Palmerton.

**IMPOSSIBLE DAYS**

56. The Medicare contractor, Safeguard Services, conducted an analysis to identify instances when Dr. Rifai was paid by Medicare for services that exceeded 24 hours in one day.

Billing codes for evaluation and management, such as office visits or psychotherapy, have minutes associated with the code to represent the amount of time spent with the patient. Between January 1, 2015 and October 31, 2018, Dr. Rifai was paid for providing more than 24 hours of services to patients on 46 separate days. For example, based on the data, Dr. Rifai would have seen 51 different patients on October 12, 2015 for visit time that accumulated to 49 hours.

57. During the course of Your Affiant's investigation, it became apparent that there is a pervasive pattern of billing fraud. It is Your Affiant's experience that fraud, when present, is present throughout most, if not all records.

58. Based on the above-described investigation and your Affiant's training and experience, your Affiant submits there is probable cause to believe that Dr. Rifai and his company, Blue Mountain Psychiatry, have committed and are committing violations of Title 18, United States Code, Section 1347, health care fraud, and Title 18, United States Code, Section 1035, false statements relating to healthcare matters.

59. It is reasonable to expect that the items listed tin Attachment B will be located in the SUBJECT PREMISES located at (1) 241 North 13th Street, Easton, Pennsylvania; (2) 217 Franklin Ave, Suite 106, Palmerton, Pennsylvania; and (3) 564 Main Street, Suite 103, Stroudsburg, Pennsylvania, as they are maintained during the normal course of business. The records listed to be seized are expected to show the extent of fraudulent billing.

60. Based on Medicare's Part B claims data, between January 2015 and October 2018, Dr. Rifai and his staff at Blue Mountain Psychiatry treated 1,408 beneficiaries. Of these, 876 beneficiaries received treatment while located at either a skilled nursing facility, assisted

living facility, and/or through via telehealth.[8] Attached to Attachment B and incorporated here is a list of approximately 500 beneficiaries who received services at the aforementioned locations and had 10 or more claims submitted to Medicare by Blue Mountain Psychiatry (the Patient list). This application seeks permission to search for and seize the patient records and information related to the Patient list.

**SEARCH AND SEIZURE OF ELECTRONIC STORAGE MEDIA**

61. As described above and in Attachment B, this application seeks permission to search for records that might be found at Blue Mountain Psychiatry, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

62. Further, even when records are stored on floppy disks, recordable CD disks, or on a hard drive, they may still be retrievable even when they purportedly have been erased or deleted. Should such data retrieval be necessary, it is time-consuming and would add to the difficulty of securing the system on the premises during the search.

63. Your Affiant submits that if a computer or storage medium is found at Blue Mountain Psychiatry, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

[8] The place of service on the claims data is derived from information provided by Dr. Rifai.

a. Based on Your Affiant's knowledge, training, and experience, Your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, Your Affiant is aware that computer equipment was used to generate, store, and print documents used

during the normal course of business at Blue Mountain Psychiatry. There is reason to believe that there is a computer system currently located at Blue Mountain Psychiatry.

61. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. Your Affiant submits there is probable cause to believe that this forensic electronic evidence will be on any storage medium at Blue Mountain Psychiatry because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and

experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's

state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. Your Affiant knows that when an individual uses a computer to submit false claims to a health care benefit program, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the

crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of the crime. From Your Affiant's training and experience, Your Affiant believes that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved and other records that indicate the nature of the offense.

62. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of Dr. Rifai/Blue Mountain Psychiatry, for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from Dr. Rifai/Blue Mountain Psychiatry, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on Dr. Rifai/Blue Mountain Psychiatry, could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described

in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

63. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant Your Affiant is applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appears to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

64. The seizure of computers may limit Dr. Rifai/Blue Mountain Psychiatry's ability to conduct its business. As with any search warrant, Your Affiant expects that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or

storage media need not be seized or copied. Where appropriate, Special Agents will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of Blue Mountain Psychiatry so request, the Special Agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of Blue Mountain Psychiatry. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

65. Based upon the information received and reviewed during the course of this investigation, Your Affiant believes probable cause exists to believe that Dr. Rifai/Blue Mountain Psychiatry billed for services that either misrepresented the actual service provided, lacked proper documentation, or were not rendered, and in violation of Title 18, United States Code, Section 1347 and in violation of Title 18, United States Code, Section 1035. Your Affiant submits there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses are located in the SUBJECT PREMISES, that is, the search locations detailed in Attachment A, which is incorporated herein. Your Affiant believes that Dr. Rifai/Blue Mountain Psychiatry is in possession of those items set forth in Attachment B, and that a search of Dr. Rifai/Blue Mountain Psychiatry offices may yield evidence of violations of 18 U.S.C § 1347 – Health Care Fraud, and 18 U.S.C § 1035 – False Statements Related to Health Care Matters.

Stephanie Yeager, Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Sworn and subscribed before me,
this 17th day of June, 2019.

Honorable Elizabeth T. Hey
United States Magistrate Judge

## ATTACHMENT A

DESCRIPTION OF PREMISES TO BE SEARCHED

**Location 1: 241 N 13th St. Easton, PA 18042**

Location 1 is located on the corner of 13th Street and Bushkill Street in Easton, Pennsylvania. The building is two stories tall, tan in color, has dark trim, and is located on a corner lot. There is a parking lot behind the building. On the side of the building, facing 13th street, the number 241 is located above a door. Located on the property are multiple signs for Lehigh Valley Wellness and Recovery Centers - Easton Campus, with Dr. Rifai's name listed below.





**Location 2: 217 Franklin Ave. Suite 106 Palmerton, PA 18071**

Location 2 is located on the corner of 2nd Street and Franklin Avenue in Palmerton, Pennsylvania. The building contains multiple offices and is tan brick, with red brick trim, on the outside. The number 217 is located above the front door. The building is named Palmerton Health Campus. Blue Mountain Psychiatry occupies Suite 106. Suite 106 is located at the end of the hallway on the right side of the building. Suite 106 has a sign outside, next to a wooden door, with Blue Mountain Psychiatry and Dr. Rifai's name printed on it. The Suite is located under a sign hanging from the ceiling labeled "Psychiatry".





**Location 3: 564 Main St. Suite 103 Stroudsburg, PA 18360**

Location 3 is located on Main Street between 6th Street and 5th Street in Stroudsburg, Pennsylvania. The building has multiple office suites, is brick, painted red, has black shutters, is three (3) stories tall, and has a white awning with Main St. Plaza written in black lettering. Blue Mountain Psychiatry is the second suite on the right when entering the front door. Blue Mountain Psychiatry shares the suite with The Center for Laser & Aesthetic Medicine (which is owned by Dr. Rifai's wife, Dr. Douha Sabouni). The entrance to the suite is a double glass door with Dr. Rifai's name printed on the left side.






**ATTACHMENT B**

ITEMS TO BE SEARCHED AND SEIZED

Evidence, fruits, and instrumentalities concerning violations of 18 U.S.C. §§ 1347 (Health Care Fraud) and 1035 (False Statements Relating to Health Care Matters), for the time period of January 1, 2015 to present, including:

1. Medical service invoices, remittance advices, and any other records or documentation related to the submission of claims and/or payment for services concerning services rendered by employees or contracted entities (workers) of Dr. Rifai and Blue Mountain Psychiatry.

2. Records and information relating to treatments provided to patients on the Patient List, including but not limited to patient files, superbills, invoices, claim forms prepared for payment, explanations of medical benefits, dispensing orders, and detailed written orders or prescriptions.

3. Receipts, records, ledgers, accounting records and/or documentation reflecting claims submitted by and paid to Dr. Rifai and Blue Mountain Psychiatry to include insured beneficiaries of Medicare.

4. Records, ledgers, contracts, accounting and/or documentation reflecting payments to employees, contracted entities (workers), or individuals working for Dr. Rifai and Blue Mountain Psychiatry, by check, cash or other payment system.

5. Calendars, daily planners, timesheets or records indicating work schedules of employees or contracted entities (workers) of Dr. Rifai and Blue Mountain Psychiatry.

6. Financial and business records and information of Dr. Rifai and Blue Mountain Psychiatry, to include: bank records, financial statements, account statements, credit reports, tax returns, receipts, accounting records, daily planners, travel records, telephone records and any other records which document the personal, financial and business affairs of Dr. Rifai and Blue Mountain Psychiatry.

7. Business correspondence, inter-office memoranda, facsimile messages and telephone messages in any form.

8. Records and information relating to complaints or inquiries into the medical practice from patients, State or Government oversight agencies, or patient family members.

9. Records and information relating to employee files and resumes relating to Dr. Rifai and Blue Mountain Psychiatry, including but not limited to, any handwritten or computer files

listing any and all employee names addresses, telephone numbers, and background information for all current and former employees, and records, ledgers, contracts, accounting and/or documentation reflecting payments to employees or contracted entities.

10. Seizure and examination of all computers and computer systems utilized by and/or accessed by Dr. Rifai and Blue Mountain Psychiatry, or by employees or workers, in the operation of the business or practice, including: any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants; any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software; any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched; any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

11. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contain or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in the warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. Evidence of the lack of such malicious software;

    d. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e. Evidence of the counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f. Evidence of the time the COMPUTER was used;

    g. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. Records of or information about Internet Protocol addresses used by the COMPUTER;

j. Records of or information about the COMPUTERS's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. Contextual information necessary to understand the evidence described in this attachment.

12. In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image, and seize the following items for off-site review:

a. Any computer or storage medium capable of being used to commit, further or store evidence of violations of 18 U.S.C. §§ 1347 (Health Care Fraud) and 1035 (False Statements Relating to Health Care Matters); and

b. Any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer or storage medium.

13. Routers, modems, and network equipment used to connect computers to the Internet.

14. Cell phones, pagers, or any other portable electronic devices known to store, or otherwise retain communications data which may provide information concerning Health Care Fraud, as well as billings or dealings with other medical insurance providers.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

# Exhibit 2:

# Search Warrant, 2019

# Agent Timonere

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Pennsylvania

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

241 NORTH 13TH ST, EASTON PA;
217 FRANKLIN AVE, PALMERTON, PA;
564 MAIN ST, STROUDSBURG, PA

Case No. 1:19-MC-0378

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

564 MAIN ST, STROUDSBURG, PA, more particularly described inAttachment A,

located in the MIDDLE District of PENNSYLVANIA, there is now concealed *(identify the person or describe the property to be seized)*:

records, both paper and electronic, electronic devices, and other information, more particularly described in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 1347 | Health Care Fraud |
| 18 USC 1035 | False Statements Relating to Health Care Matters |

The application is based on these facts:
1. Your affiant is Andrew J. Timonere, Special Agent of the United States Department of Health and Human Services, Office of Inspector General (HHS-OIG), Office of Investigations, so employed since November 2018. Prior to becoming a Special Agent, I was employed by the United States Department of Homeland Security-

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

ANDREW J. TIMONERE, SPECIAL AGENT, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/17/19

[signature: S E Schwab]
*Judge's signature*

City and state: HARRISBURG, PA

SUSAN E. SCHWAB, CHIEF U.S. MAGISTRATE JUDGE
*Printed name and title*

CONTINUATION OF AFFIDAVIT

1. (cont'd) Federal Air Marshal Service (FAMS) as a Federal Air Marshal from August 2016 to November 2018. Prior to FAMS, I was employed by the Federal Bureau of Investigation (FBI) as a Forensic Accountant from August 2012 to August 2016. During my four years as a Forensic Accountant, I performed financial analysis and assisted in investigations of different crimes including healthcare fraud, securities fraud, money laundering, and various other white-collar crimes.

2. I have a Bachelor of Science degree in Business Administration with a specialization in Accounting from The Ohio State University. I hold an active license as a Certified Fraud Examiner (CFE) from the Association of Certified Fraud Examiners (ACFE). I successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia in March 2019.

3. As a Special Agent with HHS-OIG, I am responsible for investigating allegations of fraud against the various programs under HHS's jurisdiction, including the Medicare and Medicaid programs involving violations of 18 U.S.C. § 1347. I am currently assigned to the HHS-OIG Philadelphia Regional Office. I have been assigned to cases in which many different investigative techniques were utilized including execution of search and arrest

warrants, physical surveillance, undercover operations and transactions, and analysis of various business, patient, and personal records, including Medicare claims data, Medicare beneficiaries' medical records, bank statements, tax information, and other business and medical documents. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare programs.

4. Your Affiant does hereby swear and affirm the following information as true and correct to the best of his knowledge and belief.

5. Your Affiant is submitting this Affidavit in support of Applications for Search Warrants concerning violations of Title 18 U.S.C., Section 1347 (Health Care Fraud) and Section 1035 (False Statements Relating to Health Care Matters). As described in detail below, I submit there is probable cause to believe that, from at least January 2015, Dr. Muhamad Aly Rifai (Dr. Rifai) has orchestrated a scheme to defraud the Medicare program by billing for services that were not rendered to the patient from the offices of Blue Mountain Psychiatry, LLC (Blue Mountain Psychiatry). Dr. Rifai is the sole owner and operator of Blue Mountain Psychiatry.

6. This Affidavit is submitted in support of Applications for Search Warrants for Blue Mountain Psychiatry, located at (1) 241 North 13th Street, Easton, Pennsylvania (EDPa); (2) 217 Franklin Ave, Suite 106, Palmerton,

Pennsylvania (MDPa); and (3) 564 Main Street, Suite 103, Stroudsburg, Pennsylvania (MDPa),[1] collectively known as the SUBJECT PREMISES. A detailed description of the search locations is attached as "Attachment A" and is incorporated here.

7. As set forth in more detail below, these search warrant applications relates to an ongoing investigation concerning violations of:

a. Title 18 U.S.C., Section 1347, Health Care Fraud, which states that "whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property, owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment from health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. With respect to violations of this section,

---

[1] The Blue Mountain Psychiatry website, under "locations," lists the Stroudsburg office as Suite 103 (https://bluepsychiatry.org/stroudsburg/). However, the "contact" page on the Blue Mountain Psychiatry website (https://bluepsychiatry.org/contact/) states it is Suite 3. The location is photographed in Attachment B and appears to show Suite 3.

a person need not have actual knowledge of this section or specific intent to commit a violation of this section," and;

b. Title 18 U.S.C., Section 1035, False Statements Relating to Health Care Matters, which states that "whoever, in any matter involving a health care benefit program, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services, shall be fined under title or imprisoned not more than 5 years or both."

8. For the reasons set forth herein, Your Affiant is requesting authorization to seize from the SUBJECT PREMISES all records, instrumentalities, fruits and evidence of violations of Title 18 U.S.C., Sections 1347 and 1035. A detailed description of the items to be seized is attached as "Attachment B," and is incorporated herewith.

9. Based on my personal knowledge of and participation in this investigation, and the work of other Special Agents in this investigation, including interviews with former employees of Dr. Rifai's and his practice

entitled Blue Mountain Psychiatry, and through reviews of documents, I am familiar with the below-detailed facts and circumstances.

10. This affidavit does not set forth all of the information gathered by our investigation to date. Instead, it sets forth sufficient information to establish probable cause to support the issuance of the requested search warrants.

## I. SCHEME TO DEFRAUD

11. HHS-OIG initiated this investigation into alleged violations of federal criminal law by Dr. Rifai, and his company, Blue Mountain Psychiatry, based on allegations that Dr. Rifai submitted false claims to the federally funded health care benefit program, Medicare, in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 1035. As described below, investigation has shown that Dr. Rifai routinely submits claims, or directed his staff to submit claims, for higher levels of care and for services that were never provided to the patients.

12. Between January 1, 2015 and October 31, 2018, Dr. Rifai and Blue Mountain Psychiatry billed approximately $9.3 million and received approximately $2.4 million in Medicare payment.[2] Your Affiant estimates, based upon the information presented in this Affidavit, including information

[2] This data was obtained and this figure was calculated by the Medicare Part B contractor, Safeguard Services. Claims were extracted on November 7, 2018.

provided to your affiant by former employees of Dr. Rifai and Blue Mountain Psychiatry, that approximately $1.1 million or more of the billings were false or fraudulent. These claims were submitted to Medicare representing either higher levels of care or care that was never provided to patients.

**A. The Medicare Program**

13. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

14. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Title 18, United States Code, Section 24, defines the term "health care benefit program" as any public or private plan or contract, affecting commerce, under which any medical benefit, item or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

15. Medicare is divided into multiple parts: Part A covers hospital inpatient care, Part B covers the costs of physicians' services and outpatient

care, Part C includes Medicare Advantage Plans and Part D covers prescription drugs. Medicare coverage for outpatient prescription drugs is primarily provided under the voluntary Part D benefit. However, under certain circumstances, Medicare covers a limited number of outpatient drugs under its Part B benefit. This includes drugs furnished incident to a physician's service (i.e., drugs that are infused or injected in physicians' offices or hospital outpatient settings); drugs administered through durable medical equipment; and drugs covered by statute. See 42 CFR § 414.900.

16. Per 45 CFR § 162, all health care providers (that is, physicians, suppliers, hospitals, and others), must obtain a National Provider Identifier (NPI). The NPI is a standard unique identification number for covered health care providers. Providers must use their NPI in the administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act (HIPAA). These standard HIPAA transactions include claims, eligibility inquiries and responses, claim status inquiries and responses, referrals, and remittance advices.

17. Medicare telehealth services are Part B covered services that a practitioner provides to an eligible beneficiary through a telecommunications system. Coverage and payment for Medicare telehealth includes consultation,

office visits, individual psychotherapy, and pharmacologic management delivered via a telecommunication system.

18. A medical provider is required to enroll with the Medicare program in order to submit claims for payment to CMS. To enroll in the Medicare program, a medical provider is required to enter into an agreement with CMS in which the provider agrees to comply with all applicable statutory, regulatory, and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certifies that he/she understands that payment of a claim is conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare program instructions, the law, and on the provider's compliance with all applicable conditions of participation in Medicare. Medicare requires all Part B claims are submitted electronically for processing. As part of the Medicare enrollment application, the provider must agree that he/she will ensure every electronic entry can be readily associated and identified with the original source document. The provider is required to retain all original source documents and medical records pertaining to any such Medicare claim for 6 years from the date of its creation, or the date when it was last in effect, whichever is later. <u>See</u> 45 C.F.R. § 164.316.

19. According to Title XVIII of the Social Security Act, Section 1833(e), no payment shall be made to any provider of services unless necessary and sufficient information is submitted that show the services were provided and to determine amounts due.

20. It is a crime to "knowingly and willfully execute, or attempt to execute, a scheme or artifice to (1) defraud any health care benefit program, or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of payment for health care benefits, items, or services." See 18 U.S.C. § 1347.

21. In order to bill the Medicare program, providers use a five-digit number, known as a Current Procedural Terminology (CPT) code, that identifies the nature and complexity of the service provided. The CPT codes are listed in the CPT manual, which is published annually by the American Medical Association. CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered. Virtually every medical procedure has its own CPT code. Medicare pays a specified amount for each CPT code billed.

### 1. Psychotherapy

22. According to the CPT Manual, psychotherapy is the treatment of mental illness and behavioral disturbances in which the physician or other qualified health professional uses definitive, therapeutic communication, attempts to alleviate the emotional disturbances, reverse or change maladaptive patterns of behavior, and encourages personality growth and development. Qualified health professionals include clinical psychologists, independent psychologists, nurse practitioners, clinical nurse specialists, and physician assistants when the services performed are within the scope of their state license and clinical practice/education.

23. Psychotherapy services must be comprised of clinically recognized therapies that are pertinent to the patient's illness or condition. The type, frequency, and duration of services must be medically necessary for the patient's condition under accepted practice standards.

24. Psychotherapy times are face-to-face services with the patient and/or family members. The duration of psychotherapy must be individualized for every patient. The patient must be present for all or some of the services. In billing for psychotherapy, the provider is to choose the code that most closely matches the actual time spent performing psychotherapy. A unit of time is attained when the mid-point is passed. If the time is more than half the time on

the code, the code is used. For example, an hour is attained when 31 minutes have elapsed. Psychotherapy sessions lasting less than 16 minutes are not to be reported.

25. The psychotherapy billing codes (CPT codes 90832 - 90838) include an ongoing assessment and adjustment of psychotherapeutic interventions. These codes include:

- 90832 – psychotherapy 30 minutes with patient and/or family member (16 - 37 minutes);
- 90834 – psychotherapy 45 minutes with patient and/or family member (38 - 52 minutes); and
- 90837 – psychotherapy 60 minutes with patient and/or family member (53 - 67 minutes.

Some psychiatric patients receive a medical evaluation and management (E/M) service on the same day as a psychotherapy service by the same physician or qualified health care professional. MDs, DOs, qualified Clinical Nurse Specialists, Nurse Practitioners, and Physician Assistants are the only providers that may render psychotherapy codes that include an E/M component. These psychotherapy codes are reported as "add-on" codes to the E/M code. To report both E/M and psychotherapy, the two services must be significant and separately identifiable. The psychotherapy CPT codes that include an E/M component are:

- 90833 – psychotherapy 30 minutes with patient and/or family member (16-37 minutes);
- 90836 – psychotherapy 45 minutes with patient and/or family member (38-52 minutes); and
- 90838 – psychotherapy 60 minutes with patient and/or family member (53-67 minutes.

26. Per 45 CFR § 164.501, psychotherapy notes are defined as notes recorded by a mental health professional which document or analyze the contents of a counseling session and that are separated from the rest of a medical record. The definition of psychotherapy *excludes* medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of administered treatment, results of clinical tests, and any summary of diagnosis, functional status, treatment plan, symptoms prognosis, ongoing progress and progress to date. This class of information does not qualify as psychotherapy note material.

### 2. Interactive Complexity

27. The 2016 and 2017 CPT Manual states that an add-on code for "Interactive Complexity" (CPT 90785) may be billed in conjunction with psychotherapy codes if specific criteria are met. Interactive complexity refers to four specific communication factors during a visit that complicate delivery of the

primary psychiatric procedure. These four criteria include, (1) the need to manage maladaptive communication; (2) caregiver emotions or behavior that interfere with the caregiver's understanding and ability to assist in the implementation of the treatment plan; (3) evidence or disclosure of a sentinel event and mandated report to a third party; and (4) use of play equipment, other physical devices, interpreter, or translator to communicate with the patient to overcome barriers to therapeutic or diagnostic interactions in patients who are not fluent in the same language as the provider or have lost the expressive language communication skills to explain their symptoms.

### 3. Chronic Care Management

28. CMS recognizes chronic care management as a critical component of primary care that contributes to better health and care for individuals. In 2015, Medicare began paying separately for chronic care management services furnished to Medicare patients with multiple chronic conditions. The billing code (CPT 99490) is defined as at least 20 minutes of clinical staff time directed by a physician or other qualified health care professional, per calendar month, with the following required elements: multiple (two or more) chronic conditions expected to last more than 12 months, or until the death of the patient; chronic conditions place the patient under significant risk of death, acute decomposition,

or functional decline; and that a comprehensive care plan is established, implemented, revised, or monitored.

29. Chronic care management may be billed more frequently by primary care practitioners. Chronic care management is not within the scope of practice of limited license physicians and practitioners. Examples of chronic conditions include Alzheimer's disease, cancer, and hypertension. In order to prevent duplicative practitioner billing, a practitioner must obtain consent from the patient before furnishing or billing chronic care management. Consent may be verbal or written but must be documented in the medical record and include informing the patient about the availability and applicable cost-sharing of chronic care management services; that only one practitioner can furnish and be paid for chronic care management services during a calendar month, and that the patient has the right to stop chronic care management services at any time.

30. CMS describes chronic care management as extensive because it includes structured recording of patient health information, maintaining a comprehensive electronic care plan, managing transitions of care and other care management services, and coordinating and sharing patient health information timely. A key component and requirement of chronic care management is the comprehensive care plan. This is a person-centered electronic care plan based on a physical, mental, cognitive, psychosocial, functional, and environmental

assessment, and an inventory of resources. The patient and/or caregiver needs to be given a copy of the care plan. The physician also needs to ensure the electronic care plan is available and shared timely within and outside the billing practice to individuals involved in the patient's care. The plan includes, but is not limited to problem lists, expected outcomes and prognosis, measurable treatment goals, symptom management, planned interventions, medication management, and community/social services ordered.

### B. Dr. Muhamad Rifai and Blue Mountain Psychiatry

31. Dr. Muhamad Rifai is an internist and psychiatrist who owns and operates Blue Mountain Psychiatry. Blue Mountain Psychiatry became Medicare eligible in November 2012.[3] The practice has multiple locations in northeast Pennsylvania, including offices in Easton, in Palmerton, and in Stroudsburg. Based on discussions with prior employees, patient records are stored at each office. Review of claims data shows that Dr. Rifai bills for services provided at each office. Per its website, Blue Mountain Psychiatry specializes in medication management, psychotherapy, transcranial magnetic

---

[3] Per Medicare's Provider Enrollment, Chain, and Ownership System (PECOS) and the National Provider Identifier Registry, Blue Mountain Psychiatry's other names listed included "Concierge Psychiatry of the Lehigh Valley" and "Lehigh Valley Wellness."

stimulations, and addiction. Based on wage reports and claims data, between January 2015 and October, 2018, Blue Mountain Psychiatry has employed five nurse practitioners and two physician assistants. Dr. Rifai has been the sole owner and psychiatrist at Blue Mountain Psychiatry.

32. Based on data from Medicare's Part B contractor Safeguard Services, Blue Mountain Psychiatry billed Medicare $9.3 million and was paid $2.4 million between January 1, 2015 and October 31, 2018. Billing for services provided by Dr. Rifai accounted for the majority of this amount with $6.6 million billed and $1.7 million paid. Billings for nurse practitioners Eileen Teyim, Candice Regan, and an individual described here as CW-1, accounted for the majority of the remainder of the billings. Psychotherapy, 30 minutes (CPT 90833), was the top code billed at Blue Mountain Psychiatry for approximately $2.5 million billed and $879,000 paid.

33. In March 2007, Dr. Rifai was issued Pennsylvania medical license MD 431055. Dr. Rifai was subsequently issued DEA Registration Number BR7552272 for the purpose of prescribing controlled substances in Schedules II through V in Pennsylvania and Maryland. In addition, as of September 9, 2016, Dr. Rifai requested and was authorized to administer, dispense, and prescribe buprenorphine products, including Suboxone, to up to 275 patients for the purpose of treating drug addiction. Though physicians and treatment facilities

are subject to strict rules regarding confidentially of patient records, authorized drug treatment programs are more highly regulated and subject to special restrictions and requirements as set forth in Titles 21 and 42 of the United States Code and the Code of Federal Regulations.

## II. PROBABLE CAUSE FOR SEARCH

34. On August 29, 2017, Medicare's contractor, Northeastern Unified Program Integrity Contractor (NE UPIC), requested a random sample of medical records for the period January 3, 2016 through May 25, 2017 from Dr. Rifai.[4] This request was prompted by credible evidence regarding data analysis findings, allegations regarding Dr. Rifai's billing practices, and/or medical review probe findings. The request was to substantiate Dr. Rifai's billings for 63 claims with 402 total service units, which represented 10 beneficiaries. The review found that medical records provided by Dr. Rifai did not contain documentation to support that all the services billed were rendered. This review was finalized on December 5, 2017 by a registered nurse.

[4] CMS contracts with UPICs who perform Medicare program integrity functions. UPICs are defined by specific geographic locations and include the Western, Midwestern, Southwestern, Northeastern, and Southeastern jurisdictions. Safeguard Services, LLC (SGS) is the program integrity contractor for the Northeastern jurisdiction that covers Pennsylvania.

35. Specifically, the NE UPIC reviewed a medical sample containing 225 service units of psychotherapy (CPT code 90833, 30 minutes of psychotherapy with patient, performed with E/M services) and interactive complexity (CPT code 90785). Of these 225 service units, 204 service units (91 percent) were denied due to insufficient documentation to support the requirements for the psychotherapy CPT code when performed with an E/M service code. The NE UPIC's assessment found that the treatment plans were vague, and the medical records contained no documentation about the type, amount, frequency, and duration of the psychotherapy services billed. There was no documentation of how the treatment was expected to improve and/or preserve the patient's level of functioning. The content of the psychotherapy session documentation was not significant and separately identifiable from the E/M visit documentation for the same date of service.

36. The medical review also found that there was no documentation to support the interactive complexity billings (CPT 90785), when used in conjunction with psychotherapy. There was no documentation of any adaptations utilized in the sessions and the rationale for employing any interactive technique. The documents did not support specific communication factors present during the visits and were insufficient to support the requirements for CPT 90785.

37. On or about November 8, 2017, CW-1, a nurse practitioner at Blue Mountain Psychiatry from January 2015 until September 2015 and then again from January 2016 until September 2017, filed a civil action under seal in the United States District Court, Eastern District of Pennsylvania, alleging violations of the False Claims Act, 31 U.S.C. § 3729, against Dr. Rifai and Blue Mountain Psychiatry. An amended False Claims Act Complaint was filed on or about February 12, 2018. The Amended Complaint added a second relator, CW-2, a medical biller contracted by Dr. Rifai who worked at Blue Mountain Psychiatry from January 2013 until October 2017. In this civil action, relators seek, on behalf of the United States, civil monetary penalties against Dr. Rifai and Blue Mountain Psychiatry.[5] If the action is successful, CW-1 and CW-2 would be entitled to a percentage of the government's recovery, as well as attorney fees and costs. As such, CW-1 and CW-2 have a financial interest in the outcome of an investigation of Dr. Rifai and Blue Mountain Psychiatry.

38. HHS-OIG Special Agent Stephanie Yeager spoke with CW-1 and CW-2 in January and August 2018. CW-1 stated that Dr. Rifai never maintained a consistent schedule and staff referred to him as a "ghost doctor" because of his

[5] The civil action, docketed at 17-5069, is pending before the Honorable Jeffrey L. Schmehl in the Eastern District of Pennsylvania, and is under seal.

lack of availability. CW-2 said that Dr. Rifai treated patients at Easton Hospital throughout the week, and typically saw Blue Mountain patients at their office in Stroudsburg on Tuesday, Easton on Wednesday and Friday, and Palmerton on Thursday.

## A. Former Employee Statements and Records (January 2013 – June 2018)

### 1. CW-1

39. CW-1 was a nurse practitioner at Blue Mountain Psychiatry from January 2015 until September 2015 and then again from January 2016 until September 2017. CW-1 utilized telehealth to consult with patients through video-conferencing technology through software created by Forefront Telecare, Inc. (Forefront).[6] CW-1 logged into Forefront to see her patient list, calendar, and to communicate with patients located in nursing homes. Per our discussions with CW-1, she performed only 15-minute medication checks with her telehealth patients.[7] CW-1 said that Blue Mountain Psychiatry and Dr. Rifai should not

---

[6] Forefront is a software platform that enables providers and facilities to connect via audio/video. Per Forefront's website, their system is installed in client healthcare facilities where specialists can interact in real time with staff and patients on a large, high-definition screen. Forefront provides the in-facility equipment, training, scheduling, and the technical and logistical support. It does not have any affiliation with the provider or facilities' billing for the services.

[7] When CW-1 worked for Blue Mountain Psychiatry in 2015, in addition to doing 15-minute telehealth visits, she also saw patients at Easton Hospital and at drug

have billed for services under her NPI for any service other than a 15-minute telehealth medication check.

40. In July 2017, CW-1 received a letter from CMS requesting documentation to support the billing of a 70-minute patient examination. CW-1 never performed a 70-minute examination on any patient, and never completed a visit should have been billed for more than 15 minutes.

41. After reviewing the letter from CMS, CW-1 reviewed her billing history and had conversations regarding her services with CW-2. Through this, CW-1 discovered that Dr. Rifai had been adding billing codes to her patient visits and billing Medicare under her name for services that she never provided. CW-1 discovered that Dr. Rifai logged into Forefront to code and bill for services that she never provided. Dr. Rifai printed CW 1's one page progress notes and patient information from Forefront, handwrote additional billing codes on the printout, and provided this information to CW-2 for billing purposes. Dr. Rifai added these billing codes without ever discussing the patient or the visit with CW-1, so he would have had incomplete knowledge of the treatment actually provided. In addition, CW-1's progress notes often noted the time spent

---

and alcohol facilities contracted with Blue Mountain Psychiatry. When she returned in 2016, she only provided services via telehealth.

with the patient (i.e., 15 minutes), yet the billing codes Dr. Rifai often added were for services that require at least 30 minutes.

42. CW-1 stated that she performed only 15 minute medication checks via telehealth. However, Special Agent Yeager's review of the Medicare Part B data indicated that between January 1, 2015 and October 31, 2018, Dr. Rifai used CW-1's identifier to bill $542,000 for psychotherapy, 30 minutes, and was paid $123,000. In another example of false billing, Dr. Rifai used CW-1's identifier to bill $169,000 for chronic care management and was paid $32,000. As noted earlier, chronic care management requires at least 20 minutes of clinical staff time and requires multiple components in order to meet the billing criteria. Both the services for psychotherapy, 30 minutes, and chronic care management are more complicated, and yield a higher reimbursement rate, than the 15-minute medication checks that CW-1 actually performed.

43. When CW-1 conducted her telehealth visits via Forefront, she completed these visits from her home. She either faxed or scanned her progress notes via email to Dr. Rifai and maintained the paper copy. After CW-1 resigned from Blue Mountain Psychiatry, she returned about seven boxes of all of her paper progress notes to the 13th Street office in Easton. CW-1 stated that all old patient records are stored at this location.

2. CW-2

44. CW-2 was a medical biller contracted by Dr. Rifai. CW-2 worked at Blue Mountain Psychiatry from January 2013 until October 2017. CW-2 worked in the administrative office, which was in the 13th Street office in Easton. CW-2 also had the ability to work from her home. CW-2 did not have experience doing medical coding but believed that Rifai had extensive expertise in this area. Dr. Rifai provided the CPT codes to CW-2 and she entered these codes in the billing system. Dr. Rifai gave CW-2 CPT codes and instructions on how he wanted her to bill for services allegedly performed by him and his other medical providers.

45. CW-2 described several billing practices directed by Dr. Rifai. For example, Dr. Rifai requested CW-2 research the reimbursement amounts for the "add-on" CPT codes and if it was a high enough reimbursement, he requested that she include these CPT codes on the patient's bill to Medicare. At times, Dr. Rifai would hand CW-2 a list of "add-on" CPT codes and requested she bill for the entire prior calendar year for all the patients at a particular nursing facility for these specific CPT codes. For example, CW-2 stated that in mid-to-late December 2015, Dr. Rifai provided her with a spreadsheet containing all the patients' names, diagnosis codes, and CPT codes for her to bill. This spreadsheet contained CPT codes for services that were purportedly provided to

Blue Mountain Psychiatry patients every month since January 2015. For every patient Dr. Rifai included on the spreadsheet, Dr. Rifai directed her to bill for chronic care management for each month throughout the prior year. Moreover, according to CW-2, in 2016 Dr. Rifai directed CW-2 to bill specific CPT codes from a list he created for every single patient visit, regardless of the services provided at their visit.

46. CW-2 began to have concerns about the billing not being legitimate when she noticed that the billing times did not add up. For example, Dr. Rifai directed her to bill for services that indicated he provided a 60-minute session, but CW-2 said she knows that Dr. Rifai was not at a location for that amount of time. At times, CW-2 knew Dr. Rifai was at Easton Hospital, even though he directed her to bill as though he was in a Blue Mountain Psychiatry office. Dr. Rifai directed CW-2 to bill as though he treated 20 to 50 patients per day. CW-2 thought it seemed physically impossible that Dr. Rifai had treated that number of patients.

### 3. Candice Regan

47. On October 3, 2018, Special Agent Yeager spoke with Candice Regan (Regan), who worked for Dr. Rifai as a nurse practitioner at Blue Mountain Psychiatry from June 2016 until February 2018. As part of her employment, Regan conducted in-person outpatient visits at Blue Mountain

Psychiatry's office in Palmerton, Pennsylvania and online telehealth visits via Forefront and in-person visits with patients in the various nursing homes that contracted with Blue Mountain Psychiatry.

48. During the in-person visits, Regan completed a progress note for each patient to document chief complaints, changes in medication, and any other pertinent information. Regan stated that she typically spent 15-30 minutes with each patient, and she notated the time spent with the patient on the progress note. Regan commented that she did not do psychotherapy with her patients during these visits, and that she did not have training to provide psychotherapy. In addition, there was not enough time to do patient psychotherapy since the schedule allotted for 15 minutes per patient. Regan provided her progress notes to Dr. Rifai who converted the information into the CPT codes used to bill Medicare.

49. Through the telehealth visits, Regan and the patient could speak back-and-forth via a computer using Forefront. Regan would ask the patient questions about their medical history, conduct a quick cognitive assessment, and review their medications. Initial visits lasted 45 minutes, but the vast majority of the subsequent visits lasted 15 minutes. Regan recorded the length of time for each visit on her progress notes. She then faxed these notes to Dr. Rifai at the

Palmerton office, who converted the information into the CPT codes used to bill Medicare.

50. Special Agent Yeager showed Regan copies of progress notes for patients she treated in-person and using telehealth, and showed her the Medicare claims that Dr. Rifai billed for her visits. Regan reviewed and provided the following information:

a. **Patient 1, Date of Service September 2, 2016, Nursing Home Visit.**
   i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).
   ii. Regan stated that she only provided a 15-minute examination, as documented on her progress note.

b. **Patient 2, Date of Service September 2, 2016, Nursing Home Visit.**
   i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she only provided a 15-minute examination, as documented on her progress note. Regan stated that she never provided Patient 2 with psychotherapy, and that it was impossible due to this patient's issues with communication and lack of engagement with others.

c. **Patient 3, Date of Service November 18, 2016, Nursing Home Visit.**

i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

ii. Regan stated that she provided a 30-minute examination to Patient 3, as documented on her progress note. However, she did not do psychotherapy with the patient due to their diagnosis of dementia. According to Regan, doing psychotherapy on a patient diagnosed with dementia would not be effective because of their cognitive issues.

d. **Patient 4, Date of Service November 18, 2016, Nursing Home Visit.**

   i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

   ii. Regan stated that she only provided a 15-minute examination, as documented on her progress note. She did not do psychotherapy with Patient 4 due to their diagnosis of Alzheimer's Disease.

e. **Patient 5, Date of Service August 18, 2016, Telehealth Visit.**

   i. Dr. Rifai billed a subsequent nursing facility visit, typically 15 minutes per day (CPT 99308); psychotherapy, 30 minutes (CPT 90833); telehealth originating site facility fee (CPT Q3014); interactive complexity (CPT 90785); and chronic care management services at least 20 minutes per calendar months (CPT 99490).

   ii. Regan stated that she entered into Forefront that the visit was a 15-minute follow up (CPT 99308). She did not perform any other service. Documents provided by CW-1 and CW-2 show

that CPT 99308 was entered into Forefront, but that CPT codes 90833, 90785, Q3014, and 99490 are handwritten on a printout. CW-1, CW-2, and Regan identified the handwriting as Dr. Rifai's.

51. Blue Mountain Psychiatry's billing for the majority of patients treated by Regan include services that were not provided or indicate that a more complex service was provided. Per Regan's statements and as indicated in her progress notes, Regan rarely performed psychotherapy. Between August 2016 and February 2018, Blue Mountain Psychiatry billed Medicare Part B $96,000 and was paid $23,000 for 30-minute psychotherapy sessions allegedly performed by Regan. In addition, Blue Mountain Psychiatry billed Part B $96,000 and was paid $16,000 for chronic care management and interactive complexity codes for services allegedly performed by Regan. Per Regan's statements, as noted above, the vast majority of these billings are false.

**4. Eileen Teyim**

52. On November 6, 2018, Special Agent Yeager spoke with Eileen Teyim (Teyim). Teyim is a nurse practitioner who worked for Dr. Rifai at Blue Mountain Psychiatry between October 2016 and June 2018. Teyim conducted her outpatient visits at Blue Mountain Psychiatry's office on 13th Street in Easton, Pennsylvania. As part of Blue Mountain Psychiatry, Teyim also visited

nursing homes to provide medication management. She gave all of her patient progress notes to Dr. Rifai for billing purposes. Teyim said she rarely provided psychotherapy to the patients in the nursing homes. Many of these patients had dementia and other behavioral issues, so it would be extremely difficult and ineffective to provide them with psychotherapy. Teyim said she never completed psychotherapy during the outpatient visits at the Easton office.

53. Special Agent Yeager showed Teyim a printout of the claims data billed to Medicare for her services while working at Blue Mountain Psychiatry. Teyim stated that she was surprised that nearly every nursing home patient had psychotherapy billed at each visit. She said that these billings concerned her because she definitely did not perform psychotherapy during every nursing home visit. She estimated that about 20 to 30 percent of her patients per day received psychotherapy. There literally was not enough time in her workday to provide 30 minutes of psychotherapy to each patient. The billings for the outpatient visits were also concerning to Teyim. She concluded that there was no way she could have spent 30 minutes with each patient, as indicated in the billings, because she did not have enough time in her day.

54. Psychotherapy (30 minutes) was the top code Blue Mountain Psychiatry billed Medicare Part B for Teyim. From January 14, 2017 until June 10, 2018, Blue Mountain Psychiatry billed $169,000 for 30-minute sessions of

psychotherapy and was paid $45,000. Teyim's last day working for Dr. Rifai was June 1, 2018. Teyim confirmed that she did not perform services past this day, even though 18 of the submitted psychotherapy claims were for services after June 1, 2018.

**5. Netoya Nevarez**

55. On January 22, 2019, Special Agent Yeager spoke to Netoya Nevarez (Nevarez). Nevarez was the Coordinator of Practice Management at Blue Mountain Psychiatry in the Palmerton office. She was employed there from July 2015 until November 2017. Nevarez mentioned that patients without insurance are charged $250 cash for their first intake visit and $100 for all subsequent visits. Nevarez also commented that Dr. Rifai does not spend much time with his patients and described him as "in-and-out" of the office. Dr. Rifai would require that Nevarez schedule patients in 15-minute increments for not only himself, but also his physician assistants at Palmerton.

**B. Impossible Days**

56. The Medicare contractor, Safeguard Services, conducted an analysis to identify instances when Dr. Rifai was paid by Medicare for services that exceeded 24 hours in one day. Billing codes for evaluation and management, such as office visits or psychotherapy, have minutes associated with the code to represent the amount of time spent with the patient. Between

January 1, 2015 and October 31, 2018, Dr. Rifai was paid for providing more than 24 hours of services to patients on 46 separate days. For example, based on the data, Dr. Rifai would have seen 51 different patients on October 12, 2015 for visit time that accumulated to 49 hours.

57. During the course of the investigation, it became apparent that there is a pervasive pattern of billing fraud. It is Your Affiant's experience that fraud, when present, is present throughout most, if not all records.

58. Based on the above-described investigation and your Affiant's training and experience, your Affiant submits there isprobable cause to believe that Dr. Rifai and his company, Blue Mountain Psychiatry, have committed and are committing violations of Title 18, United States Code, Section 1347, health care fraud, and Title 18, United States Code, Section 1035, false statements relating to healthcare matters.

59. It is reasonable to expect that the items listed in Attachment B to be seized will be located in the SUBJECT PREMISES located at (1) 241 North 13th Street, Easton, Pennsylvania; (2) 217 Franklin Ave, Suite 106, Palmerton, Pennsylvania; and (3) 564 Main Street, Suite 103, Stroudsburg, Pennsylvania, as they are maintained during the normal course of business. The records listed to be seized are expected to show the extent of fraudulent billing.

60. Based on Medicare's Part B claims data, between January 2015 and October 2018, Dr. Rifai and his staff at Blue Mountain Psychiatry treated 1,408 beneficiaries. Of these, 876 beneficiaries received treatment while located at either a skilled nursing facility, assisted living facility, and/or through via telehealth.[8] Attached to Attachment B and incorporated here is a list of approximately 500 beneficiaries who received services at the aforementioned locations and had 10 or more claims submitted to Medicare by Blue Mountain Psychiatry (the Patient list). This application seeks permission to search for and seize the patient records and information related to the Patient list.

## III. SEARCH AND SEIZURE OF ELECTRONIC STORAGE MEDIA

61. As described above and in Attachment B, this application seeks permission to search for records that might be found at Blue Mountain Psychiatry, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

---

[8] The place of service on the claims data is derived from information provided by Dr. Rifai.

62. Further, even when records are stored on floppy disks, recordable CD disks, or on a hard drive, they may still be retrievable even when they purportedly have been erased or deleted. Should such data retrieval be necessary, it is time-consuming and would add to the difficulty of securing the system on the premises during the search.

63. Your Affiant submits that if a computer or storage medium is found at Blue Mountain Psychiatry, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on Your Affiant's knowledge, training, and experience, Your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not

currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, Your Affiant is aware that computer equipment was used to generate, store, and print documents used during the normal course of business at Blue Mountain Psychiatry. There is reason to believe that there is a computer system currently located at Blue Mountain Psychiatry.

64. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. Your Affiant submits there is probable cause to believe that this forensic electronic evidence will be on any storage medium at Blue Mountain Psychiatry because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of

computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions

about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. Your Affiant knows that when an individual uses a computer to submit false claims to a health care benefit program, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of

the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of the crime. From Your Affiant's training and experience, Your Affiant believes that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved and other records that indicate the nature of the offense.

65. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of Dr. Rifai/Blue Mountain Psychiatry, for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from Dr. Rifai/Blue Mountain Psychiatry, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for,

and who has used it requires considerable time, and taking that much time on Dr. Rifai/Blue Mountain Psychiatry, could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

66. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant Your Affiant is applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appears to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

67. The seizure of computers may limit Dr. Rifai/Blue Mountain Psychiatry's ability to conduct its business. As with any search warrant, Your Affiant expects that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, Special Agents will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of Blue Mountain Psychiatry so request, the Special Agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of Blue Mountain Psychiatry. If, after inspecting the computers, it is determined that some

# Exhibit 3:

# Search Warrant, 2021

# Agent Yeager

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AND DESCRIBED AS 241 NORTH 13TH ST, EASTON, PA | **FILED UNDER SEAL** |
| | Magistrate No. 21-1822 |

**AFFIDAVIT**

I, Stephanie Yeager, Special Agent, United States Department of Health and Human Services' Office of Inspector General (HHS-OIG), Office of Investigations, being duly sworn, depose and state the following:

## I. INTRODUCTION

1. I have been a Special Agent with the HHS-OIG, Office of Investigations, since May 2015. I am currently assigned to the Philadelphia Regional Office. Prior to becoming a Special Agent, I was employed by HHS-OIG Office of Evaluation and Inspections as a Team Leader from August 2006 to May 2015. During my nine years as a Team Leader, I led inspections that focused on preventing fraud, waste, and abuse within HHS' programs and gained extensive experience and knowledge of the government's reimbursement methodologies, program coverage, and data trends for prescription drugs.

2. I have a bachelor's degree in psychology from York College of Pennsylvania and a master's degree in Applied Psychology from the University of Baltimore. I successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia in August 2015.

3. As a Special Agent with HHS-OIG, I am responsible for investigating allegations of fraud against the various programs under HHS's jurisdiction, including the Medicare and Medicaid programs involving violations of 18 U.S.C. § 1347. I have also investigated the distribution of controlled substances, including violations of Title 21, United States Code, Section 846 and 841(a)(1). In the course of my investigations of these laws, I have learned that some doctors and other health care providers licensed to prescribe controlled substances knowingly provide fraudulent prescriptions to drug abusers, addicts, and dealers, for no legitimate medical purpose and outside the normal course of professional practice. The customers then take these fraudulent prescriptions to pharmacies which dispense the controlled substances prescribed.

4. Your Affiant is submitting this Affidavit in support of an Application for a Search Warrant for Blue Mountain Psychiatry (Blue Mountain), located at 241 North 13th Street, Easton, Pennsylvania (referred to as the SUBJECT PREMISES).[1] A detailed description of the search location is attached as "Attachment A" and is incorporated here.

5. Dr. Muhamad Aly RIFAI (Dr. RIFAI) is an internist and psychiatrist who owns and operates Blue Mountain. Per its website, Blue Mountain Psychiatry specializes in general psychiatry services, medication assessment and treatment, and opioid addiction care. Dr. RIFAI was issued Pennsylvania medical license MD 431055 in March 2007 and subsequently issued DEA Registration Number BR7552272 for the purpose of prescribing controlled substances in Schedules II through V in Pennsylvania and Maryland.

6. As described in detail below, there is probable cause to believe that Dr. RIFAI has orchestrated a scheme to write and dispense prescriptions for controlled substances that are

[1] The office is approximately 500 feet from Paxinosa Elementary School. Blue Mountain has other locations at 217 Franklin Avenue, Suite 101, Palmerton, PA and 1803 West Main Street, Stroudsburg, PA.

outside the normal course of professional practice and for no legitimate medical purpose, in violation of 21 U.S.C. § 841 (Illegal Distribution of Controlled Substances), and that the evidence and proceeds from these violations exist at the SUBJECT PREMISES. Dr. RIFAI routinely conducted telemedicine and in-person visits and wrote controlled substance prescriptions for patients without performing a thorough medical examination, evaluation, or patient medication counseling.

7. Starting in approximately February 2021, Dr. RIFAI expanded this scheme by having students in a physician assistant graduate program who were unlicensed and uncredentialled conduct psychiatric follow up visits with patients of Blue Mountain. These students did not have billing privileges, did not have prescription authority, had not graduated from a physician assistant program, and had not taken or passed the physician assistant examination. Based off the student's progress note, Dr. RIFAI wrote controlled substance prescriptions for these patients. These students interned at Blue Mountain for college credit and were not paid for their work. Therefore, Dr. RIFAI could presumably increase his overall profits by billing insurance or collecting cash from the patients for services provided by the unpaid students.

8. For the reasons set forth herein, Your Affiant is requesting authorization to seize from the SUBJECT PREMISES all records, instrumentalities, fruits and evidence of violations of Title 21 U.S.C. § 841(a)(1). A detailed description of the items to be seized is attached as "Attachment B," and is incorporated here.

9. The information set forth below is derived from an investigation conducted by the Drug Enforcement Administration (DEA) and HHS-OIG. The evidence presented below includes interviews, consensually recorded visits with confidential sources, records of

prescriptions, and reviews of prescription data. Because this affidavit is submitted for the limited purpose of establishing probable cause to support the issuance of the search warrant, I have not set forth every fact learned by me or other agents during the course of this investigation.

## II. RELEVANT LAW

### Title 21 and The Controlled Substance Act

10. The Controlled Substance Act (CSA) governs the manufacturing, distributing, and dispensing of controlled substances in the United States. See 21 U.S.C. 801-971. Title 21, United States Code, Section 841(a)(1), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally … manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

11. Title 21, United States Codes, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances."

12. The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of 21 Code of Federal Regulations § 1306.04, governing the issuance of prescriptions, which provides:

a. A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription, issued not in the usual course of professional treatment or in legitimate and authorized research, is not a prescription within the meaning and intent of section

309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the law relating to controlled substances.

13. The CSA classifies drugs into five schedules based on their medicinal value, potential for abuse, and safety or dependence liability. Schedule I drugs (such as heroin and LSD) have a high potential for abuse and no currently accepted medical use. Schedule II drugs (such as methadone, oxycodone, fentanyl and morphine) may be used legitimately as painkillers, but they are highly addictive and often abused. Abuse of Schedule II controlled substances may lead to severe psychological or physical dependence. Schedule III drugs (such as codeine products with aspirin), Schedule IV drugs (such as Xanax and Clonazepam), and Schedule V drugs (such as Promethazine with codeine, a cough syrup) all have medical uses and have successively lower potential for abuse and dependence. All Scheduled drugs, except those in Schedule I, are legally available to the public with a valid prescription.

14. Stimulants, which are Schedule II controlled substances can be used to treat patients who suffer from Attention Deficit Disorder; however, stimulants can be diverted for illicit purposes. The DEA regulates all controlled substances in order to prevent diversion. DEA's mission is to prevent diversion on controlled substances and ensure that Practitioners are prescribing controlled substances for a legitimate medical purpose. In recent years, stimulants, namely amphetamines, have been highly abused for illicit purposes.

15. Adderall is a brand name amphetamine salts prescription drug and is classified as a Schedule II controlled substance. Adderall is a combination of four different amphetamine salts and affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Adderall is available in tablets of 5mg, 7.5mg, 10mg, 12.5mg, 15mg, 20mg, and 30mg.

Based on my training and experiences, I am aware that stimulants like Adderall increase the effect of opioids.

**The Pennsylvania Code of Professional and Vocational Standards**

16. The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania to prescribe controlled substances. Chapter 16.92 provides in pertinent part:

> (a) A person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board, when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:
>
> (1) Initial medical history and physical examination. . . . [B]efore commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination will be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days. The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.
>
> (2) Reevaluations. Among the factors to be considered in determining the number and frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up

evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

(3) Patient counseling. Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or dispensed. Unless the patient is in an inpatient setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of us and possible side effects.

(4) Medical records. Certain information shall be recorded in the patient's medical record on each occasion a controlled substance is prescribed, administered or dispensed. This information shall include the name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient. The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of the condition for which the controlled substance is being given and the directions given to the patient for the use of the controlled substance. If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

17. The Pennsylvania Code of Professional and Vocational Standards (49 Pa. Code, Chapter 16.95) requires physicians to maintain timely and complete medical records for at least 7 years from the date of the last medical service for the patient. The Drug Enforcement Administration requires physicians to maintain records, whether in paper and/or digital form, of their purchases, distributions and prescriptions of controlled substances for at least two years.

18. The Pennsylvania Code of Professional and Vocational Standards (49 Pa. Code, Chapter 17.22) states that a person in a graduate medical trainee program may not practice medicine as part of a graduate medical education program without a valid license issued by the Board. A graduate medical trainee is a medical school graduate with a graduate license issued by the Board for training purposes.

19. Chapter 18.122 of the Pennsylvania Code of Professional and Vocational Standards defines a physician assistant as an individual who is licensed as a physician assistant by the Board. Per Chapter 18.141, the Board approves a physician assistant license when the applicant (1) satisfies certain requirements (legal age, of good moral character, not intemperately using alcohol or habitually using narcotics, and not convicted of a felony under the Controlled Substance, Drug, Device and Cosmetic Act); (2) has graduated from a physician assistant program recognized by the Board; (3) has submitted a completed application; and (4) has passed the physician assistant examination.

20. Similarly, Chapter 21.251 defines a nurse practitioner as a professional nurse licensed in the State who is certified by the Board. Further, Chapter 21.271 requires a nurse practitioner to have completed an accredited, Board-approved master's or post-master's nurse practitioner program. To obtain prescriptive authority, a certified nurse practitioner must also complete at least 45 hours of pharmacologic course work and submit an application for approval by the Board.

## III. PROBABLE CAUSE

### A. Case Initiation of Drug Diversion Investigation

21. HHS-OIG initiated this investigation in March 2018 based on allegations that Dr. RIFAI and Blue Mountain submitted false claims to the federally funded health care

benefit program, Medicare, in violation of 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters). The health care fraud investigation has levels of care and for services that were never provided to the patients, who are primarily Medicare beneficiaries. Agents from HHS-OIG executed search warrants at all Blue Mountain offices on June 18, 2019.

22. The investigation into Dr. RIFAI and Blue Mountain continued following the search warrants and found new evidence indicating that Dr. RIFAI is illegally prescribing highly addictive and often abused controlled substances. In August 2020, your affiant interviewed former Blue Mountain employee, Kenneth Fulton-Resig (Fulton-Resig). Fulton-Resig was a licensed professional counselor at Blue Mountain from approximately March 2019 to April 2020. Fulton-Resig stated that he anonymously reported Dr. RIFAI to the DEA in April 2020, based on his view that Dr. RIFAI engaged in illegal prescribing and unethical conduct. Fulton-Resig observed Dr. RIFAI prescribing dangerous drug cocktails such as Ativan with Adderall.[2] He also observed patients receiving Suboxone prescriptions after having a 5-minute visit with Dr. RIFAI. Blue Mountain did not have a maintenance program, conduct suboxone counseling, or perform testing of illicit substances in the patient's system.

23. On October 1, 2020, DEA Diversion Investigators (DI) and HHS Special Agents discussed the prescribing of Schedule II Stimulants by Dr. RIFAI. DEA Investigator Austin T. Lastoskie informed HHS Special Agents that he received an anonymous complaint

[2] Adderall, the brand name for amphetamine/dextroamphetamine, is a stimulant and Schedule II controlled substance. Substances in this classification have an increased potential for abuse and can lead to extreme psychological and/or physical dependence. Ativan, a Schedule IV controlled substance, is a sedative classified as a benzodiazepine. It is prescribed to treat anxiety. Substances in this classification have a low potential for abuse and low risk of dependence. In September 2020, the Food and Drug Administration issued a news release about benzodiazepines commonly being abused or misused when taken with opioid pain relivers, other medicines, alcohol, and illicit drugs.

from a former therapist at Blue Mountain (this was presumably the complaint put forth by Fulton-Resig). According to the anonymous therapist, Dr. RIFAI prescribed Benzodiazepines, Stimulants, Ketamine, and Suboxone to any individual or patient who wants those controlled substances.

24. Due to this anonymous tip, DEA Investigator Lastoskie reviewed the Pennsylvania Prescription Drug Monitoring Program (PDMP). The Pennsylvania PDMP monitors all controlled substances prescribed and dispensed in the State of Pennsylvania. Any controlled substance prescribed by a physician is recorded in the PDMP when the prescription is filled at a pharmacy. The information records the patient's information, as well as what the patient was prescribed and by which physician's name and DEA Registration Number.

25. According to the Pennsylvania PDMP, Dr. RIFAI prescribed more than 40,000 pills of Schedule II Stimulants in 2018. This increased to more than 67,000 pills of Schedule II Stimulants in 2019. In 2020, Dr. RIFAI prescribed more than 104,000 pills of Schedule II Stimulants.

### B. Undercover Visits and Treatment by Students

#### Undercover Visit on May 17, 2021

26. On May 17, 2021, DEA Investigators Austin T. Lastoskie, Christina Pelosi, Group Supervisor (GS) Scott Davis, along with HHS Agents Stephanie Yeager, Andrew Timonere, and Zachary Ney, Resident Agent in Charge (RAC) Philip Bernal, DEA Task Force Officer (TFO) Christopher Kopp, and DEA TFO Brent Lear, met with Bethlehem Township Police Department (BTPD) Officer Gretchen Kraemer to conduct an undercover office visit with

Dr. RIFAI at Blue Mountain's Easton office, located at 241 N. 13th Street, Easton, PA (SUBJECT PREMISES).

27. BTPD Officer Kraemer entered SUBJECT PREMISES at approximately 3:30 PM where she, acting in undercover capacity, identified herself as an undercover name, "Gretchen Davis." When Officer Kraemer entered Blue Mountain, she met with an unknown female who was at the front desk. Officer Kraemer paid the unknown female $300 cash and was provided a receipt. Officer Kraemer sat in the waiting room and was given medical history forms to complete. Officer Kraemer waited sometime before two unknown females approached her and identified themselves as "students." The students explained to Officer Kraemer to follow them to a room and the students would help her fill out the forms. Once in the office room, one of the female students asked her questions regarding her medical history. Officer Kraemer explained to the students that a previous doctor prescribed her Adderall.

28. When Officer Kraemer was finished speaking with the students, she proceeded back to the waiting room. Officer Kraemer was then called back to meet with Dr. RIFAI. Officer Kraemer was in the room with Dr. RIFAI, as well as the two unknown female students. Officer Kraemer disclosed to Dr. RIFAI that a previous doctor prescribed her Adderall, but Officer Kraemer did not give Dr. RIFAI a reason why her previous doctor prescribed Adderall. Dr. RIFAI questioned Officer Kraemer about her fictitious address and the reason why she did not have a driver's license. Officer Kraemer disclosed to Dr. RIFAI that she lost her license due to receiving a Driving Under the Influence of alcohol citation. Officer Kraemer's weight and blood pressure were taken during the appointment.

29. Dr. RIFAI checked the Pennsylvania PDMP and stated that Officer Kraemer has not been prescribed a controlled substance in five years. Before the appointment

concluded, Officer Kraemer told Dr. RIFAI that she would like the Adderall prescription sent to CVS Pharmacy, located at 4950 Freemansburg Avenue, Easton, PA. Dr. RIFAI prescribed Officer Kraemer 30 Adderall 5mg tablets.

30. Dr. RIFAI never conducted any type of medical examination with Officer Kraemer nor did Dr. RIFAI order any laboratory tests or a urine drug screen. In addition, Officer Kraemer was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or X-Rays. Dr. RIFAI never discussed with Officer Kraemer about attending counseling or therapy sessions. Dr. RIFAI never discussed with Officer Kraemer the dangers of the controlled substance medication that was prescribed.

**Undercover Visit on June 11, 2021**

31. On June 11, 2021, DEA and BTPD had a prearranged telemedicine appointment with Dr. RIFAI. A little after 5:00 PM, Officer Kraemer received a telephone call from "Julia," who was at Dr. RIFAI's office. Officer Kraemer asked Julia if she was one of the "students" she met with on her last visit and Julia confirmed that she was one of the students who helped Officer Kraemer to complete her initial intake paperwork. Julia questioned Officer Kraemer about the Adderall Dr. RIFAI prescribed her on the last visit. Officer Kraemer told Julia that she wanted more Adderall and requested the Adderall be for a longer number of days (i.e., 30-day prescription). Julia asked how Officer Kraemer was sleeping and if Melatonin works. Julia asked Officer Kraemer if she would like a prescription for sleeping and Officer Kraemer replied "Sure." Julia stated that she would inform Dr. RIFAI about this and she would call Officer Kraemer back shortly.

32. On that same day, at approximately 5:15 PM, Officer Kraemer received a telephone call back from Julia. Julia stated that Dr. RIFAI would prescribe her Adderall 10mg

tablets for a two-week period, as well as a sleeping sedative. Dr. RIFAI prescribed the undercover officer 60 Adderall 10mg tablets for a 30-day period (an increase from the prior 5mg tablets), along with 30 Trazadone 50mg tablets. In addition to Officer Kraemer never speaking or seeing Dr. RIFAI, Dr. RIFAI never had Julia order any laboratory tests or a urine drug screen. Officer Kraemer was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or X-Rays. Dr. RIFAI never had Julia discuss with Officer Kraemer about attending counseling or therapy sessions. Dr. RIFAI did not have Julia discuss the dangers of the controlled substance medications that were prescribed to Officer Kraemer.

**Undercover Visit on July 16, 2021**

33. On July 16, 2021, DEA and BTPD had a prearranged telemedicine appointment with Dr. RIFAI. However, Dr. RIFAI was on international travel to Turkey on the day of the visit. At approximately 2:32 PM, Officer Kraemer received a telephone call from Destiny at Blue Mountain. Destiny explained to Officer Kraemer that she spoke with the physician assistant, Amy MAKL (MAKL), and MAKL would send the prescriptions over to the pharmacy. Officer Kraemer never spoke with MAKL nor any medical professional of Blue Mountain. However, she received a prescription for 60 Adderall 10mg tablets and 30 Trazodone 50mg tablets. MAKL never had Destiny order any laboratory tests or a urine drug screen.

34. In addition, Officer Kraemer was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or X-Rays. MAKL or Destiny never discussed with Officer Kraemer about attending counseling or therapy sessions. MAKL did not

have Destiny discuss the dangers of the controlled substance medications that were prescribed to Officer Kraemer.

**Undercover Visit on August 9, 2021**

35. On August 9, 2021, DEA and BTPD had a prearranged telemedicine appointment with Dr. RIFAI. At approximately 11:50 AM, Officer Kraemer received a telephone call from Blue Mountain, and a woman who identified herself as "Rosalynn" spoke with Officer Kraemer. Rosalynn stated to Officer Kraemer that she was a Nurse Practitioner "Student" who was making phone calls for Dr. RIFAI's office. Rosalynn asked Officer Kraemer, "How are things going," and asked how she was feeling. Officer Kraemer told Rosalynn that she was wondering if she could get more of the medication, specifically, the Adderall. Rosalynn stated, "I would have to ask him" referring to Dr. RIFAI. Before the phone call terminated, Rosalynn asked Officer Kraemer, "What's the name of your pharmacy?"

36. At approximately 12:03 PM, Officer Kraemer received a telephone call from Blue Mountain and Rosalynn identified herself again. Rosalynn stated to Officer Kraemer that Rosalynn spoke with Dr. RIFAI, who increased the Adderall to 15mg. Dr. RIFAI prescribed the undercover officer 60 Adderall 15mg tablets without her speaking to Dr. RIFAI or a licensed medical professional. Rosalynn stated that for the next appointment Officer Kraemer would have to come in person to perform a urine drug screen. Rosalynn stated to Officer Kraemer that Rosalynn did not know for how long the prescription was prescribed (15 or 30 days).

37. In addition to Officer Kraemer never speaking or seeing Dr. RIFAI, Rosalynn never ordered any laboratory tests. Officer Kraemer was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or X-Rays. Dr. RIFAI never had

Rosalynn discuss with Officer Kraemer about attending counseling or therapy sessions. Dr. RIFAI did not have Rosalynn discuss the dangers of the controlled substance medications that were prescribed to Officer Kraemer.

**Interviews with Students**

***Julia Canty***

38. On August 2, 2021, DEA Investigator Lastoskie and HHS Agent Yeager interviewed Julia CANTY (CANTY) a former student intern at Blue Mountain. While CANTY was a student intern at Blue Mountain, she had not graduated from her physician assistant program at Misericordia University and was not licensed.

39. CANTY explained to Investigators that her duties at Blue Mountain included conducting phone calls with current patients. CANTY would speak with the patients and would present the "Case" to Dr. RIFAI, who would then submit an electronic prescription to the pharmacy. CANTY made about 20 phone calls a day and she stated that about half of those patients received controlled substances. A typical phone call lasted about five minutes. CANTY was one of the students who assisted Officer Kraemer with the intake paperwork and subsequently made the phone call for the follow up visit.

40. When it came to Suboxone patients,[3] CANTY made phone calls to about two or three Suboxone patients. She would speak with the Suboxone patients and then relay the information to Dr. RIFAI who would then submit the Schedule III controlled substance prescription to the pharmacy. However, according to Title 21 C.F.R. Section 1301.28 (b)(1)(ii), "With respect to patients to whom the practitioner will provide such drugs or combinations of drugs, the individual practitioner has the capacity to provide directly, by referral, or in such other

[3] Suboxone is an opioid dependency medication and is used to treat opioid use disorders.

manner as determined by the Secretary of Health and Human Services: (A) All drugs approved by the Food and Drug Administration for the treatment of opioid use disorder, including for maintenance, detoxification, overdose reversal, and relapse prevention; and (B) Appropriate counseling and other appropriate ancillary services." In the instances where CANTY spoke to a Suboxone patient, Dr. RIFAI did not provide any counseling or any other type of service. Additionally, CANTY is not a licensed practitioner and not registered to prescribe narcotics used to treat opioid use disorders.

41. According to CANTY, when students were making the telephone calls, Dr. RIFAI was in another room seeing patients who came to Blue Mountain in-person. Including the phone calls and the in-person patients, CANTY estimated Blue Mountain treated about 40 patients a day. According to CANTY, Misericordia University could not understand why Investigators wanted to speak with her because CANTY "does not have prescribing authority."

***Maureen Kloap***

42. August 18, 2021, DEA Investigator Lastoskie and Agent Yeager interviewed Maureen KLOAP (KLOAP), a former student intern at Blue Mountain. KLOAP started her six-week internship at Blue Mountain in May 2021 and ended in June 2021. When KLOAP was at Blue Mountain, she had not graduated from her physician assistant program and was not licensed.

43. KLOAP explained that she shadowed another student on her first day. This student was CANTY. KLOAP stated that she assisted CANTY in completing new patient's initial intake paperwork. KLOAP and CANTY met new patients to discuss their medical history,

why they were seeking treatment, and what medications (if any) they were taking. KLOAP only had access to the initial intake paperwork.

44. KLOAP explained that she also called patients for "follow-up" appointments. According to KLOAP, Dr. RIFAI was not physically present when KLOAP and other students made the follow-up calls. While KLOAP was making calls, Dr. RIFAI was meeting with patients that came into Blue Mountain for an office visit. Dr. RIFAI did not oversee the students who made patient phone calls. KLOAP stated the students made about 10 to 20 patient phone calls a day and approximately 25 to 50 percent of the patients received controlled substances. KLOAP explained to Investigators that the phone calls usually lasted between 5 and 10 minutes.

45. KLOAP stated that Blue Mountain had two patient daily visit sheets: one for the student interns to make telephone calls to the patients, and the other for Dr. RIFAI to meet with the patients who arrived at the office. KLOAP disclosed that a typical patient visit with Dr. RIFAI was for approximately 5 to 10 minutes.

***Jacob Stancato***

46. On August 16, 2021, DEA Investigator Lastoskie and Agent Yeager interviewed Jacob STANCATO (STANCATO). STANCATO was a student intern at Blue Mountain from the beginning of July to August 2021. When STANCATO was at Blue Mountain, he had not graduated from his physician assistant program and was not licensed.

47. STANCATO's responsibilities included making phone calls to patients for follow up visits. He received a patient list each day that included the patient's name, phone number to call, current medications, date of birth, and their last visit note. These lists were referred to as a "super script." Dr. RIFAI instructed STANCATO to ask patients about whether

they needed refills, how they were doing, how they were sleeping and how was their appetite. Some patients only asked if Dr. RIFAI could send their prescription refills to the pharmacy and did not answer questions. STANCATO passed the information he learned from the patients to Dr. RIFAI as a handwritten note and/or verbally. STANCATO believed Dr. RIFAI used these notes to determine if he needed to follow up with the patient. However, STANCATO never discussed the additional follow ups with Dr. RIFAI and never heard Dr. RIFAI make follow up calls to these patients.

48. While STANCATO was making phone calls to patients, Dr. RIFAI was either treating other patients in-person or via telehealth. Dr. RIFAI was not in the room while STANCATO was doing the patient follow-up phone calls. About three to four students were at Blue Mountain making similar types of follow-up call with patients. STANCATO is not credentialled and does not have his own NPI. Dr. RIFAI would read STANCATO and the other student's patient notes into his dictation system for entry into the electronic medical records.

49. STANCATO found it weird that he, as a student, was performing patient follow-up visits without supervision. STANCATO felt that he did not have a relationship with Dr. RIFAI because they barely talked.

***Jacquelyn Michalski***

50. On August 18, 2021, DEA Investigator Lastoskie and Agent Yeager interviewed Jacquelyn MICHALSKI (MICHALSKI). MICHALSKI was a student intern at Blue Mountain between mid-January and February 19, 2021.

51. MICHALSKI's responsibilities included bringing patients from the waiting room to the exam room, observing the examinations and assisting with the intake visits. There were times when MICHALSKI did the patient intake and presented the patient's

information to Dr. RIFAI before he saw the patient. He did not ask many questions during patient's visits and the visit lasted about 10-15 minutes. MICHALSKI did not believe Dr. RIFAI's visits were thorough. His telehealth visits lasted about 5 minutes. Dr. RIFAI treated between 25 to 27 patients per day, with a lot of these being patients for substance abuse.

52. The follow up visit phone calls performed by students started after MICHALSKI's internship ended. One of the students who started at the end of February questioned whether MICHALSKI made these calls too. According to MICHALSKI, this student was worried about calling patients for their psychiatric follow up visits without supervision, without being licensed, and while still being enrolled in school.

**C. Prescriptions for Scranton Patient Group**

53. DEA Investigator Lastoskie reviewed the Pennsylvania Prescription Drug Monitoring Program (PDMP) and discovered multiple patients of Dr. RIFAI in the Scranton, PA area travelling to Blue Mountain's office in Stroudsburg. The Scranton-area is approximately 48 miles from Dr. RIFAI'S office. Based on my training and experience, patients travelling a distance to see a doctor can be indicative of drug diversion.

54. On October 14, 2020, DEA Investigators Lastoskie and Christina Pelosi received intelligence from pharmacist Kasey Krutski, regarding a prescription being filled at CVS PHARMACY #01611 (CVS), located at 1101 Moosic Street, Scranton, PA 18505. Krutski stated that Dr. RIFAI's patient, Rita N[redacted] was going to have her son, Robert N[redacted] pick up her prescriptions within a half hour. Robert N[redacted] is a patient of Dr. RIFAI as well.

55. After this notification by CVS, DI Lastoskie and Pelosi went to the parking lot of CVS. They witnessed Robert N[redacted] exit CVS carrying a prescription bag when an unidentified Hispanic male approached Robert N[redacted]. Robert N[redacted] and the

unidentified Hispanic male proceeded towards Robert N[redacted]'s vehicle. Robert N[redacted] and the unidentified Hispanic male were in the vehicle for approximately 10-15 minutes and appeared to be counting pills. The unidentified Hispanic male exited the vehicle, with what appeared to be a large bulge in his pocket.

56. On October 15, 2020, DI Pelosi and HHS Agent Andrew Timonere interviewed Robert N[redacted], along with Robert N[redacted]'s Probation Officer Joey Gianacopoulos. Robert N[redacted] admitted he drove himself to the CVS Pharmacy on October 14, 2020, even though his license is suspended, to pick up his mom's prescription for Adderall. This prescription was written by Dr. RIFAI. He confessed to selling 25 Adderall pills to a man named Chuck O'Dell for $10 per pill.

57. On October 16, 2020, DI Lastoskie and Pelosi, along with Probation/Parole Officer (PO) Alfredo Pisa interviewed Justin S[redacted]. At the time, Justin S[redacted] was a current patient of Dr. RIFAI. S[redacted] explained that Brooke E[redacted] recruited him to go to Dr. RIFAI's office, along with Alex S[redacted] (E[redacted] new/current boyfriend), Robert N[redacted] (E[redacted] baby's father) and Rita N[redacted] (ROBERT's mother). According to S[redacted], ROBERT and E[redacted] had been going to DR. RIFAI's for over a year and were being prescribed Adderall and Clonazepam. S[redacted], E[redacted], S[redacted], R[redacted], and R[redacted] all reside in the Scranton area.

58. Justin S[redacted] stated that on April 29, 2020, S[redacted], along with E[redacted], S[redacted], R[redacted], R[redacted] and Liam (E[redacted] and R[redacted]'s five-year-old child) drove to Dr. RIFAI's Stroudsburg office. S[redacted] alleged that the sole purpose of the visit was to obtain stimulants and benzodiazepines. According to S[redacted], the group took two separate vehicles to make the drive. S[redacted] told investigators he always filled the

prescriptions written by Dr. RIFAI and sold these medications to Robert N[redacted] for $200. Justin S[redacted] told investigators that Robert N[redacted] had notified him on October 15, 2020, that Robert N[redacted] had spoken to the DEA. Robert N[redacted] indicated to Justin S[redacted] that the DEA "did not know anything," and that Robert N[redacted] would contact him the near future about the next meeting to sell his prescriptions.

**D. Telemedicine Visits**

**November 18, 2020 Telemedicine Visit (SOI)**

59. On November 18, 2020, DEA Investigators Lastoskie and Pelosi, along with DEA Task Force Officer (TFO) Jason Gula met with Scranton Police Department's (SPD) Source of Information (SOI) for a telemedicine appointment with Dr. RIFAI. The telemedicine meeting lasted approximately four minutes, with about one to two minutes of video service connections issues.

60. During this visit, Dr. RIFAI asked the SOI how he/she was feeling and asked how the medication was working. The SOI responded that he/she "Can't complain" and that the medication was fine. Dr. RIFAI asked the SOI if Biancarelli's Pharmacy was still where he/she wanted the prescriptions submitted. The SOI acknowledged that this was the pharmacy. Dr. RIFAI electronically forwarded the prescriptions to Biancarelli's Pharmacy. Dr. RIFAI asked the SOI if the Seroquel was helping him/her sleep and the SOI responded that it was helping. Dr. RIFAI explained that he would forward an electronic prescription to Biancarelli's Pharmacy for Seroquel, as well as the Amphetamine Salts and Clonazepam. Dr. RIFAI prescribed the SOI 90 Adderall 30mg tablets, 60 Clonazepam 1mg tablets, and 30 Quetiapine 100mg tablets.

61. During the telemedicine call between Dr. RIFAI and the SOI, Dr. RIFAI never asked the SOI medical related questions nor did Dr. RIFAI order any laboratory tests or a

urine drug screen. In addition, the SOI was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or E-Rays. Dr. RIFAI did not ask the SOI to provide blood pressure numbers and/or weight numbers.

**January 5, 2021 Telemedicine Visit (SOI)**

62. On January 5, 2021, DEA Investigators Lastoskie and Pelosi, along with DEA TFO Gula met with SPD's SOI for a telemedicine appointment with Dr. RIFAI. Also present for this telemedicine appointment was DEA TFO Cristie Soto, and HHS Agents Stephanie Yeager and Andrew Timonere. Dr. RIFAI asked the SOI how he/she was feeling and asked how the medication was working. The SOI responded that he/she "Can't complain" and that the medication was fine. Dr. RIFAI asked the SOI if Biancarelli's Pharmacy was still where he/she wanted the prescriptions submitted. The SOI acknowledged that Biancarelli's was the pharmacy. Dr. RIFAI prescribed the SOI 90 Adderall 30mg tablets, 60 Clonazepam 1mg tablets, and 30 Quetiapine 100mg tablets.

63. During the telemedicine call between Dr. RIFAI and the SOI, Dr. RIFAI never asked the SOI medical related questions nor did Dr. RIFAI order any laboratory tests or a urine drug screen. In addition, the SOI was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or X-Rays. Dr. RIFAI never discussed with the SOI about attending counseling or therapy sessions. Dr. RIFAI never discussed with the SOI why it was important to continue taking these medications. Dr. RIFAI did not ask the SOI to provide blood pressure numbers and/or weight numbers.

**February 9, 2021 Telemedicine Visit (SOI)**

64. On February 9, 2021, DEA TFO Gula met with SPD's SOI to conduct a telemedicine appointment with Dr. RIFAI. The SOI spoke with Dr. RIFAI via facetime, where

the SOI disclosed that he was doing well and skiing a lot. Dr. RIFAI asked the SOI about the medication, how the holidays were, and if the same pharmacy (Biancarelli's Pharmacy) was still where the SOI wanted the medications sent. The SOI confirmed and Dr. RIFAI explained that the "girls" would reach out to the SOI regarding payment. The entire telemedicine visit lasted approximately 100 seconds. Dr. RIFAI prescribed the SOI 90 Adderall 30mg tablets, 60 Clonazepam 1mg tablets, and 30 Quetiapine 100mg tablets.

65. During the telemedicine call between Dr. RIFAI and the SOI, Dr. RIFAI never asked the SOI medical related questions nor did Dr. RIFAI order any laboratory tests or a urine drug screen. In addition, the SOI was not required to produce or submit any type of diagnostic testing results, such as MRIs and/or X-Rays. Dr. RIFAI never discussed with the SOI about attending counseling or therapy sessions. Dr. RIFAI never discussed with the SOI why it was important to continue taking these medications. Dr. RIFAI did not ask the SOI to provide blood pressure numbers and/or weight numbers.

**E. Interviews with Former Patients**

66. On December 22, 2020, DEA Investigators Lastoskie and Pelosi interviewed Michelle H[redacted] (H[redacted]). Halenar was a former patient of Dr. RIFAI. She started going to Dr. RIFAI in 2016 and stopped towards the end of 2017. H[redacted] was first introduced to Dr. RIFAI because she was seeking treatment for drugs and alcohol addiction. Dr. RIFAI typically prescribed her 90 Dextroamp-Amphetamin 15mg tablets for a 30-day period. Dr. RIFAI prescribed it to her because she seemed/felt "unmotivated." Dr. RIFAI prescribed H[redacted] Methadone initially in smaller doses, however, over the course of a few visits H[redacted] realized she was becoming addicted to the Methadone. Dr. RIFAI raised the prescription quantity and was eventually prescribing her 270 Methadone 10mg tablets for a 30-

day period. H[redacted] explained to Investigators that even though the pain was still present, she felt that she needed the Methadone to prevent withdrawal.

67. On January 7, 2021, DEA Investigators Lastoskie and Pelosi, interviewed Jesse C[redacted] (C[redacted]). C[redacted] started seeing Dr. RIFAI due to a work-related injury that happened in April 2014. C[redacted] was seeking pain management for his work-related injury. Investigators questioned why he was seeing Dr. RIFAI since he is a psychiatrist but C[redacted] did not have an explanation. C[redacted] paid $100 cash for his visits at Blue Mountain. C[redacted] explained that Blue Mountain would not take his insurance. The visit with Dr. RIFAI consisted of him asking C[redacted] how were his medications and how he was doing. C[redacted] would typically be in Dr. RIFAI's office for about 15 minutes. C[redacted] would then receive written prescriptions from Dr. RIFAI for 15 Percocet 10mg tablets, 180 Methadone 10 mg tablets, 90 Xanax 2mg tablets, and 90 Adderall 30mg tablets.

68. C[redacted] stated that Dr. RIFAI did not conduct physical exams, rather Dr. RIFAI would only write him the prescriptions. C[redacted] explained that he was arrested by Pennsylvania State Police (PSP) for possession of more than 500 Xanax Bars (tablets). C[redacted] was not charged for the Xanax due to him having a prescription. Investigators asked why he had so much Xanax and he explained that he was saving the Xanax tablets because he was trying to wean his way off of the Xanax. When investigators asked him why he continued to see Dr. RIFAI for Xanax prescriptions, he stated it was just easier to get all of the prescriptions filled. Investigators asked C[redacted] if anyone at Blue Mountain ever questioned him regarding his arrest or why there was more than 500 Xanax tablets recovered by PSP. According to C[redacted] no one at Blue Mountain questioned him about his arrest or why there was more than 500 Xanax

tablets recovered by PSP. Despite his arrest with multiple controlled substances, Blue Mountain continued to prescribe [redacted] Methadone, Xanax, Adderall, and Percocet.

## IV. SEARCH AND SEIZURE OF ELECTRONIC STORAGE MEDIA

69. As described above and in Attachment B, this application seeks permission to search for records that might be found at Blue Mountain Psychiatry, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

70. Further, even when records are stored on floppy disks, recordable CD disks, or on a hard drive, they may still be retrievable even when they purportedly have been erased or deleted. Should such data retrieval be necessary, it is time-consuming and would add to the difficulty of securing the system on the premises during the search.

71. Your Affiant submits that if a computer or storage medium is found at Blue Mountain Psychiatry, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on Your Affiant's knowledge, training, and experience, Your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, Your Affiant is aware that computer equipment was used to generate, store, and print documents used during the normal course of business at Blue Mountain Psychiatry. There is reason to believe that there is a computer system currently located at Blue Mountain Psychiatry.

72. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this

forensic electronic evidence will be on any storage medium at Blue Mountain Psychiatry because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. Your Affiant knows that when an individual uses a computer to submit false claims to a health care benefit program, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of the crime. From Your Affiant's training and experience, Your Affiant believes that a computer used to commit a crime of this type may contain: data that is evidence of how the

computer was used; data that was sent or received; notes as to how the criminal conduct was achieved and other records that indicate the nature of the offense.

73. Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of Dr. RIFAI/Blue Mountain Psychiatry, for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from Dr. RIFAI/Blue Mountain Psychiatry, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on Dr. RIFAI/Blue Mountain Psychiatry, could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.

Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

74. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant Your Affiant is applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appears to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

75. The seizure of computers may limit Dr. RIFAI/Blue Mountain Psychiatry's ability to conduct its business. As with any search warrant, Your Affiant expects that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, Special Agents will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of Blue Mountain Psychiatry so request, the Special Agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or

important to the continuing function of Blue Mountain Psychiatry. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## V. CONCLUSION

76. Based upon the information contained in this affidavit, and my training and experience, there is probable cause to believe that Dr. RIFAI illegally distributed prescriptions for controlled substances for no legitimate medical purpose and outside the normal course of professional practice, in violation of 21 U.S.C § 841(a)(1). Furthermore, there is probable cause to believe that evidence of those violations, as described in Attachment B, can be found on SUBJECT PREMISES located at 241 North 13th Street, Easton, Pennsylvania, as they are maintained during the normal course of business.

77. Therefore, I respectfully request the issuance of a search warrant authorizing the search of SUBJECT PREMISES, as is more fully described in Attachment A, for the items set forth in Attachment B.

__/s/ Stephanie Yeager ____________________________
Stephanie Yeager, Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Sworn and subscribed before me,
this _3rd__day of December, 2021.

____/s/ Timothy R. Rice____________________________
Honorable Timothy R. Rice
United States Magistrate Judge

# Exhibit 4:

# Target Letter

**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

*Joan E. Burnes*
*Direct Dial: (215) 861-8302*
*Facsimile: (215) 861-8618*
*E-mail Address: joan.burnes@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, PA 19106-4476*
*215-861-8200*

December 13, 2021

Re: Federal Criminal Investigation

Dear Dr. Rifai:

The Department of Justice guidelines encourage prosecutors to notify individuals who are targets of federal criminal investigations. You are presently a target of a federal criminal investigation concerning among others, violations of Title 21, United States Code, Section 841 (Distribution of Controlled Substances) and 18 United States Code, Section 1347 (Healthcare Fraud).

In order to determine how best to proceed in this matter, I would like an opportunity to discuss your case with an attorney representing you. At that time, decisions regarding what charges might be filed, whether you would want to appear before the grand jury, as well as other matters could be resolved.

If you have the financial ability to retain your own attorney, please do so and have him or her contact me. If you do not have the resources to retain your own attorney, you may contact the Federal Defenders Association of Philadelphia, Federal Court Division at (215) 928-1100. In either event, please have an attorney contact me no later than December 28, 2021; otherwise this office will proceed with its investigation.

For your attorney's convenience, I can be reached at the above address or at (215) 861-8302.

Very truly yours,

JENNIFER ARBITTIER WILLIAMS
United States Attorney

***/s/ Joan E. Burnes***

Joan E. Burnes
Assistant United States Attorney

# Exhibit 5:

# AMA CPT 2016

2016

Celebrating 50 Years of cpt

# Professional Edition

# cpt®

current procedural terminology

**Your trusted source!**

The only official CPT® codebook with rules and guidelines from the AMA's CPT Editorial Panel

AMA
AMERICAN MEDICAL ASSOCIATION

# Psychiatry

Psychiatry services include diagnostic services, psychotherapy, and other services to an individual, family, or group. Patient condition, characteristics, or situational factors may require services described as being with interactive complexity. Services may be provided to a patient in crisis. Services are provided in all settings of care and psychiatry services codes are reported without regard to setting. Services may be provided by a physician or other qualified health care professional. Some psychiatry services may be reported with **Evaluation and Management Services** (99201-99255, 99281-99285, 99304-99337, 99341-99350) or other services when performed. **Evaluation and Management Services** (99201-99285, 99304-99337, 99341-99350) may be reported for treatment of psychiatric conditions, rather than using **Psychiatry Services** codes, when appropriate.

Hospital care in treating a psychiatric inpatient or partial hospitalization may be initial or subsequent in nature (see 99221-99233).

Some patients receive hospital evaluation and management services only and others receive hospital evaluation and management services and other procedures. If other procedures such as electroconvulsive therapy or psychotherapy are rendered in addition to hospital evaluation and management services, these may be listed separately (eg, hospital care services [99221-99223, 99231-99233] plus electroconvulsive therapy [90870]), or when psychotherapy is done, with appropriate code(s) defining psychotherapy services.

Consultation for psychiatric evaluation of a patient includes examination of a patient and exchange of information with the primary physician and other informants such as nurses or family members, and preparation of a report. These services may be reported using consultation codes (see **Consultations**).

(Do not report 90785-90899 in conjunction with 90839, 90840, 0364T, 0365T, 0366T, 0367T, 0373T, 0374T)

## Interactive Complexity

Code 90785 is an add-on code for interactive complexity to be reported in conjunction with codes for diagnostic psychiatric evaluation (90791, 90792), psychotherapy (90832, 90834, 90837), psychotherapy when performed with an evaluation and management service (90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350), and group psychotherapy (90853).

Interactive complexity refers to specific communication factors that complicate the delivery of a psychiatric procedure. Common factors include more difficult communication with discordant or emotional family members and engagement of young and verbally undeveloped or impaired patients. Typical patients are those who have third parties, such as parents, guardians, other family members, interpreters, language translators, agencies, court officers, or schools involved in their psychiatric care.

These factors are typically present with patients who:

- Have other individuals legally responsible for their care, such as minors or adults with guardians, or
- Request others to be involved in their care during the visit, such as adults accompanied by one or more participating family members or interpreter or language translator, or
- Require the involvement of other third parties, such as child welfare agencies, parole or probation officers, or schools.

Psychiatric procedures may be reported "with interactive complexity" when at least one of the following is present:

1. The need to manage maladaptive communication (related to, eg, high anxiety, high reactivity, repeated questions, or disagreement) among participants that complicates delivery of care.
2. Caregiver emotions or behavior that interferes with the caregiver's understanding and ability to assist in the implementation of the treatment plan.
3. Evidence or disclosure of a sentinel event and mandated report to third party (eg, abuse or neglect with report to state agency) with initiation of discussion of the sentinel event and/or report with patient and other visit participants.
4. Use of play equipment, other physical devices, interpreter, or translator to communicate with the patient to overcome barriers to therapeutic or diagnostic interaction between the physician or other qualified health care professional and a patient who:
   - Is not fluent in the same language as the physician or other qualified health care professional, or
   - Has not developed, or has lost, either the expressive language communication skills to explain his/her symptoms and response to treatment, or the receptive communication skills to understand the physician or other qualified health care professional if he/she were to use typical language for communication.

When provided in conjunction with the psychotherapy services (90832-90838), the amount of time spent by a physician or other qualified health care professional providing interactive complexity services should be reflected in the timed service code for psychotherapy (90832, 90834, 90837) or the psychotherapy add-on code performed with an evaluation and management service (90833, 90836, 90838) and must relate to the psychotherapy service only. Interactive complexity is not a factor for evaluation and management services selection (99201-99255, 99281-99285, 99304-99337, 99341-99350), except as it directly affects key components as defined in the Evaluation and Management Services Guidelines (ie, history, examination, and medical decision making).

**+ 90785** Interactive complexity (List separately in addition to the code for primary procedure)

*CPT Changes: An Insider's View* 2013

*CPT Assistant* May 13:12, Jun 13:3, Apr 14:6

(Use 90785 in conjunction with codes for diagnostic psychiatric evaluation [90791, 90792], psychotherapy [90832, 90834, 90837], psychotherapy when performed with an evaluation and management service [90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350], and group psychotherapy [90853])

(Do not report 90785 in conjunction with 90839, 90840, or in conjunction with E/M services when no psychotherapy service is also reported)

(Do not report 90785 in conjunction with 90839, 90840, 0364T, 0365T, 0366T, 0367T, 0373T, 0374T)

## Psychiatric Diagnostic Procedures

Psychiatric diagnostic evaluation is an integrated biopsychosocial assessment, including history, mental status, and recommendations. The evaluation may include communication with family or other sources and review and ordering of diagnostic studies.

Psychiatric diagnostic evaluation with medical services is an integrated biopsychosocial and medical assessment, including history, mental status, other physical examination elements as indicated, and recommendations. The evaluation may include communication with family or other sources, prescription of medications, and review and ordering of laboratory or other diagnostic studies.

In certain circumstances one or more other informants (family members, guardians, or significant others) may be seen in lieu of the patient. Codes 90791, 90792 may be reported more than once for the patient when separate diagnostic evaluations are conducted with the patient and other informants. Report services as being provided to the patient and not the informant or other party in such circumstances. Codes 90791, 90792 may be reported once per day and not on the same day as an evaluation and management service performed by the same individual for the same patient.

The psychiatric diagnostic evaluation may include interactive complexity services when factors exist that complicate the delivery of the psychiatric procedure. These services should be reported with add-on code 90785 used in conjunction with the diagnostic psychiatric evaluation codes 90791, 90792.

Codes 90791, 90792 are used for the diagnostic assessment(s) or reassessment(s), if required, and do not include psychotherapeutic services. Psychotherapy services, including for crisis, may not be reported on the same day.

(Do not report 90791-90899 in conjunction with 90839, 90840, 0364T, 0365T, 0366T, 0367T, 0373T, 0374T)

**90791** Psychiatric diagnostic evaluation

*CPT Changes: An Insider's View* 2013

*CPT Assistant* May 13:12, Jun 13:3, Dec 13:18, Jun 14:3

**90792** Psychiatric diagnostic evaluation with medical services

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jun 13:3, Dec 13:18, Jun 14:3

(Do not report 90791 or 90792 in conjunction with 99201-99337, 99341-99350, 99366-99368, 99401-99444, 0368T, 0369T, 0370T, 0371T)

(Use 90785 in conjunction with 90791, 90792 when the diagnostic evaluation includes interactive complexity services)

(90801 and 90802 have been deleted. To report diagnostic evaluations, see 90791, 90792)

(90804, 90805, 90806, 90807, 90808, 90809 have been deleted. To report, see psychotherapy codes 90832, 90834, 90837 or psychotherapy add-on codes when performed with an evaluation and management service [90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350])

(90810, 90811, 90812, 90813, 90814, 90815 have been deleted. To report interactive psychotherapy, report 90785 in conjunction with psychotherapy codes 90832, 90834, 90837 or psychotherapy add-on codes when performed with an evaluation and management service [90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350])

(90816, 90817, 90818, 90819, 90821, 90822 have been deleted. To report, see psychotherapy codes 90832, 90834, 90837 or psychotherapy add-on codes when performed with an evaluation and management service [90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350])

(90823, 90824, 90826, 90827, 90828, 90829 have been deleted. To report interactive psychotherapy, report 90785 in conjunction with psychotherapy codes 90832, 90834, 90837 or psychotherapy add-on codes when performed with an evaluation and management service [90833, 90836, 90838, 99201-99255, 99304-99337, 99341-99350])

## Psychotherapy

Psychotherapy is the treatment of mental illness and behavioral disturbances in which the physician or other qualified health care professional, through definitive therapeutic communication, attempts to alleviate the emotional disturbances, reverse or change maladaptive patterns of behavior, and encourage personality growth and development.

The psychotherapy service codes 90832-90838 include ongoing assessment and adjustment of psychotherapeutic interventions, and may include involvement of family member(s) or others in the treatment process.

Psychotherapy times are for face-to-face services with patient and/or family member. The patient must be present for all or some of the service. For family psychotherapy without the patient present, use 90846. In reporting, choose the code closest to the actual time (ie, 16-37 minutes for 90832 and 90833, 38-52 minutes for 90834 and 90836, and 53 or more minutes for 90837 and 90838). Do not report psychotherapy of less than 16 minutes duration. (See instructions for the usage of time in the Introduction of the CPT code set.)

Psychotherapy provided to a patient in a crisis state is reported with codes 90839 and 90840 and cannot be reported in addition to the psychotherapy codes 90832-90838. For psychotherapy for crisis, see "Other Psychotherapy."

Code 90785 is an add-on code to report interactive complexity services when provided in conjunction with the psychotherapy codes 90832-90838. The amount of time spent by a physician or other qualified health care professional providing interactive complexity services should be reflected in the timed service code for psychotherapy (90832, 90834, 90837) or the psychotherapy add-on code performed with an evaluation and management service (90833, 90836, 90838).

Some psychiatric patients receive a medical evaluation and management (E/M) service on the same day as a psychotherapy service by the same physician or other qualified health care professional. To report both E/M and psychotherapy, the two services must be significant and separately identifiable. These services are reported by using codes specific for psychotherapy when performed with evaluation and management services (90833, 90836, 90838) as add-on codes to the evaluation and management service.

Medical symptoms and disorders inform treatment choices of psychotherapeutic interventions, and data from therapeutic communication are used to evaluate the presence, type, and severity of medical symptoms and disorders. For the purposes of reporting, the medical and psychotherapeutic components of the service may be separately identified as follows:

1. The type and level of E/M service is selected first based upon the key components of history, examination, and medical decision-making.
2. Time associated with activities used to meet criteria for the E/M service is not included in the time used for reporting the psychotherapy service (ie, time spent on history, examination and medical decision making **when used for the E/M service** is not psychotherapy time). Time may not be used as the basis of E/M code selection and Prolonged Services may not be reported when psychotherapy with E/M (90833, 90836, 90838) are reported.
3. A separate diagnosis is not required for the reporting of E/M and psychotherapy on the same date of service.

**90832** Psychotherapy, 30 minutes with patient and/or family member

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jan 13:3, May 13:12, Jun 13:3, Aug 13:14, Feb 14:3, Aug 14:5

**✚ 90833** Psychotherapy, 30 minutes with patient and/or family member when performed with an evaluation and management service (List separately in addition to the code for primary procedure)

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jan 13:3, May 13:12, Jun 13:3, Aug 13:14, Aug 14:5

(Use 90833 in conjunction with 99201-99255, 99304-99337, 99341-99350)

**90834** Psychotherapy, 45 minutes with patient and/or family member

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jan 13:3, May 13:12, Jun 13:3, Aug 13:14, Jun 14:3

**✚ 90836** Psychotherapy, 45 minutes with patient and/or family member when performed with an evaluation and management service (List separately in addition to the code for primary procedure)

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jan 13:3, May 13:12, Jun 13:3, Aug 13:14

(Use 90836 in conjunction with 99201-99255, 99304-99337, 99341-99350)

**90837** Psychotherapy, 60 minutes with patient and/or family member

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jan 13:3, May 13:12, Jun 13:3, Aug 13:14, Apr 14:6

(Use the appropriate prolonged services code [99354, 99355, 99356, 99357] for psychotherapy services not performed with an E/M service of 90 minutes or longer face-to-face with the patient)

**✚ 90838** Psychotherapy, 60 minutes with patient and/or family member when performed with an evaluation and management service (List separately in addition to the code for primary procedure)

*CPT Changes: An Insider's View* 2013

*CPT Assistant* Jan 13:3, May 13:12, Jun 13:3, Aug 13:14, Feb 14:3, Apr 14:6

(Use 90838 in conjunction with 99201-99255, 99304-99337, 99341-99350)

(Use 90785 in conjunction with 90832, 90833, 90834, 90836, 90837, 90838 when psychotherapy includes interactive complexity services)

## Psychotherapy for Crisis

Psychotherapy for crisis is an urgent assessment and history of a crisis state, a mental status exam, and a disposition. The treatment includes psychotherapy, mobilization of resources to defuse the crisis and restore safety, and implementation of psychotherapeutic

**2016 Professional CPT Current Procedural Terminology Manual**

**Psychotherapy** page 583, 584

Psychotherapy is the treatment of mental illness and behavioral disturbances in which the physician or other qualified health care professional, through definitive, therapeutic communication, attempts to alleviate the emotional disturbances, reverse or change maladaptive patterns of behavior, and encourage personality growth and development.

The psychotherapy service codes 90832-90838 include ongoing assessment and adjustment of psychotherapeutic interventions, and may include involvement of family member(s) or others in the treatment process.

Psychotherapy times are for face-to-face services with patient and/or family member. The patient must be present for all or some of the service. For family psychotherapy without the patient present, use 90846.

In reporting, choose the code closest to the actual time (i.e., 16-37 minutes for 90832 and 90833, 38-52 minutes for 90834 and 90836, and 53 or more minutes for 90837 and 90838). Do not report psychotherapy of less than 16 minutes duration. (See instructions for the usage of time in the Introduction of the CPT code set.)

Psychotherapy provided to a patient in a crisis state is reported with codes 90839 and 90840 and cannot be reported in addition to the psychotherapy codes 90832- 90838. For psychotherapy for crisis, see "Other Psychotherapy"

Code 90785 is an add-on code to report interactive complexity services when provided in conjunction with the psychotherapy codes 90832-90838. The amount of time spent by a physician or other qualified health care professional providing interactive complexity services should be reflected in the timed service code for psychotherapy (90832, 90834, 90837) or the psychotherapy add-on code performed with an evaluation and management service (90833, 90836, 90838).

Some psychiatric patients receive a medical evaluation and management (E/M) service on the same day as a psychotherapy service by the same physician or other qualified health care professional. To report both E/M and psychotherapy, the two services must be significant and separately identifiable. These services are reported by using codes specific for psychotherapy when performed with evaluation and management services (90833, 90836, 90838) as add-on codes to the evaluation and management service.

Medical symptoms and disorders inform treatment choices of psychotherapeutic interventions, and data from therapeutic communication are used to evaluate the presence, type, and severity of medical symptoms and disorders; for the purposes of reporting, the medical and psychotherapeutic components of the service may be separately identified as follows:

GOVERNMENT EXHIBIT 68

1. The type and level of E/M service is selected first based upon the key components of history, examination, and medical decision making.

2. Time associated with activities used to meet criteria for the E/M service is not included in the time used for reporting the psychotherapy service (i.e., time spent on history, examination and medical decision making when used for the E/M service is not psychotherapy time). Time may not be used as the basis of E/M code selection and Prolonged Services may not be reported when psychotherapy with E/M (90833, 90836, 90838) are reported.

3. A separate diagnosis is not required for the reporting of E/M and psychotherapy on the same date of service.

# Exhibit 6:

# CPT 2012

AMA
AMERICAN MEDICAL ASSOCIATION

2012

# cpt®

current procedural terminology

## Standard Edition

**Your Trusted Source!**

The only official CPT® codebook with rules and guidelines from the AMA's CPT Editorial Panel

90808 Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 75 to 80 minutes face-to-face with the patient;

90809 with medical evaluation and management services

### Interactive Psychotherapy

90810 Individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an office or outpatient facility, approximately 20 to 30 minutes face-to-face with the patient;

90811 with medical evaluation and management services

90812 Individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an office or outpatient facility, approximately 45 to 50 minutes face-to-face with the patient;

90813 with medical evaluation and management services

90814 Individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an office or outpatient facility, approximately 75 to 80 minutes face-to-face with the patient;

90815 with medical evaluation and management services

## Inpatient Hospital, Partial Hospital or Residential Care Facility

### Insight Oriented, Behavior Modifying and/or Supportive Psychotherapy

90816 Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an inpatient hospital, partial hospital or residential care setting, approximately 20 to 30 minutes face-to-face with the patient;

90817 with medical evaluation and management services

90818 Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an inpatient hospital, partial hospital or residential care setting, approximately 45 to 50 minutes face-to-face with the patient;

90819 with medical evaluation and management services

90821 Individual psychotherapy, insight oriented, behavior modifying and/or supportive, in an inpatient hospital, partial hospital or residential care setting, approximately 75 to 80 minutes face-to-face with the patient;

90822 with medical evaluation and management services

### Interactive Psychotherapy

90823 Individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an inpatient hospital, partial hospital or residential care setting, approximately 20 to 30 minutes face-to-face with the patient;

90824 with medical evaluation and management services

90826 Individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an inpatient hospital, partial hospital or residential care setting, approximately 45 to 50 minutes face-to-face with the patient;

90827 with medical evaluation and management services

90828 Individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an inpatient hospital, partial hospital or residential care setting, approximately 75 to 80 minutes face-to-face with the patient;

90829 with medical evaluation and management services

## Other Psychotherapy

90845 Psychoanalysis

90846 Family psychotherapy (without the patient present)

90847 Family psychotherapy (conjoint psychotherapy) (with patient present)

90849 Multiple-family group psychotherapy

90853 Group psychotherapy (other than of a multiple-family group)

90857 Interactive group psychotherapy

## Other Psychiatric Services or Procedures

(For analysis/programming of neurostimulators used for vagus nerve stimulation therapy, see 95970, 95974, 95975)

90862 Pharmacologic management, including prescription, use, and review of medication with no more than minimal medical psychotherapy

90865 Narcosynthesis for psychiatric diagnostic and therapeutic purposes (eg, sodium amobarbital (Amytal) interview)

▲ 90867 Therapeutic repetitive transcranial magnetic stimulation (TMS) treatment; initial, including cortical mapping, motor threshold determination, delivery and management

(Report only once per course of treatment)

►(Do not report 90867 in conjunction with 95928, 95929, 90868, 90869)◄

▲ 90868 subsequent delivery and management, per session

Medicine

# Exhibit 7:

# Administrative

# Subpoena

**U.S. DEPARTMENT OF JUSTICE/DRUG ENFORCEMENT ADMINISTRATION**
**SUBPOENA**

In the matter of the investigation of
Case No: CK-21-2001
Subpoena No. CK-23-383930

**TO:** Dr. Muhamad Aly Rifai M.D.

**AT:** 241 North 13th Street
Easton, PA 18042

Phone: (540) 819-0313
Email: DR.RIFAI@BLUEPSYCHIATRY.ORG
FAX: (484) 898-0334

By the service of this subpoena on you by Diversion Investigator Austin T. Lastoskie who is authorized to serve it, you are hereby commanded and required to appear before Austin T. Lastoskie, an officer of the Drug Enforcement Administration, to give testimony and bring with you and produce for examination the following books, records, and papers at the time and place hereinafter set forth:

Pursuant to an investigation of violations of 21 U.S.C. Section 801 et seq., please provide the following for the time period of 05/01/2021 to 09/25/2023 for Gretchen Davis (date of birth May 5, 1971):

- Any and all medical patient records (hard copy and electronic), including but not limited to patient charts, records of examination, diagnostic tests, progress notes, prescriptions, documented patient contact, and billing and payment information

Please do not disclose the existence of this request or investigation for an indefinite time period. Any such disclosure could impede the criminal investigation being conducted and interfere with the enforcement of the Controlled Substances Act.

Please direct questions concerning this subpoena and/or responses to DI Austin T. Lastoskie, 571-362-3349.

Please complete and execute a Certification of Records and return the fully executed Certification of Records with your response.

Place and time for appearance: At 600 Arch Street Room 10224 PHILADELPHIA, PA 19106 US on the 6th day of October 2023 at 05:00 PM. In lieu of personal appearance, please email records to Austin.T.Lastoskie@DEA.gov.

Failure to comply with this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

Issued under authority of Sec. 506 of the Comprehensive Drug
Abuse Prevention and Control Act of 1970, Public Law No. 91-513
(21 U.S.C. 876)
**ORIGINAL**

HEIDI CARROLL Digitally signed by HEIDI CARROLL Date: 2023.09.26 15:54:42 -04'00'

Signature: ______________________
Heidi J Carroll
DPM

Issued this 26th day of September 2023

FORM DEA-79

**Public Law 513-91st Congress**
**2nd Session**
**H.R. 18583**
**AN ACT**

SEC. 506 (a) In any investigation relating to his functions under this title with respect to controlled substances, listed chemicals, tableting machines, or encapsulating machines, the Attorney General may subpoena witnesses, compel the attendance and testimony of witnesses, and require the production any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation. The attendance of witnesses and the production of records may be required from any place in any State or in any territory or other place subject to the jurisdiction of the United States at any designated place of hearing; except that a witness shall not be required to appear at any hearing more than 500 miles distant from the place where he was served with a subpoena. Witnesses summoned under this section shall be paid the same fees and mileage that are paid witnesses in the courts of the United States

(b) A subpoena issued under this section may be served by the person designated in the subpoena to serve it. Service upon a natural person may be made by personal delivery of the subpoena to him. Service may be made upon a domestic or foreign corporation or upon a partnership or other unincorporated association which is subject to suit under a common name, by delivering the subpoena to an officer, to a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. The affidavit of the person serving the subpoena entered on a true copy thereof by the person serving it shall be proof of service.

(c) In the case of contumacy by or refusal to obey a subpoena to any person, the Attorney General may invoke the aid of any court in the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subpoena. The court may issue an order requiring the subpoenaed person to appear before the Attorney General to produce records, if so ordered, or to give testimony touching the matter under investigation. Any failure to obey the order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in any judicial district in which such person may be found.

# Exhibit 8:

# Medicare Publication 100-08

# CMS Manual System

## Pub. 100-08 Medicare Program Integrity

Department of Health & Human Services (DHHS)
Centers for Medicare & Medicaid Services (CMS)

Transmittal 98 — Date: JANUARY 21, 2005

CHANGE REQUEST 3457

**SUBJECT: Psychotherapy Notes**

**I. SUMMARY OF CHANGES:** This change request instructs contractors not to request that a provider submit psychotherapy notes. It states that physically integrating information excluded from the definition of psychotherapy notes and protected information into one document or record does not transform the non-protected information into protected psychotherapy notes. Finally, it indicates that the provider is responsible for extracting the information needed to support that the claim is reasonable and necessary.

**NEW/REVISED MATERIAL –EFFECTIVE DATE*: February 22, 2005**
**IMPLEMENTATION DATE: February 22, 2005**

**II. CHANGES IN MANUAL INSTRUCTIONS:**
**(R = REVISED, N = NEW, D = DELETED)**

| R/N/D | CHAPTER/SECTION/SUBSECTION/TITLE |
|---|---|
| R | 3/3.4.1.2/Additional Documentation Requests (ADR) During Prepayment or Postpayment MR |
| | |
| | |

**III. FUNDING: Medicare contractors shall implement these instructions within their current operating budgets.**

**IV. ATTACHMENTS:**

| | |
|---|---|
| X | Business Requirements |
| X | Manual Instruction |
| | Confidential Requirements |
| | One-Time Notification |
| | Recurring Update Notification |

***Unless otherwise specified, the effective date is the date of service.**

# Attachment - Business Requirements

| Pub. 100-08 | Transmittal: 98 | Date: January 21, 2005 | Change Request 3457 |
|---|---|---|---|

**SUBJECT: Psychotherapy Notes**

## I. GENERAL INFORMATION

**A. Background:** The Privacy Rule in 45 CFR §164.501 defines psychotherapy notes as notes recorded by a mental health professional that document or analyze the contents of a counseling session and that are separated from the rest of a medical record. The definition of psychotherapy notes expressly excludes: Medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of diagnosis, functional status, treatment plan, symptoms, prognosis, progress, and progress to date. Physically integrating this information into protected psychotherapy notes does not automatically transform it into protected information.

**B. Policy:** This policy instructs contractors not to request that a provider submit psychotherapy notes. It states that physically integrating information excluded from the definition of psychotherapy notes and protected information into one document or record does not transform the non-protected information into protected psychotherapy notes. Finally, it indicates that the provider is responsible for extracting the information needed to support that the claim is reasonable and necessary.

**C. Provider Education:** A Medlearn Matters provider education article related to this instruction will be available at www.cms.hhs.gov/medlearn/matters shortly after the CR is released. You will receive notification of the article release via the established "Medlearn Matters" listserv. Contractors shall post this article, or a direct link to this article, on their Web site and include information about it in a listserv message within one week of the availability of the provider education article. In addition, the provider education article must be included in your next regularly scheduled bulletin. Contractors are free to supplement Medlearn Matters articles with localized information that would benefit their provider community in billing and administering the Medicare program correctly.

## II. BUSINESS REQUIREMENTS

*"Shall" denotes a mandatory requirement*
*"Should" denotes an optional requirement*

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | FI | RHHI | Carrier | DMERC | Shared System Maintainers | | | | Other |
| | | | | | | FISS | MCS | VMS | CWF | |

| Requirement Number | Requirements | Responsibility ("X" indicates the columns that apply) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | FI | RHHI | Carrier | DMERC | Shared System Maintainers | | | | Other |
| | | | | | | FISS | MCS | VMS | CWF | |
| 3457.1 | Contractors shall not request that a provider submit psychotherapy notes. | X | | X | | | | | | Program Safeguard Contractors (PSCs) performing medical review |
| 3457.2 | Contractors shall not deny a claim for a provider's refusing to submit psychotherapy notes. | X | | X | | | | | | PSCs performing medical review |
| 3457.3 | Contractors must review the claim using all supporting documentation submitted by the provider. | X | | X | | | | | | PSCs performing medical review |
| 3457.4 | Contractors shall deny the claim if the provider does not submit sufficient information to demonstrate that services were reasonable and necessary. | X | | X | | | | | | PSCs performing medical review |
| 3457.4 | Educate providers by posting the Medlearn Matters article, or a direct link to the article, on your website and include information about it in a listserv message within one week of the availability of the provider education article. In addition, the provider education article must be included in your next regularly scheduled bulletin. | X | | X | | | | | | |
| | | | | | | | | | | |

## III. SUPPORTING INFORMATION AND POSSIBLE DESIGN CONSIDERATIONS

**A. Other Instructions:** None

| X-Ref Requirement # | Instructions |
|---|---|

| | |
|---|---|
| | |

**B. Design Considerations:** None

| X-Ref Requirement # | Recommendation for Medicare System Requirements |
|---|---|
| | |

**C. Interfaces:** None

**D. Contractor Financial Reporting /Workload Impact:** None

**E. Dependencies:** None

**F. Testing Considerations:** None

## IV. SCHEDULE, CONTACTS, AND FUNDING

| | |
|---|---|
| **Effective Date*:** February 22, 2005<br>**Implementation Date:** February 22, 2005<br><br>**Pre-Implementation Contact(s):** Dan Schwartz (dschwartz2@cms.hhs.gov).<br><br>**Post-Implementation Contact(s):** Regional offices | **Medicare contractors shall implement these instructions within their current operating budgets.** |

***Unless otherwise specified, the effective date is the date of service.**

## 3.4.1.2 - Additional Documentation Requests (ADR) During Prepayment or Postpayment MR

*(Rev. 98, Issued: 01-21-05, Effective: 02-22-05, Implementation: 02-22-05)*

When contractors cannot make a coverage or coding determination based upon the information on the claim and its attachments, the contractors may solicit additional documentation from the provider by issuing an additional documentation request (ADR). *Contractors must request records related to the claim(s) being reviewed.*

Contractors must specify in the ADR the specific pieces of documentation needed (and ONLY those pieces needed) to make a coverage or coding determination.

*When reviewing documentation during medical review, contractors shall review and give appropriate consideration to all documentation that is provided. Documentation provided for pre- or post-payment medical review must support the medical necessity of the item(s) or service(s) provided.*

*The treating physician or another clinician or provider may create this documentation. This documentation may take the form of PT/OT evaluations, physician letters, other written physician evaluations, or other documents intended to record relevant information about a patient's clinical condition and treatment(s).*

*The date that an individual document was created, or the creator of a document is not the sole deciding factor in determining if the documentation supports the services billed.*

*In instances where documentation is not supported by contemporaneous information in physician progress notes, physician progress notes shall be the determining factor. In instances where documentation is provided in lieu of contemporaneous physician progress notes, contractors shall determine if the documentation is sufficient to justify coverage. If it is not, the claim shall be denied.*

### A. Development of Non-Lab Claims for Additional Documentation

If, during pre- or postpay review, a contractor chooses to send an Additional Documentation Request (ADR) regarding a non-lab targeted service, they must solicit the documentation from the **billing provider** and may solicit documentation from other entities (**third parties**) involved in the beneficiary's care. If a contractor chooses to solicit documentation from a third party, they may send the third party ADR simultaneously with the billing provider ADR. Contractors must send ADRs in accordance with the following requirements:

**BILLING PROVIDER ADRs**

- Contractors who choose to request additional documentation must solicit such information from the billing provider and must notify them that they have 30 days to respond. Contractors have the discretion to grant an extension of the timeframe upon request. The contractor must pend the claim for 45 days. Contractors may cc a third party.
- Contractors have the discretion to issue no more than 2 "reminder" notices via letter or phone call prior to the 45th day.
- If information is automatically requested only from the billing provider and no response is received within 45 days after the date of the request (or extension), the contractor must deny the service as not reasonable and necessary (except for ambulance claims where the denial may be based on §1861(s)(7) or §1862(a)(1)(A) of the Act depending upon the reason for the requested information). This would count as automated review.
- If information is requested **only** from the **billing provider** and the information received fails to support the coverage or coding of the claim, in full or in part, the contractor must deny the claim, in full or in part, using the appropriate denial code (see section 4.2). This would count as a complex review.

**THIRD PARTY ADRs**

A contractor may NOT solicit documentation from a **third party** unless the contractor first or simultaneously solicits the same information from the **billing provider**. Beneficiaries are not third parties.

When a contractor solicits documentation from a third party:

- The contractor must notify the third party that they have 30 days to respond and copy the billing provider. Contractors have the discretion to grant extensions of the timeframe upon request.
- For prepay review, the contractor must pend the claim for 45 days. This 45 day time period may run concurrent with the 45 day time period for the billing provider ADR letter;
- Contractors have the discretion to issue no more than 2 "reminder" notices via email, letter or phone call prior to the 45th day;
- If information is requested from **both** the billing provider and a third party and no response is received from either within 45 days after the date of the request (or extension), the contractor must deny the claim, in full or in part, as *not* reasonable and necessary. This would count as automated review.
- If information requested from **both** the billing provider and a third party and a response is received from one or both, but the information fails to support the coverage or coding of the claim, the contractor must deny the claim, in full or in part, using appropriate denial code (see section 3.4.2).

## B. Development of Lab Claims for Additional Documentation

Effective November 25, 2002, contractors shall develop lab claims in accordance with the following requirement:

- If, during pre- or postpay review, a contractor chooses to send an ADR regarding a targeted lab service, they must solicit the documentation from the billing provider, and under certain circumstances, must also solicit documentation from the ordering provider.

Contractors must send ADRs in accordance with the following requirements:

**Billing Provider ADRs**

- Contractors who choose to request additional documentation must solicit such information from the **billing provider** and must notify them that they have 30 days to respond. Contractors have the discretion to grant an extension of the time frame upon request. For prepay review, the contractor must pend the claim for 45 days. **Contractors may solicit billing providers only for the following information**:
    - Documentation of the order for the service billed (including information sufficient to allow the contractor to identify and contact the ordering provider);
    - Documentation showing accurate processing for the order and submission of the claim; and
    - Diagnostic or other medical information supplied to the billing provider by the ordering provider, including any ICD-9 codes or narratives supplied.
- Contractors have the discretion to issue no more than 2 "reminder" notices via letter, e-mail, or phone call prior to the 45th day;
- If no response is received from the billing provider within 45 days after the date of the request (or extension), the contractor must deny the service as not reasonable and necessary. This would count as automated review;
- If a response is received that demonstrates that the service is not covered or correctly coded, the contractor must deny. *This would count as complex review;*
- If the information requested from the **billing provider** is received, does not demonstrate noncoverage or incorrect coding of the claim, but fails to support the coverage or coding of the claim in full or in part, the contractor must:
    - Deny the claim if a benefit category, statutory exclusion, or coding issue is in question, or;
    - Develop to the ordering provider in accordance with the requirements listed below if a reasonable and necessary issue is in question.

**Ordering Provider ADRs**

A contractor may NOT solicit documentation from the ordering provider unless the contractor:

1) Solicits information from the **billing provider,**

2) Finds the ADR response from the billing provider insufficient or not provided, and

3) The issue in question is one of medical necessity. Contractors may implement these requirements to the extent possible without shared systems changes.

When a contractor solicits documentation from the ordering provider the contractor must provide to the ordering provider information sufficient to identify the claim being reviewed.

- The contractor must solicit from the ordering provider those parts of the medical record that are relevant to the specific claim(s) being reviewed. The contractor must notify the ordering provider that they have 30 days to respond and copy the billing provider. Contractors have the discretion to grant extensions of the time frame upon request.
- For prepay review, the contractor must pend the claim for 45 days.
- Contractors have the discretion to issue no more than 2 "reminder" notices via email, letter or phone call prior to the 45th day.
- If information is requested from the ordering provider and no response is received within 45 days after the date of the request (or extension), the contractor must deny the claim, in full or in part, as not reasonable and necessary. This would count as automated review.
- If the information requested from the ordering provider is received, but the information fails to support the coverage or coding of the claim, the contractor must deny the claim, in full or in part, using appropriate denial code (see section 3.4.2). This would count as a complex review.

***C. Psychotherapy Notes***

*Psychotherapy notes are defined in 45 CFR §164.501as "notes recorded by a mental health professional which document or analyze the contents of a counseling session and that are separated from the rest of a medical record." The definition of psychotherapy notes expressly* ***excludes*** *medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of diagnosis, functional status, treatment plan, symptoms, prognosis, progress, and progress to date. Physically integrating information excluded*

*from the definition of psychotherapy notes and protected information into one document or record does not transform the non-protected information into protected psychotherapy notes.*

*Under no circumstances shall a contractor request a provider to submit notes defined in 45 CFR §164.501. The refusal of a provider to submit such information shall not result in the denial of a claim.*

*If the medical record includes any of the information excluded from the definition of psychotherapy notes in §164.501, as stated above, the provider is responsible for extracting the information required to support that the claim is reasonable and necessary. Contractors must review the claim using all supporting documentation submitted by the provider. If the provider does not submit sufficient information to demonstrate that services were medically necessary, the claim will be denied.*

BLUE MOUNTAIN PSYCHIATRY

PO Box 1360
Easton PA 18044-1360
Phone: 610-253-2500
Fax: 888-972-2853
www.bluepsychiatry.org

December 21, 2024

Carrie Adamowski
Media Contact
United States Attorney Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

**Re; United States of America v Muhamad Aly Rifai 5:22-cr-00390-JLS**
**Request for Information Removal**
Website publication dated November 14, 2022

https://www.justice.gov/usao-edpa/pr/lehigh-valley-psychiatrist-charged-stealing-medicare-through-improper-billing-scheme

**Background**

On October 11, 2024 I wrote to the United States Attorney's Office for the Eastern District of Pennsylvania asking for the removal of the press release dated November 14, 2022 referenced above, in accordance with Section 515 of Public Law 106-554 (OMB Memorandum M-19-15 ), known as the Information Quality Act, which requires agencies to maximize the quality, objectivity, utility, and integrity of information disseminated to the public, and define mechanisms for redress by affected parties, where appropriate.

On October 28, 2024, United States Attorney's Office for the Eastern District of Pennsylvania responded that an update was added to the press release without removing it in its entirety as requested "UPDATE - On May 9, 2024, a federal jury acquitted Dr. Muhamad Aly Rifai of the charges alleged in the indictment described in the press release below".

The original press release, published on November 14, 2022, and the updated version are in violation of the Department of Justice Policy on Confidentiality and Media Contact as outlined in the Justice Manual section 1-7. Specifically, the text of the press release unambiguously violates the Justice Manual which "sets forth Internal Department of Justice Policies and Procedures" Section 1-1.100. https://www.justice.gov/jm/jm-1-1000-introduction

*The removal of the Press Release in its entirety is the only available remedy to stop the defamatory injury and harm created by the press release since it was made public on November 14, 2022 and its revision on October 28, 2024.*

**Statement**

The original press release, published on November 14, 2022, and its updated version released October 28, 2024, violates The United Stated Department of Justice Manual "Justice Manual" sections 1-7.400, 1-7.500, 1-7.610, 1-7.310 and 1-7.710. as I will outline in detail below. The press release in its original and updated versions violated section 1-7.500 on Disclosure of Information; "A news release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty". The original press release, published on November 14, 2022, and its updated version released October 28, 2024 does not contain such statement.

Second, the press release in its original and updated versions violated section 1-7.610 of the Justice Manual on Concerns of Prejudice as the press release contains "observation about a defendant or party Character" and "Opinions as to the Defendant's guilt". Third, the press release in its original and updated versions violated section1-7.310 of the Justice Manual on United States Attorneys as the "United States Attorney with exercise discretion and sound Judgement with this Policy". It is clear to any independent arbiter from the text of the original and updated release that no discretion or sound judgement was exercised in the drafting of the press release and its update.

Last, the press release in its original and updated versions violated section 1-7.400 of the Justice Manual as "DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations. Except as provided in subparagraph C of this section, DOJ personnel shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress before charges are publicly filed.". The press release in its original and updated form creates an *eternal* investigation status of Muhamad Aly Rifai, MD and Blue Mountain Psychiatry.

1) **The United States Attorney Office of the Eastern District of Pennsylvania egregiously and blatantly violated Justice Manual section 1-7.500 causing continuous harmful and irreparable injury to the reputation of Muhamad Aly Rifai and Blue Mountain Psychiatry.**

Section1-7.500 of The Justice Manual clearly states:

1-7.500-Release of Information in Criminal, Civil, and Administrative Matters—Disclosable Information
A news release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty.

This statement is suspiciously and blatantly missing from the press release made public on November 14, 2022 and its revised version on October 28, 2024. This action is discriminatory and intentional on the part of the office of the United States Attorney for the Eastern District of Pennsylvania. This action creates a defamatory injury as the United States Government presumed the guilt of Defendant Muhamad Aly Rifai in violation of the United States Supreme Court precedent in Coffin v. United States of America 156 U.S. 432 (1895). The Supreme Court stated that the presumption of innocence in criminal cases is "axiomatic and elementary".

Muhamad Aly Rifai, MD was deprived of the right of presumption of innocence as it was transmitted to the public and the statement about the presumption of innocence was missing from the press release on November 14, 2022 and its revised version updated on 10/28/2024. The omission of the statement about the presumption of innocence of Muhamad Aly Rifai was not an error or an oversight but was a malicious, intentional and a discriminatory act toward a Muslim and Middle Eastern physician who is a pilar of the Lehigh Valley Community in the Eastern District of Pennsylvania. https://www.mcall.com/2018/05/18/newsmaker-muhamad-aly-rifai-doctor-and-researcher/

For example, a press release from of the office of the United States Attorney for the Eastern District of Pennsylvania on November 4, 2022 "SEPTA Video Surveillance Manager, Equipment Vendor Indicted for Extensive Bribery and Extortion Scheme" contains the following statement: "An indictment, information, or criminal complaint is an accusation. A defendant is presumed innocent unless and until proven guilty". https://www.justice.gov/usao-edpa/pr/septa-video-surveillance-manager-equipment-vendor-indicted-extensive-bribery-and

In another example from the office of the United States Attorney for the Eastern District of Pennsylvania. the same day November 4, 2022 and 10 days prior to the publication of the defamatory press release about Muhamad Aly Rifai, MD another press release published on November 4, 2022 "Philadelphia Man Indicted for Stalking and Nearly Blinding Ex-Girlfriend in Broad Daylight Attack " contains the following statement;: "An indictment, information, or criminal complaint is an accusation. A defendant is presumed innocent unless and until proven guilty".

https://www.justice.gov/usao-edpa/pr/philadelphia-man-indicted-stalking-and-nearly-blinding-ex-girlfriend-broad-daylight

Hence, the removal of the Press Release in its entirety is the only available remedy to stop the defamatory injury and irreparable harm created by the press release since it was made public on November 14, 2022 and its revision on October 28, 2024.

2) **The Office of the United States Attorney for the Eastern District of Pennsylvania egregiously and blatantly violated Justice Manual section 1-7.310 causing continuous harmful and irreparable defamatory injury to the reputation of Muhamad Aly Rifai and Blue Mountain Psychiatry.**

Section1-7.310 of The Justice Manual clearly states:

1-7.310 - United States Attorneys

Each of the 93 United States Attorneys will exercise discretion and sound judgment, consistent with this Policy, as to matters affecting their own district, but must coordinate their news media contacts with OPA in cases that transcend their district or are of national importance. The United States Attorney has responsibility for all matters involving the local media.

The office of the United States Attorney for the Eastern District of Pennsylvania did not exercise discretion nor sound judgement when it did not follow the policies of the Justice Department as outlined in the Justice Manual section 1-7 on Confidentiality and Media Contact.

The office of the United States Attorney for the Eastern District of Pennsylvania did not take responsibility for denying Muhamad Aly Rifai the right to a presumption of innocence. The office of the United States Attorney for the Eastern District of Pennsylvania released statements to the local media about the definitive guilt of Muhamad Aly Rifai and did not exercise sound judgement to afford Muhamad Aly Rifai the presumption of innocence. https://www.lehighvalleylive.com/news/2022/11/easton-psychiatrist-billed-medicare-for-treating-dead-patients-in-1m-fraud-scheme-feds-say.html

Furthermore, the office of the United States Attorney for the Eastern District of Pennsylvania did not exercise sound judgement in correcting the misinformation disseminated by its defamatory and injurious press releases on 11/14/2022 and 10/28/2024. Despite Media requests for comments and clarification "the U.S. Attorney spokeswoman Carrie Adamowski confirmed the verdict but declined to comment on it" as reported by Rudy Miller from Lehigh Valley Live who contacted the Media Contact in the of the United States Attorney for the Eastern District of Pennsylvania. https://www.lehighvalleylive.com/news/2024/05/jury-clears-easton-psychiatrist-of-1m-heath-care-fraud-allegation.html

Therefore, the removal of the Press Release in its entirety is the only available remedy to stop the defamatory injury and harm created by the press release since it was made public on November 14, 2022 and its revision on October 28, 2024.

3) **The United States Attorney Office of the Eastern District of Pennsylvania egregiously and blatantly violated Justice Manual section 1-7.610 causing significant prejudice and continuous harmful and irreparable injury to the reputation of Muhamad Aly Rifai and Blue Mountain Psychiatry.**

Section1-7.610 of The Justice Manual clearly states:

1-7.610 - Concerns of Prejudice

Because the release of certain types of information could prejudice an adjudicative proceeding, DOJ personnel should refrain from disclosing the following, except as appropriate in the proceeding or in an announcement after a finding of guilt:

A. Observations about a defendant's or party's character;............

F. Any opinion as to the defendant's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea to a lesser offense.

The office of the United States Attorney for the Eastern District of Pennsylvania titled the press release on 11/14/2022 "Lehigh Valley Psychiatrist Charged With Stealing From Medicare Through Improper Billing Scheme" and included in its text that "the defendant was a licensed psychiatrist who was the sole owner of Blue Mountain Psychiatry". These statements are inaccurate, defamatory and impugned the character of Muhamad Aly Rifai, MD and implied an opinion about his guilt in violation of the Department of Justice Policy 1-7.610 about the Concerns of Prejudice.

Merriam-Webster Dictionary defines https://www.merriam-webster.com/dictionary/steal the word stealing as "to take the property of another wrongfully and especially as a habitual or regular practice". Yet at the core of the presumption of innocence is the lack of the veracity of the unproven allegations in the press release and that defendant Muhamad Aly Rifai, MD acted appropriately and did not steal from Medicare.

Merriam-Webster Dictionary also defines the term "was" as "past tense first- and third-person singular of be" https://www.merriam-webster.com/dictionary/was#dictionary-entry-1. The use of the language "the Defendant was a licensed psychiatrist" implies that as a results of these unproven allegation for which the presumption of innocence was denied, Muhamad Aly Rifai, MD ceased to be a licensed psychiatrist. This language not only violates the Justice Manual guidelines but also Section 515 of Public Law 106-554 the Information Quality Act. This is a false and defamatory statement as confirmed by the listings on the website of the Commonwealth of Pennsylvania, Department of State indicating that at no time was the medical license of Muhamad Aly Rifai, MD encumbered in any way by the false allegations by the office of the United States Attorney of the Eastern District of Pennsylvania.

The use of such language clearly violated the Justice Manual Policy on Confidentiality and Media Contacts. The characterization of the language used in the press release published on 11/14/2022 and its modified version on 10/28/2024 as inappropriate and false is derived from the Supreme Court of The United States of America utilizing the Dictionaries more than 600 times in its decisions to define language and what is means. It would be up to an independent factfinder to opine whether the use of this language in this press release clearly violates articulated policies in the Justice Manual and other pertinent laws and statutes in the United States and the Commonwealth of Pennsylvania.

Certainly, these facts support the removal of the Press Release in its entirety as the only available remedy to stop the defamatory injury and harm created by the press release since it was made public on November 14, 2022 and its revision on October 28, 2024.

4) **The United States Attorney Office of the Eastern District of Pennsylvania egregiously and blatantly violated Justice Manual section 1-7.310 causing continuous harmful and irreparable injury to the reputation of Muhamad Aly Rifai and Blue Mountain Psychiatry.**

Section1-7.610 of The Justice Manual clearly states:

1-7.400 - Disclosure of Information Concerning Ongoing Criminal, Civil, or Administrative Investigations

Any communication by DOJ personnel with a member of the media relating to a pending investigation or case must be approved in advance by the appropriate United States Attorney or

Assistant Attorney General, or their designee, except in emergency circumstances. For administrative investigations not overseen by a United States Attorney or Assistant Attorney General, approval must be obtained from the Assistant Attorney General for Administration, or their designee. Where the investigation is being handled by the Office of the Inspector General, approval must come from the Inspector General, or their designee. Obtaining information from or related to the news media is covered by the Department's news media policy, 28 C.F.R. § 50.10.

DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations. Except as provided in subparagraph C of this section, DOJ personnel shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress before charges are publicly filed.

When the community needs to be reassured that the appropriate law enforcement agency is investigating a matter, or where release of information is necessary to protect the public safety, comments about or confirmation of an ongoing investigation may be permissible, subject to the approval requirement in subparagraph A.

An investigating agency may not disclose to a member of the news media or general public its recommended charging decision in a criminal case without the approval of the appropriate United States Attorney or Assistant Attorney General overseeing the prosecution of the case, or their designee.

The press release published by the Office of the United States Attorney for the Eastern District of Pennsylvania on 11/14/2022 and it modified version on 10/28/2024 states "If the public has any information regarding Blue Mountain Psychiatry or any other health care fraud allegation, individuals should contact the HHS-OIG hotline at 800-HHS-TIPS". The press release in its original and updated form creates an eternal investigation status of Muhamad Aly Rifai, MD and Blue Mountain Psychiatry. These statements, not only violates the Regulations in the Justice Manual, but also contradict the public Statement by the United States Department of Justice on "Transparency in Criminal Division Prosecutions" https://www.justice.gov/opa/blog/transparency-criminal-division-enforcement

It therefore, serves the principles of Justice that the removal of the Press Release in its entirety is the only available remedy to stop the defamatory injury and harm created by the press release since it was made public on November 14, 2022 and its revision on October 28, 2024.

5) **The United States Attorney Office of the Eastern District of Pennsylvania egregiously and blatantly violated Justice Manual section 1-7.710 causing continuous harmful and irreparable injury to the reputation of Muhamad Aly Rifai and Blue Mountain Psychiatry.**

1-7.710 - Assisting the News Media

DOJ personnel shall not prevent lawful efforts by the news media to record or report about a matter, unless by reason of a court order. DOJ personnel may enforce access restrictions that apply to all persons, such as a crime scene perimeter.

In order to promote the aims of law enforcement, including the deterrence of criminal conduct and the enhancement of public confidence, DOJ personnel, with the prior approval of the appropriate United States Attorney or Assistant Attorney General, may assist the news media in recording or reporting on a law enforcement activity. The United States Attorney or Assistant Attorney General shall consider, among other things, whether such assistance would:

1. Unreasonably endanger any individual;
2. Prejudice the rights of any person; or
3. Be otherwise proscribed by law.

Here again the office of the United States Attorney for the Eastern District of Pennsylvania in its press on 11/14/2022 and its modified version on 10/28/2024 violates The United Stated Department of Justice Manual "Justice Manual" sections 1-7.400, 1-7.500, 1-7.610, 1-7.310 as well as 1-7.710. The statements in the press release are inaccurate, defamatory and impugned the character of Muhamad Aly Rifai, MDand implied an opinion about his guilt in violation of the Department of Justice Policies 1-7.610 and 1-7.710 about the Concerns of Prejudice. This causes significant harm to the reputation of Muhamad Aly Rifai as an exemplary physician with an international reputation. https://en.wikipedia.org/wiki/Muhamad_Aly_Rifai

**Requestor contact information:**

Muhamad Aly Rifai, MD
Blue Mountain Psychiatry
241 North 13th Street Easton PA 18042
Phone: 540-819-0313, Fax 888-972-2853
Email: Dr.Rifai@bluepsychiatry.org

**Specific description of information to Remove:**

Website publication dated November 14, 2022

https://www.justice.gov/usao-edpa/pr/lehigh-valley-psychiatrist-charged-stealing-medicare-through-improper-billing-scheme

**Explanation of noncompliance with DOJ Policies;**

The publication on the website of the DOJ USAO EDPA is incorrect or fails to meet either the OMB or the DOJ information quality guidelines. Furthermore this publication violates the Department of Justice Policies as outlined in the Justice Manual sections 1-7.400, 1-7.500, 1-7.610, 1-7.310 as well as 1-7.710

**Explanation of the impact of the error.**

On May 9, 2024, a jury trial found that the allegations by DOJ and OIG-HHS were unfounded, and a jury found the Lehigh Valley Psychiatrist Muhamad Aly Rifai, MD NOT GUILTY of all charges making the allegation in this information release false.
The information of the release is therefore not correct
https://www.justice.gov/usao-edpa/pr/lehigh-valley-psychiatrist-charged-stealing-medicare-through-improper-billing-scheme

These statements caused a significant loss in reputation and income for Muhamad Aly Rifai, MD and Blue Mountain Psychiatry

**Recommendation and justification for how the information will be corrected –**

The release is incorrect and therefore needs to be removed in compliance with OMB Memorandum M-19-15

**Supporting documentary evidence**

Recorded court order and Jury Decision on May 9, 2024, from the Eastern District of Pennsylvania attached. This information can also be verified through the Public Court case Docket at pacer. Comparative Press Release Versions

I request the information be removed and the unfounded allegations that were proven incorrect in a jury trial be corrected in a Public Press Release.

M. Aly Rifai

Muhamad Aly Rifai, MD, FACP, FAPA, FACLP
Board Certified in Internal Medicine, Psychiatry, Consultation Psychiatry and Addiction Medicine
President 2018-2020 Lehigh Valley Psychiatric Society
President CEO, Chief Psychiatrist; Blue Mountain Psychiatry

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :

v. : NO. 22-CR-390

MUHAMAD ALY RIFAI :

**ORDER**

AND NOW this 9th day of May, 2024, the Verdict of the jury is hereby recorded as NOT GUILTY on Counts 1 through 4.

**BY THE COURT:**

/s/ Jeffrey L. Schmehl

JEFFREY L. SCHMEHL, J.

PRESS RELEASE

# Lehigh Valley Psychiatrist Charged With Stealing From Medicare Through Improper Billing Scheme

Monday, November 14, 2022

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Pennsylvania

PHILADELPHIA – United States Attorney Jacqueline C. Romero announced that Muhamad Aly Rifai, 49, of Easton, PA, was charged by Indictment with four counts of healthcare fraud stemming from his alleged scheme to improperly and fraudulently bill the federal Medicare program for services not provided, or not provided at the level which was claimed.

According to the Indictment, the defendant was a licensed psychiatrist who was the sole owner of Blue Mountain Psychiatry, a psychiatry practice with offices located in Easton, Palmerton, and Stroudsburg, Pennsylvania. The Indictment alleges that for several years, Rifai routinely and improperly billed Medicare for services which he did not provide to Medicare beneficiaries and nursing home patients, including billing for treating dead beneficiaries; billing for treating the same patient at the same time at different nursing homes; and billing for providing more than 24 hours' worth of services to patients on a single day.

The Indictment further alleges that the defendant routinely billed for higher levels of care than he or his staff provided to nursing home patients. According to the Indictment, despite not having actually seen the patient, Rifai added a pre-printed stamp to medical progress notes to support billing for psychological and add-on services which were not provided by his staff. From about January 2015 until October 2022, Rifai, through Blue Mountain, obtained Medicare payments of at least approximately $1.36 million based on fraudulent claims.

The defendant made an initial appearance in federal court on these charges before U.S. Magistrate Judge Richard Lloret.

If the public has any information regarding Blue Mountain Psychiatry or any other health care fraud allegation, individuals should contact the HHS-OIG hotline at 800-HHS-TIPS.

If convicted, the defendant faces a maximum possible sentence of 40 years in prison, and a fine of up to $1 million.

The case was investigated by the Office of Inspector General, U.S. Department of Health and Human Services, and is being prosecuted by Assistant United States Attorney Joan E. Burnes.

Contact
UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF PENNSYLVANIA
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

JENNIFER CRANDALL
Media Contact
215-861-8300

Follow @USAO_EDPA on Twitter to get the most up-to-date information about big cases and community news.

*Updated November 14, 2022*

Topic

HEALTH CARE FRAUD

PRESS RELEASE

# UPDATED//Lehigh Valley Psychiatrist Charged With Stealing From Medicare Through Improper Billing Scheme

Monday, November 14, 2022

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Pennsylvania

UPDATE

On May 9, 2024, a federal jury acquitted Dr. Muhamad Aly Rifai of the charges alleged in the indictment described in the press release below.

PHILADELPHIA – United States Attorney Jacqueline C. Romero announced that Muhamad Aly Rifai, 49, of Easton, PA, was charged by Indictment with four counts of healthcare fraud stemming from his alleged scheme to improperly and fraudulently bill the federal Medicare program for services not provided, or not provided at the level which was claimed.

According to the Indictment, the defendant was a licensed psychiatrist who was the sole owner of Blue Mountain Psychiatry, a psychiatry practice with offices located in Easton, Palmerton, and Stroudsburg, Pennsylvania. The Indictment alleges that for several years, Rifai routinely and improperly billed Medicare for services which he did not provide to Medicare beneficiaries and nursing home patients, including billing for treating dead beneficiaries; billing for treating the same patient at the same time at different nursing homes; and billing for providing more than 24 hours' worth of services to patients on a single day.

The Indictment further alleges that the defendant routinely billed for higher levels of care than he or his staff provided to nursing home patients. According to the Indictment, despite not having actually seen the patient, Rifai added a pre-printed stamp to medical progress notes to support billing for psychological and add-on services which were not provided by his staff. From about January 2015 until October 2022, Rifai, through Blue Mountain, obtained Medicare payments of at least approximately $1.36 million based on fraudulent claims.

The defendant made an initial appearance in federal court on these charges before U.S. Magistrate Judge Richard Lloret.

If the public has any information regarding Blue Mountain Psychiatry or any other health care fraud allegation, individuals should contact the HHS-OIG hotline at 800-HHS-TIPS.

If convicted, the defendant faces a maximum possible sentence of 40 years in prison, and a fine of up to $1 million.

The case was investigated by the Office of Inspector General, U.S. Department of Health and Human Services, and is being prosecuted by Assistant United States Attorney Joan E. Burnes.

Contact
UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF PENNSYLVANIA
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

JENNIFER CRANDALL
Media Contact
215-861-8300

PRESS RELEASE

# Philadelphia Man Indicted for Stalking and Nearly Blinding Ex-Girlfriend in Broad Daylight Attack

Friday, November 4, 2022

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Pennsylvania

PHILADELPHIA – United States Attorney Jacqueline C. Romero announced that Victor Ortiz, 45, of Philadelphia, PA, was arrested and charged by Indictment for stalking and assaulting a woman with whom he had a previous relationship.

According to the Indictment, on the morning of May 4, 2022, the defendant pursued the victim, who is his ex-girlfriend and a federal employee, as she walked to her office in Philadelphia. Before reaching her office, the defendant allegedly threw a caustic substance on victim's face and torso. His attack temporarily blinded the victim in her left eye and caused severe pain and scarring on her body. Additionally, the defendant attached a GPS device to the victim's vehicle so that he could monitor her location and stalk her. After law enforcement officials discovered and removed the device, the defendant was caught on camera allegedly attempting to install a second GPS device on the victim's vehicle in July 2022.

"The charges against Victor Ortiz allege behavior that is dangerous, terrorizing and abhorrent," said U.S. Attorney Romero. "Everyone deserves to feel safe as they go about their daily lives: at home, while at work, and in transit; and intimate partner violence can sometimes be the most terrifying kind because someone who knows you well can strike any part of your routine. Thank you to our partners with Homeland Security Investigations for their dedicated work on this case."

"Threats and violence against federal employees will never be tolerated," said William S. Walker, Special Agent in Charge of HSI's Philadelphia office. "HSI Philadelphia is committed to utilizing our investigative expertise, technical capabilities and partnerships to investigate and pursue the prosecution of those who threaten, harm or intimidate government officers or employees."

If convicted, the defendant faces a maximum possible sentence of 40 years in prison.

The case was investigated by Homeland Security Investigations, and is being prosecuted by Assistant United States Attorneys Michael R. Miller and Angella Middleton.

An indictment, information, or criminal complaint is an accusation. A defendant is presumed innocent unless and until proven guilty.

Contact

UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF PENNSYLVANIA
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

JENNIFER CRANDALL
Media Contact
215-861-8300

Follow @USAO_EDPA on Twitter to get the most up-to-date information about big cases and community news.

Updated November 4, 2022

Topic

VIOLENT CRIME

PRESS RELEASE

# SEPTA Video Surveillance Manager, Equipment Vendor Indicted for Extensive Bribery and Extortion Scheme

Friday, November 4, 2022

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Pennsylvania

PHILADELPHIA - United States Attorney Jacqueline C. Romero announced that James Stevens, 69, of Somerdale, NJ, and Robert Welsh, 59, now living in Arizona, were charged by Indictment with conspiracy, bribery, extortion, and fraud charges related to a scheme to pay off Stevens in exchange for Stevens helping grow the businesses of Welsh. Welsh's business installed, maintained, and supplied video surveillance equipment to the Southeastern Regional Transportation Authority (SEPTA), and Stevens was a SEPTA official responsible for video surveillance operations at SEPTA.

According to the Indictment, from about March 2014 until about July 2018, the defendants allegedly engaged in a bribery and extortion scheme in which Stevens, who was the Director of the Video Evidence Unit with SEPTA during the time period of the charged conduct, demanded from Welsh, owner and operator of Spector Logistics, Inc., a stream of financial and other benefits in exchange for Stevens' role in helping maintain and grow Spector's business with SEPTA. The benefits Welsh provided to Stevens included, most significantly, tens of thousands of dollars in cash payments, as well as donations to an alleged charity that Stevens pocketed, lodging and meals during the 2015 Papal Visit, frequent meals and drinks, tickets to a 2016 Barbra Streisand concert, and funds for SEPTA annual holiday parties. As Stevens demanded, Welsh also offered Stevens future employment with Spector when Stevens retired from SEPTA. During the time of this corrupt relationship, Spector maintained and obtained millions of dollars in contracts with SEPTA. Stevens played a significant role in facilitating and approving contracts for Spector and Blue Zebra, a second company Welsh owned and established with Stevens' assistance, and helped Spector win bids by giving Welsh inside information about SEPTA's financial analyses and otherwise collaborating with Welsh in the contracting process. In doing so, Stevens allegedly provided an unfair advantage to Welsh and a disadvantage to other potential vendors.

"Philadelphians deserve public employees who do their jobs honestly, without corrupting the system to line their own pockets," said U.S. Attorney Romero. "As alleged in the Indictment, the defendants' participation in this scheme was extensive: using millions of dollars in public contracts to fraudulently benefit themselves."

"SEPTA exists to transport people where they want to go — not to move crooked insiders up a tax bracket," said Jacqueline Maguire, Special Agent in Charge of the FBI's Philadelphia Division. "Stealing public money through back-door deals is reprehensible and the FBI will hold accountable anyone foolish enough to engage in this kind of fraud."

The case was investigated by the Federal Bureau of Investigation, and is being prosecuted by Assistant United States Attorney Louis D. Lappen.

An indictment, information, or criminal complaint is an accusation. A defendant is presumed innocent unless and until proven guilty.

Contact
UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF PENNSYLVANIA
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

JENNIFER CRANDALL
Media Contact
215-861-8300

Follow @USAO_EDPA on Twitter to get the most up-to-date information about big cases and community news.

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL EXPRESS

Retail

U.S. POSTAGE PAID
PME
EASTON, PA 18042
FEB 08, 2025

18101

$31.40

RDC 07

S2324P507124-05

# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EI 229 195 621 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE 610 253 2500

M. Aly Rifai, MD
Blue Mountain Psychiatry
241 North 13th Street
Easton PA 18042

DELIVERY OPTIONS (Customer Use Only)

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options

☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

Clerk of Court EDPA
504 W Hamilton Street
Allentown PA

ZIP + 4® (U.S. ADDRESSES ONLY) 18101-

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PAYMENT BY ACCOUNT (if applicable)

USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No.

REC'D FEB 11 2025

ORIGIN (POSTAL SERVICE USE ONLY)

☐ 1-Day ☑ 2-Day ☐ Military ☐ DPO

| | | |
|---|---|---|
| PO ZIP Code: 18042 | Scheduled Delivery Date (MM/DD/YY): 2/10/25 | Postage: $ 31.40 |
| Date Accepted (MM/DD/YY): 2/8/25 | Scheduled Delivery Time: ☐ 6:00 PM | Insurance Fee: $ |
| | | COD Fee: $ |
| Time Accepted: 11:51 ☑ AM ☐ PM | | Return Receipt Fee: $ |
| | | Live Animal Transportation Fee: $ |
| Special Handling/Fragile: $ | Sunday/Holiday Premium Fee: $ | Total Postage & Fees: $ 31.40 |
| Weight: 1 lbs. 5.0 ozs. ☐ Flat Rate | Acceptance Employee Initials: BE | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| | ☐ AM ☐ PM | |

LABEL 11-B, MAY 2021 PSN 7690-02-000-9996

PEEL FROM THIS CORNER

UNITED STATES POSTAL SERVICE®

This package is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.